# PURCHASE AND SALE AGREEMENT

**by and among**

**Gajan A. Mahendiran and Amudha Mahendiran,**

**as Buyer,**

**and**

**TRXADE GROUP, INC.,**

**as Seller**



Exhibit "A"

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of December 31, 2016 (the "**Agreement Date**"), is entered into by and among Gajan A. Mahendiran and Amudha Mahendiran (collectively the "**Buyer**"), and TRXADE GROUP, INC., a Delaware corporation ("**Seller**"). Buyer and Seller are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties.**"

WHEREAS, Seller owns one hundred percent (100%) of all Ownership Interests (the "**Seller's Equity Interest")** in Westminster Pharmaceuticals, LLC, a Delaware limited liability company ("**Westminster**"), which is in the wholesale and private label pharmaceutical distribution business (the "**Business**");

WHEREAS, Seller, Buyer and Westminster entered into a Convertible Promissory Note Purchase Agreement in October 2015, and as amended in June 2016 (the "**Note Purchase Agreement**"), together with multiple Note Agreements and various exhibits attached thereto (collectively, the "**Notes**"), for an aggregate principal amount of $1,500,000, as evidenced by a Note Purchase Agreement and Notes, copies of which are attached hereto as **Exhibit B** and made a part hereof; and together with together with certain warrant agreements to purchase an aggregate of 510,001 shares of Common Stock of the Parent at $0.01 per share, which have been exercised and are now issued and outstanding shares of Common Stock of Parent (the "**Issued Shares**").

WHEREAS, subject to the terms and conditions hereof, Seller desires to sell to Buyer the Seller's Equity Interest in Westminster and Buyer wishes to purchase such Seller's Equity Interest from Seller.

NOW, THEREFORE, intending to be legally bound, and in consideration of the promises and the mutual representations, warranties, covenants and agreements contained in this Agreement, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

**1.1 Defined Terms**. Capitalized terms used in this Agreement (including in the recitals hereto) without other definition shall have the meanings described on **Exhibit A**, unless the context clearly requires otherwise:

## ARTICLE 2
## PURCHASE PRICE

**2.1 Purchase Price**. The aggregate consideration (the "**Purchase Price**") that Buyer shall pay to Seller for the Seller's Equity Interest shall be the following:

**2.1.1** A cash payment in immediately available funds, of **One Hundred Thousand Dollars ($100,000)** due on the Settlement Date by Buyer to Seller;

**2.1.2** The cancellation of an aggregate of **One Million Five Hundred Thousand Dollars ($1,500,000)** of principal outstanding senior secured debt of Westminster under the Note Purchase Agreement and Notes, together with all obligations, interest and rights associated therewith (the "**Loan Cancellation**"), loaned by Buyer to Westminster and Seller, listed hereto on **Exhibit B**, together with the Cancellation and Termination of Promissory Note Agreement, as attached as **Exhibit C**; and





**2.1.3** The issuance of a warrant to purchase One Million Five Hundred Thousand (1,500,000) shares of Common Stock of Seller at an exercise price of One Cent (US$0.01) per share, pursuant to the term and conditions of the Warrant Agreement, attached hereto as **Exhibit D**.

**ARTICLE 3**
**CLOSING; CONDITIONS PRECEDENT**

**3.1 Closing.**

**3.1.1 Time and Place of the Closing.** Subject to the terms and conditions hereof, including Article 8 (Termination), the closing of the transactions contemplated by Article 2 (the "**Closing**") shall take place on December 31, 2016, also referred to as the "**Closing Date**").

**3.1.2 Actions at the Closing.** At the Closing, the Parties (as applicable) shall take or cause to be taken the following actions (the "**Closing Actions**"):

**3.1.2.1 Ownership of Equity Interests by Buyer.** Upon receipt of the mutually executed Transaction Documents by Seller, the Buyer shall become the sole member of Westminster with the rights and obligations associated with the ownership of all Equity Interests in Westminster.

**3.1.2.2 Additional Actions.** The Parties shall execute and deliver, or cause to be executed and delivered, all other documents, and take such other actions, in each case as shall be reasonably requested by either Party as necessary or appropriate to consummate the transactions contemplated hereby, all in accordance with the provisions of this Agreement.

**3.1.3 Conditions Precedent to Obligations of Buyer at the Closing.** The obligation of Buyer to consummate the transactions contemplated hereby shall be subject to the satisfaction, at or prior to the Closing, of the following conditions precedent, any of which may be waived by Buyer in its sole discretion:

**3.1.3.1 Performance of Closing Actions.** Seller shall have tendered performance of the Closing Actions applicable thereto.

**3.1.3.2 Representations and Warranties.** The representations and warranties made by Seller set forth in Article 4 shall be true and correct in all material respects as of the Agreement Date and the Closing Date (except that those representation or warranties which address matters only as of a particular date shall have been true and correct only on such date).

**3.1.3.3 Resignations.** Seller shall deliver to Buyer resignations of all of the managers and officers of Westminster appointed by Seller with such resignations to be effective upon payment by Buyer of the Purchase Price in accordance with Section 3.1.2.1 above.

**3.1.4 Conditions Precedent to Obligations of Seller at Closing.** The obligation of Seller to consummate the transactions contemplated hereby shall be subject to the satisfaction, prior to the Closing, of the following conditions precedent, any of which may be waived by Seller in its sole discretion:

**3.1.4.1 Performance of Closing Actions.** Buyer shall have tendered performance of the Closing Actions applicable thereto.

**3.1.4.2 Representations and Warranties.** The representations and





warranties set forth in Article 5 shall be true and correct in all material respects as of the Agreement Date and the Closing Date (except to the extent a representation or warranty speaks specifically as of an earlier date, in which case as of such date).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

4.1 **General Representations and Warranties Regarding Seller**. The Seller represents and warrants to Buyer as of the Agreement Date and as of the Closing Date as follows:

4.1.1 **Organization**. Such Seller is a corporation organized, validly existing and in good standing under the Laws of the State of Delaware.

4.1.2 **Authority and Power**. Such Seller has the requisite corporate power and authority to enter into each of the Transaction Documents to which it is or will be a party (the "**Seller Transaction Documents**"), consummate each of the transactions and undertakings contemplated thereby, and perform all of the terms and conditions thereof to be performed by such Seller. The execution, delivery and performance of each Seller Transaction Document and the consummation of the transactions and undertakings contemplated thereby have been duly authorized by all requisite corporate action on the part of such Seller under its Charter Documents.

4.1.3 **Valid and Binding Obligations**. Each Seller Transaction Document has been, or will be when executed and delivered, duly and validly executed and delivered by such Seller, and is, or will be when executed and delivered, enforceable against such Seller in accordance with the terms thereof, except as such enforceability may be limited or denied by (a) applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights and the enforcement of debtors' obligations generally, and (b) general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law (the "**Enforceability Exceptions**").

4.1.4 **Approvals and Consents**. Assuming the accuracy of the representations and warranties of Buyer set forth herein, such Seller is not, and such Seller will not be, required to give any notice, make any filing, or obtain any consent or approval (including Governmental Approvals and consents or approvals of any third party) to execute, deliver or perform any of the Seller Transaction Documents or to consummate the transactions contemplated thereby.

4.1.5 **No Violations**. The execution, delivery and performance by such Seller of each of the Seller Transaction Documents does not and will not, and the consummation of the transactions contemplated hereby and thereby will not, (a) violate the Charter Documents of such Seller; (b) violate or be in conflict with, or constitute a default under, any Contract to which such Seller is a party or by which any of such Seller's properties or assets are or may be bound that, in any case, would materially adversely affect the ability of such Seller to perform any of its obligations under the Seller Transaction Documents; or (c) violate any applicable Law, order, judgment decree or consent that, in any case, would materially adversely affect the ability of such Seller to perform any of its obligations under the Seller Transaction Documents.

4.1.6 **No Litigation**. Other than as listed on **Schedule 4.1.6**, there are no Actions pending or, to such Seller's Knowledge, threatened against such Seller that would reasonably be expected to have a Material Adverse Effect on the ability of such Seller to perform its obligations under the Seller Transaction Documents or to consummate the transactions contemplated thereby.

4.1.7 **Seller's Equity Interest**. Seller is the record and beneficial owner of and has good





and marketable title to the Seller's Equity Interest free and clear of all Liens, other than Permitted Encumbrances. The Seller's Equity Interest constitutes one hundred percent (100%) of all Ownership Interests in Westminster. At Closing, Seller will cause to be transferred all of the Seller's Equity Interest in Westminster to Buyer free and clear of all Liens, other than Permitted Encumbrances. Immediately after the Closing, Buyer shall own one hundred percent (100%) of the Equity Interests of Westminster.

**4.1.8 Brokers**. Neither Seller, nor any Affiliate of Seller, nor any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions, finder's fees or other similar obligations in connection with the transactions provided for in the Transaction Documents. Neither Westminster nor any of its respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions, finder's fees or other similar obligations in connection with the transactions provided for in the Transaction Documents.

**4.2 Representations and Warranties Regarding Westminster and the Business**. Seller represents and warrants to Buyer, with respect to Westminster and the Business, as follows (except as set forth in the Seller Disclosure Schedules):

**4.2.1 Organization of Westminster**. Westminster is organized, validly existing and in good standing under the laws of the State of Delaware. Westminster is qualified to do business in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and where failure so to qualify would have a Material Adverse Effect. The Limited Liability Company Agreement of Westminster is attached hereto as **Exhibit F**.

**4.2.2 Contracts**. **Schedule 4.2.2** contains a true, correct and complete list of all Material Contracts and all amendments and supplements thereto to which Westminster is a party or by which its assets are subject. True, correct and complete copies of all Material Contracts listed on **Schedule 4.2.2**, including any amendments, have been delivered to either Buyer or its counsel prior to the Agreement Date.

**4.2.3 Capitalization**. Seller is the record and beneficial owner of, and holds good and valid title to, the Equity Interests free and clear of all Liens, other than Permitted Encumbrances. The Equity Interests constitute One Hundred percent (100%) of the Ownership Interests in Westminster. Seller is the sole Member of Westminster. At Closing, Seller will cause to be transferred all of the Equity Interests of Westminster to Buyer free and clear of all Liens, other than Permitted Encumbrances. Immediately after the Closing, Buyer shall own 100% of the Equity Interests of Westminster. Westminster is not subject to any Contracts or other arrangements with respect to voting rights or transferability, and there are no outstanding options, warrants, profits interests, rights (including conversion or preemptive rights) or Contracts for the purchase or acquisition of any portion of Westminster's interests or securities convertible or exchangeable for any portion of Westminster, including any of the foregoing issued or entered into with any independent contractor providing services in connection with the Business, other than as provided in this Agreement or as may have been created by or through Buyer. Westminster is (a) not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any of its Equity Interests or (b) has not violated in any material respect any applicable federal or state securities laws in connection with the offer, sale or issuance of any of its Equity Interests.

**4.2.4 Financial Statements**. The unaudited financial statements of Westminster as of December 31, 2016, attached hereto as **Exhibit E** (including balance sheets and income statement) (the "**Financial Statements**"), fairly present the financial condition and results of operations of Seller for the period then ended.

**4.2.5 Litigation**. Other than as listed on **Schedule 4.1.6**, there are no Actions pending,





nor to Seller's Knowledge, threatened against Westminster or against any of Westminster's properties or assets that challenge the validity or propriety of the transactions contemplated by this Agreement.

**4.2.6 Inventory and Other Tangible Personal Property**. **Schedule 4.2.6**, attached to this Agreement, is a complete and accurate schedule describing and specifying the location of all Inventory, and equipment, furniture, supplies, documentation, and all other tangible personal property owned by, or in possession of, or used by the Westminster in connection with the Business.

**4.2.7 Trade Names, Trademarks**. Westminster owns (through common law) unregistered trademark "Westminster Pharmaceuticals, LLC."

**4.2.8 Compliance with Laws**. (i) Westminster has complied in all material respects with all applicable Laws; (ii) no notice, charge, claim, action or assertion has been filed, commenced or threatened in writing against Westminster alleging any violation of any of the foregoing, which such notice, charge, action or assertion remains threatened or pending; (iii) to Seller's Knowledge, no investigation with respect to any of the foregoing has been commenced and remains unresolved.

**4.2.9 Permits and Other Governmental Approvals**. True and correct copies of each permit and other Governmental Approval that has been obtained by or for the benefit of Westminster have been made available to Buyer. To Seller's Knowledge, all permits or other Governmental Approvals necessary for the ownership and operation of the Business that are required have been obtained and are held by Westminster. To Seller's Knowledge (a) each such permit or other Governmental Approval currently held by Westminster is in full force and effect and not subject to any current legal proceeding, and (b) Westminster is not in violation in any material respect of any such permits or other Governmental Approvals. There are no proceedings pending, or to Seller's Knowledge threatened, which might reasonably be expected to result in the revocation or termination of any such permit or other Governmental Approval currently held by Westminster in respect of the Business or the imposition of any penalty or material condition thereunder.

**4.2.10 Books and Records**. Seller has made available to Buyer a true, complete and correct copy of the books and records of Westminster. The books and records have been kept and maintained in all material respects as required by applicable Laws.

**4.2.11 Service Providers**. Westminster has current contractual relationships with the Service Providers listed on **Schedule 4.2.2**.

**4.2.12 Subsidiaries and Joint Ventures**. Westminster does not own any capital stock, security, partnership interest or other equity interest of any kind in any corporation, partnership, limited liability company, joint venture, association or other entity.

**4.2.13 Disclaimer**. EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER DISCLAIMS ALL OTHER EXPRESS AND IMPLIED WARRANTIES RELATING TO THE EQUITY INTERESTS AND THE BUSINESS, INCLUDING ANY WARRANTY REGARDING WESTMINSTER'S FUTURE OPERATIONS, FINANCIAL REQUIREMENTS OR PERFORMANCE.

## ARTICLE 5
## REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS OF BUYER

5.1 **Representations and Warranties of Buyer**. Buyer hereby represents and warrants to Seller jointly and severally, as of the Agreement Date and as of the Closing Date as follows (except as set forth on the Buyer Disclosure Schedules):

5.1.1 **Individuals**. Gajan A. Mahendiran and Amudha Mahendiran are husband and wife and purchase the Equity Interests as tenants by entirety.

5.1.2 **Authority and Power**. Buyer has the requisite limited liability company power and authority to enter into each of the Transaction Documents to which it is or will be a party (the "**Buyer Transaction Documents**"), consummate each of the transactions and undertakings contemplated thereby, and perform all the terms and conditions thereof to be performed by it. The execution, delivery and performance of each Buyer Transaction Document and the consummation of each of the transactions and undertakings contemplated thereby have been duly authorized by all requisite limited liability company action on the part of Buyer under its Charter Documents.

5.1.3 **Valid and Binding Obligations**. Each of the Buyer Transaction Documents has been, or will be when executed and delivered, duly and validly executed and delivered by Buyer, and is, or will be when executed and delivered, enforceable against Buyer in accordance with the terms thereof, except as may be limited or denied by the Enforceability Exceptions.

5.1.4 **Approvals and Consents**. Buyer is not, and will not be, required to give any notice, make any filing, or obtain any consent or approval (including Governmental Approvals and consents or approvals of any third party) to execute, deliver or perform each Buyer Transaction Document or to consummate the transactions contemplated thereby .

5.1.5 **No Violations**. The execution, delivery and performance by Buyer of each Buyer Transaction Document does not and will not, and the consummation of the transactions contemplated thereby will not (a) violate or be in conflict with, or constitute a default under, any Contract to which Buyer is a party or by which any of Buyer's properties or assets are or may be bound that, in any case, would materially affect the ability of Buyer to perform its obligations under the Buyer Transaction Documents, or (b) violate any applicable Law that, in any case, would materially adversely affect the ability of Buyer to perform its obligations under the Buyer Transaction Documents.

5.1.6 **No Litigation**. There are no Actions pending or, to Buyer's Knowledge, threatened against Buyer that would reasonably be expected to have a material adverse effect on the ability of Buyer to perform its obligations under the Buyer Transaction Documents or to consummate the transactions contemplated thereby.

5.1.7 **Securities Law Matters**. Buyer hereby acknowledges that the Equity Interests have not been registered under the Securities Act, or registered or qualified for sale under any state securities laws, and cannot be resold without registration thereunder or exemption therefrom, to the extent such Laws are applicable. Buyer is an "accredited investor," as such term is defined in Regulation D of the Securities Act, and will acquire the Equity Interests for its own account and not with a view to a sale or distribution thereof in violation of the Securities Act, and the rules and regulations thereunder, any applicable state "blue sky" laws or any other applicable securities laws. Buyer has sufficient knowledge and experience in financial and business matters to enable it to evaluate the risks of investment in the Equity Interests and at the Closing will have the ability to bear the economic risk of this investment for an indefinite period of time. Buyer acknowledges that it has been afforded an opportunity to request and to review all information





considered by Buyer to be necessary to make the investment decision to enter into this Agreement and to consummate the transactions contemplated hereby.

**5.1.8** Neither Buyer, nor any Affiliate of Buyer, nor any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions, finder's fees or other similar obligations in connection with the transactions provided for in the Transaction Documents.

## ARTICLE 6
## COVENANTS

**6.1 Tax Matters.**

**6.1.1 Tax Returns.** Following the Closing Date, Seller agrees that Buyer shall file all Tax Returns for Westminster after 12/31/16, except any Tax Returns related to Seller's Tax liabilities related to the transactions contemplated by this Agreement.

**6.1.2 Tax Proceedings.** With respect to any Tax specifically for the time prior to the Closing, for which Seller is responsible under Section 6.1.1, Seller shall have the right, at their sole cost and expense, to control the prosecution, settlement or compromise of any proceeding involving such Tax. Buyer shall (and shall cause Westminster to) take such action in connection with any such proceeding as Seller shall reasonably request from time to time to implement the preceding sentence, including the selection of counsel and experts and the execution of powers of attorney. Buyer shall (and shall cause Westminster to) give written notice to Seller of its receipt of any notice of any audit, examination, claim or assessment for any Tax for which Seller are responsible within ten (10) days after its receipt of such notice; failure to give any such written notice within such 10-day period shall limit Seller' indemnification obligation pursuant to this Agreement to the extent it is actually prejudiced by such failure.

**6.1.3 Cooperation.** Seller shall grant to Buyer (or its designees) access at all reasonable times to all of the existing information, books and records relating to Westminster within the possession of Seller that are not transferred to Buyer (including workpapers and correspondence with Taxing Authorities), and shall afford Buyer (or its designees) the right (at Buyer's expense) to take extracts therefrom and to make copies thereof, to the extent reasonably necessary to permit Buyer (or its designees) to prepare Tax Returns, respond to Tax audits and investigations, prosecute Tax protests, appeals and refund claims and to conduct negotiations with Taxing Authorities. Buyer shall grant or cause Westminster to grant to Seller (or their designees) access at all reasonable times to all of the information, books and records relating to Westminster for taxable periods and portions of taxable periods through the Closing Date within the possession of Buyer (including workpapers and correspondence with Taxing Authorities if in existence) or Westminster, and shall afford Seller (or their designees) the right (at Seller' expense) to take extracts therefrom and to make copies thereof, in each case to the extent reasonably necessary to permit Seller (or its designees) to prepare Tax Returns, respond to Tax audits and investigations, prosecute Tax protests, appeals and refund claims and to conduct negotiations with Taxing Authorities.

**6.2 Transition Assistance.**

**6.2.1** For a period of six (6) months following the Closing Date, Seller agrees to provide Buyer such reasonable professional consulting advice, as the Buyer may request from time to time, in order to facilitate an effective and efficient leadership transition (the "**Transition Assistance**"), in exchange for $15,000.00 per month, payable in advance by Westminster to Seller. Buyer may terminate the Transition





assistance at any time. The Transition Assistance shall include: (a) management consulting advice at executive level (Suren Ajjarapu), and (b) a dedicated part-time human resources services and controller services of the Seller. Any business information shared by Buyer and/or Westminster to Seller shall be considered jointly owned information by both Westminster and Seller. Transition Assistance shall further include the use of three (3) desk spaces at Seller's Odessa office location for a period of ninety (90) days after the Closing Date. Seller will also assist Buyer with Buyer's 13D SEC filings required immediately after the Closing, and Buyer will reimburse Seller for any reasonable legal fees associated therewith.

**6.2.2** In the absence of gross negligence, fraud or reckless or willful misconduct on Seller's part, and whether or not it is negligent, Seller shall not be liable for any Losses arising out of Seller providing or failing to provide the Transition Assistance.

**6.2.3** It is expressly acknowledged that with regards to the Transition Assistance, Seller shall be an "independent contractor," and will not act as an employee, agent or other representative of Westminster or Buyer for any purpose whatsoever. With respect to this Section 6.2: (i) Neither Buyer nor Westminster shall have the ability to exercise control or direction over the manner or method by which the Seller performs the Transition Assistance that are the subject matter of this Section 6.2, and (ii) in all matters relating to the Transition Assistance, each of Westminster and Seller will be solely responsible for the acts of its employees and agents, and employees or agents of one party will not be considered employees or agents of the other party nor entitled to any employee benefits of such other party as a result of the Transition Assistance. Neither party will have any right, power or authority to create any obligation, express or implied, on behalf of any other party, or in any way bind or commit any other party to any obligations. Nothing in this Agreement is intended to create or constitute a joint venture, partnership, agency, trust or other association of any kind among the parties or persons referred to herein and each party will be responsible only for its respective obligations as set forth in this Agreement.

**6.2.4** In connection with the Transition Assistance, Seller's liability for damages to Westminster and/or Seller for any cause whatsoever, and regardless of the form of action, whether in contract or in tort, including negligence, gross negligence or willful misconduct, shall be capped at $10,000.

**6.2.5** IN NO EVENT SHALL EITHER PARTY BE LIABLE UNDER ANY THEORY, WHETHER IN TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY, FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF REVENUES, BUSINESS INTERRUPTION OR ANY OTHER LOSS) ARISING FROM OR RELATING TO ANY CLAIM MADE UNDER THIS AGREEMENT OR REGARDING THE PROVISION OR THE FAILURE TO PROVIDE ANY SERVICES, REGARDLESS OF WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**6.2.6** SELLER SPECIFICALLY DISCLAIMS ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, ARISING OUT OF OR RELATED TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES. SELLER AND WESTMINSTER AND BUYER AGREE THAT THE TRANSITION SERVICES ARE SERVICES FOR PURPOSES OF THE UNIFORM COMMERCIAL CODE AND THEREFORE THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE SHALL NOT APPLY TO SECTION 6.2.

**6.3 Software Assignment.**

**6.3.1** Seller shall use Reasonable Commercial Efforts to assign the Software listed on **Schedule 6.3** to Westminster within ninety (90) days after the Closing Date, as such Software is considered an asset of the Business, as listed in the Financial Statements. Once the Software is assigned, for a period of one (1) year thereafter, Buyer shall grant or cause Westminster to grant to Seller (or their designees) access at all reasonable times to all of the data, information, and records relating to Westminsfer or the Seller for taxable periods and portions of taxable periods through the Closing Date held in the Software.

**6.4 Non-Solicitation**. For a period of four (4) years after the Closing Date, neither Buyer nor Westminster (nor any of their affiliates) shall solicit, encourage, or take any other action which is directly or indirectly intended to induce any existing employee, contractor or consultant of Seller (or any of its subsidiaries or affiliates) to terminate employment with Seller (or any of its subsidiaries or affiliates).

## ARTICLE 7
## INDEMNIFICATION

**7.1 Non-Recourse**. Except as expressly set forth in this Agreement, no Party shall have recourse whatsoever under this Agreement against any of the Representatives of the other Party (including for such purposes, the Representatives of any Affiliate of a Party). Each Party, on behalf of itself and its Affiliates, hereby fully and irrevocably waives any right, claim or entitlement whatsoever against such Representatives relating to any and all Liabilities suffered or incurred by any of them arising from, based upon, related to, or associated with this Agreement, the Material Contracts in **Schedule 4.2.2**, or the transactions contemplated hereby (including any breach, termination or failure to consummate such transactions) in each case whether based on contract, tort, strict liability, other laws or otherwise and whether by piercing of the corporate veil, by claim on behalf of or by a Party hereto or other Person or otherwise.

**7.2 Indemnification and Damages**

**7.2.1 Indemnification of Buyer**. Seller hereby agrees to indemnify, defend and hold Buyer, its affiliates and their respective directors, managers, officers, employees and agents (collectively, the "**Buyer Parties**") harmless from any and all liabilities, obligations, claims, contingencies, damages, costs, deficiencies and expenses, including all investigative costs, court costs, litigation expenses and reasonable attorneys' and accountants' fees (collectively, "**Losses**") that any Buyer Party may suffer or incur as a result of or relating to:

**7.2.1.1** the misrepresentation or breach of any representation or warranty made by Seller in this Agreement, or any allegation by a third party that, if true, would constitute such a misrepresentation or breach;

**7.2.1.2** the breach of any covenant or agreement made by Seller in this Agreement or pursuant hereto or any allegation by a third party that, if true, would constitute such a breach; or

**7.2.1.3** any liability arising from the operation of Westminster by Seller on or prior to the Closing Date, other than the Liabilities expressly assumed by Buyer under this Agreement.

**7.2.2 Indemnification of Seller**. Buyer hereby indemnifies, defends and holds Seller, and its Affiliates, directors, managers, officers, employees and agents (collectively, the "**Seller Parties**") harmless from any and all Losses that any Seller Party may suffer or incur as a result of or relating to:





**7.2.2.1** the misrepresentation or breach of any representation or warranty made by Buyer in this Agreement or pursuant hereto or any allegation by a third party that, if true, would constitute such a misrepresentation or breach;

**7.2.2.2** the breach of any covenant or agreement made by Buyer in this Agreement or pursuant hereto or any allegation by a third party that, if true, would constitute such a breach; or

**7.2.2.3** the failure of Buyer to perform and discharge in full, in a due and timely manner, the Liabilities expressly assumed by Buyer under this Assignment or failure by Buyer to assign and/or transfer to Seller Equity Interests.

**7.2.3 Survival.** The representations, warranties, covenants and agreements of Seller, and Buyer made in or pursuant to this Agreement will survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby for a period of one (1) year following the Closing Date.

**7.2.4 No Consequential Damages and Maximum Liability.** Notwithstanding anything to the contrary contained in this Agreement or provided for under any applicable law, no party hereto shall be liable to any other Person, either in contract or in tort, for any consequential, incidental, indirect, special or punitive damages of such other Person, including any loss of future revenue, or income or profits, or any diminution of value or multiples of earnings damages relating to the breach or alleged breach hereof, whether or not the possibility of such damages has been disclosed to the other party in advance or could have been reasonably foreseen by such other party. The maximum liability of either Party under this Article 7 or otherwise under this Agreement shall not exceed twenty percent (20%) of the Loan Cancellation amount in Section 2.1.

## ARTICLE 8
## TERMINATION

**8.1 Termination of Agreement.** This Agreement may be terminated at any time prior to the Closing by either Party for any reason with a written notice including email communication

**8.2 Effect of Termination.** In the event of a termination of this Agreement as provided in Section 8.1, this Agreement shall cease to have force and effect, and there shall be no further liability or obligation on the part of any Party, except that (a) the provisions of this Section 8.2 and 9 shall continue to apply following any such termination, (b) each Party shall continue to be liable for any willful and material breach by such Party of its representations, warranties or covenants contained in this Agreement occurring prior to such termination and (c) Material Contracts shall continue to remain in full force and effect.

## ARTICLE 9
## MISCELLANEOUS

**9.1 Further Assurances.** From time to time after the Closing, upon the request of any other Party and without further consideration, each Party shall execute and deliver to the requesting Party such documents and take such action as the requesting Party reasonably requests to consummate more effectively the intent and purpose of the Parties under this Agreement and the transactions contemplated hereby.

**9.2 Notices.** Any notice, statement, demand, claim, offer or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such





notice and shall be sent by facsimile or other electronic transmission (and, if by facsimile, also by email), hand messenger delivery, overnight courier service, or certified mail (receipt requested) to the other Party at the address set forth below:

(a) If to Seller, at:

**Gajan A. Mahendiran and Amudha Mahendiran**
**4427 Corral Road**
**Warrenton, VA 20187**

(b) If to Buyer, at:

**TRXADE GROUP, INC.**
1115 Gunn Hwy Suite 201
Odessa, FL 33556
**Attention: Suren Ajjarapu, President**

Each Party shall have the right to change the place to which notices shall be sent or delivered or to specify one additional address to which copies of notices may be sent, in either case by similar notice sent or delivered in like manner to the other Party. Without limiting any other means by which a Party may be able to prove that a notice has been received by another Party, all notices and communications shall be deemed to have been duly given: (i) at the time delivered by hand, if personally delivered; (ii) five (5) Business Days after being deposited in the mail, postage prepaid, if mailed by first class certified mail, receipt requested; and (iii) when received, if sent by courier, facsimile or other electronic transmission, if received prior to 5 p.m., recipient's time, on a Business Day, or on the next Business Day, if received later than 5 p.m., recipient's time. In any case hereunder in which a Party is required or permitted to respond to a notice from another Party within a specified period, such period shall run from the date on which the notice was deemed duly given as above provided, and the response shall be considered to be timely given if given as above provided by the last day of the period provided for such response.

**9.3 Entire Agreement; Amendments**. This Agreement and the other Transaction Documents constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, of the Parties with respect to the subject matter hereof, including but not limited any prior term sheets or letters of intent. Any oral representations or modifications concerning this instrument shall be of no force or effect unless contained in a subsequent written modification signed by the Party to be charged. This Agreement may be amended or modified only by a written instrument executed by the Parties.

**9.4 Successors and Assigns**. This Agreement and the other Transaction Documents shall be binding upon, and shall inure to the benefit of, and shall be enforceable by, the Parties and their respective successors and permitted assigns.

**9.5 Currency Matters**. U.S. Dollars shall be the currency of account in the case of all obligations arising under or relating to this Agreement.

**9.6 Governing Law**. This Agreement, and any instrument or agreement required hereunder (to the extent not otherwise expressly provided for therein), shall be governed by, and construed under, the laws of the State of Florida, without reference to conflicts of laws rules. The Parties agree that any action, dispute or question by or against any party (or its affiliates or designees) arising as to the interpretation of any clause of, or the rights and liabilities of the parties under, in any manner relating to, this Agreement and the purchase of Seller's Equity Interest and the Business associated therewith, if not resolved by negotiation, shall be referred to binding arbitration before a single arbitrator in Tampa, FL, under the rules

and procedures of the American Arbitration Association relating to the selection of arbitrators for the determination of issues. This agreement to arbitrate is supported by adequate consideration, receipt of which is acknowledged. The decision of the arbitrator will be binding, final and conclusive on the parties, and judgment on the arbitrators decision may be entered in any court having jurisdiction thereof. This agreement to arbitrate is binding upon the respective successors, heirs, legal representatives, assigns and transferees of the parties. The arbitrator may, sua sponte or upon the written request of a party, issue written directions as to the scope and timetable for discovery. In the event that the arbitrator should determine that the matter(s) in dispute may be resolved by a review of a written record, and that a hearing is not necessary, each party waives the right to a hearing. The arbitrator shall be charged to render a written opinion reciting the facts as determined and the applicable law as applied. Except to the extent limited under the Agreement, the arbitrator may award injunctive and other equitable relief, as well as an award of monetary damages. No claim of fraud, duress or other basis for revocation of contract made with respect to this Agreement shall limit or preclude the enforcement of this Agreement to arbitrate except as such fraud, duress or other basis for revocation shall arise with particularity to this agreement to arbitrate. The award of the arbitrator may allocate attorneys' fees and expenses (at such amount as the Arbitrator may deem appropriate.

**9.7 Expenses.** Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall bear responsibility for its own costs and expenses in connection with the Transaction Documents and the transactions contemplated hereby or thereby, including the fees and expenses of its legal counsel and other consultants and advisors in connection with any Transaction Document, except as may be otherwise provided therein, and Westminster shall not incur any costs or expenses in connection with this Agreement and the transaction contemplated hereby.

**9.8 Confidential Information.** From and after the Closing Date, Seller will hold, and will cause their respective Affiliates and Representatives to hold, in strict confidence from any other Person all information and documents relating to Westminster and the Business ("**Confidential Information**"), provided that nothing in this sentence shall limit the disclosure by any Party of any information (a) to the extent required by Law or judicial process (provided that if permitted by Law, each Party agrees to give the other Party prior notice of such disclosure in sufficient time to permit such other Party to obtain a protective order should they so determine), (b) in connection with any litigation among the Parties (provided that such Party has taken all reasonable actions to limit the scope and degree of disclosure in any such litigation), (c) in an Action brought by a Party in pursuit of its rights or in the exercise of its remedies under the Transaction Documents, (d) to the extent that such documents or information can be shown to have come within the public domain through no action or omission of the disclosing Party or its Affiliates or Representatives, and (e) to its Affiliates (but the Party shall be liable for any breach by its Affiliates). In the event this Agreement is terminated under Section 8.1, upon the request of any Party, the other Party will, and will cause its Affiliates and Representatives to, promptly (and in no event later than five (5) Business Days after such request) redeliver or destroy, or cause to be redelivered or destroyed, all copies of confidential documents and information furnished by such other Party in connection with this Agreement and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related to or based on such information or documents prepared by the Party furnished with such documents and information or its Representatives.

**9.9 Public Statements.** All Parties shall not (and shall cause its Affiliates and Representatives not to) release any public statement regarding the transactions contemplated hereunder without the other Party's prior written consent; provided, however, that Seller may at any time make disclosure if it is advised by outside legal counsel to Seller that such disclosure is required under applicable law, regulatory authority or stock exchange listing agreement.

**9.10 Joint Effort.** Preparation of this Agreement has been a joint effort of the Parties and the





resulting document shall not be construed more severely against one Party than against any other Party.

**9.11 Captions**. The captions contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained herein.

**9.12 Severability**. The invalidity of one or more phrases, sentences, clauses, Sections or Articles contained in this Agreement shall not affect the validity of the remaining portions of this Agreement so long as the material purposes of this Agreement can be determined and effectuated.

**9.13 Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall constitute an original but all of which, taken together, shall constitute but one agreement.

**9.14 Third Parties**. Except as otherwise expressly provided in this Agreement, nothing contained in this Agreement shall be construed to create any right in, duty to, standard of care with respect to, or any liability to any Person who is not a party to this Agreement.

**9.15 No Waiver**. Any failure of a Party to enforce any of the provisions of this Agreement or to require compliance with any of its terms at any time during the pendency of this Agreement shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of such Party thereafter to enforce any and each such provision.

**9.16 Delivery by Facsimile or PDF**. This Agreement, and any amendments hereto or, to the extent signed and delivered by means of a facsimile machine or electronic transmission in portable document format (pdf), shall be treated in all manner and respects as an original Contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any Party, each other Party shall re-execute original forms thereof and deliver them to the other Party. No Party shall raise the use of a facsimile machine or electronic transmission in pdf to deliver a signature or the fact that any signature was transmitted or communicated through such means as a defense to the formation of a Contract and each Party forever waives any such defense.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the Parties have caused this Purchase and Sale Agreement to be duly executed and delivered as of the Agreement Time.

**BUYER: Gajan A. Mahendiran and Amudha Mahendiran**

By: ______________________________
**Gajan A. Mahendiran**

By: ______________________________
**Amudha Mahendiran**

**SELLER:**

**TRXADE GROUP, INC..**

By: ______________________________
**Name: Suren Ajjarapu, CEO**

*[SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT]*

**Exhibits and Schedules**

Blank

# EXHIBIT A

## DEFINITIONS

"**Action**" means any litigation, cause of action, claim, breach of contract, violation of duty or violation of Law, arbitration, audit, hearing, suit, investigation or proceeding (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, arbitrator or any other Person.

"**Affiliate**" means, with respect to a Person, any other Person that, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such first Person.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in Tampa, FL are required or authorized by Law to close.

"**Buyer's Knowledge**" means the actual knowledge of the officers and directors of the Buyer.

"**Cancellation and Termination of Promissory Note Agreement**," means the agreement attached hereto Exhibit B;

"**Charter Documents**" means, with respect to any Person, all organizational documents and all limited liability company agreements, partnership agreements, member agreements or similar Contracts relating to the ownership or governance of such Person.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any agreement, contract, lease, consensual obligation, promissory note, evidence of indebtedness, purchase order, letter of credit, license, promise or undertaking of any nature (whether written or oral and whether express or implied).

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, its capacity as sole or managing member, its capacity as general partner, by contract or otherwise. The term "Control" when used as a verb in the referenced clauses shall have a correlative meaning.

"**Equity Interests**" means all of the equity membership interests in Westminster Pharmaceuticals, a Delaware limited liability company.

"**Governmental Approval**" means any authorization, approval, consent, license, ruling, permit, tariff, certification, exemption, order, recognition, grant, confirmation, clearance, filing or registration by or with any Governmental Authority.

"**Governmental Authority**" means any federal, national, regional, state, municipal or local government authority, tribunal, court, agency, authority, body, board or instrumentality, or any regulatory, administrative or other department, bureau or agency, or any political or other subdivision, department or branch of the foregoing, including any independent system operator or electric reliability organization.

"**Indebtedness**" means (a) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) any indebtedness evidenced by any note, bond, debenture, mortgage or other debt security, (c) any indebtedness for the deferred purchase price of property or services, (d) liabilities under any interest rate protection agreement, interest rate future agreement,



interest rate option agreement, interest rate swap agreement or other similar agreement designed to protect Westminster against fluctuations in interest rates or other currency fluctuations, (e) all liabilities with respect to any commitment by which Westminster assures a creditor against loss (including, without limitation, contingent reimbursement obligations with respect to letters of credit) and all other liabilities guaranteed in any manner by Westminster, (f) any obligations under capitalized leases, conditional sales contracts and other similar title retention instruments whether short term or long term, (g) any indebtedness secured by a Lien on any property or assets of Westminster and/or any off-balance sheet financings, (h) to the extent due and payable, all accrued interest, prepayment premiums, penalties, expenses or other amounts related to any of the foregoing, and (i) all liabilities with respect to the obligations of other Persons of the types described in clauses (a) - (h) above guaranteed in any manner by Westminster.

"**IRS**" means the United States Internal Revenue Service.

"**Law**" means any applicable federal, national, regional, state, municipal or local law, statute, treaty, rule, regulation, ordinance, order, code, protocol, judgment, decree, directive, injunction, writ or similar action or decision duly implementing any of the foregoing by any Governmental Authority, and includes all applicable Governmental Approvals.

"**Liability**" means any liability, debt or obligation whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, incurred or due or to become due.

"**Lien**" means any mortgage, pledge, bailment (in the nature of a pledge or for purposes of security), deed of trust, the grant of power to confess judgment, conditional sale or title retention agreement (including any lease in the nature thereof), lien, charge, or encumbrance that has the same or a similar effect to the granting of security or of any similar right of any or any arrangement or obligation to create the foregoing.

"**Material Adverse Effect**" means any condition, circumstance, event or change that has had or is reasonably likely to have a material adverse effect on the business, results of operation, assets, properties, projected operations, financial assumptions or condition (financial or otherwise) of Westminster or the Business excluding, without limitation: (a) any event or condition resulting from or relating to changes or developments in Laws, the economy, financial markets or commodity markets; (b) any event or condition generally applicable to the pharmaceutical industry, whether international, national, regional or local; (c) any order or act of a Governmental Authority affecting providers or users of generation, transmission or distribution of electricity generally, that imposes restrictions, regulations or other requirements thereon; or (d) changes in general regulatory or political conditions, including any acts of war or terrorist activities; except in the case of clauses (a) through (d) above, to the extent the adverse effect the Business or Westminster is disproportionate to the adverse effect on the industry as a whole.

"**Material Contract**" means, in each case, any Contract to which Westminster is a party, or by the terms of which Westminster is bound, that is (a) any Contract as to which the expected annual cost of performing such contract in the ordinary course by Westminster, or the annual revenue in any year exceeds Five Thousand Dollars ($5,000) or in the aggregate exceeds Ten Thousand Dollars ($10,000); (b) any Contract between Westminster and Seller or any Affiliate of Westminster; (c) any agreements with any supplier, customer, contractor or other third party; (d) any Indebtedness Document or other Contract relating to the borrowing of money or to mortgaging, pledging or otherwise placing a Lien on any of its assets, or guarantying any obligation (other than endorsements made for collection) or otherwise related to any Indebtedness; (e) any exclusivity agreement or other Contract which prohibits it from freely engaging in business anywhere in the world, including any exclusivity agreement with any supplier (i) any Contract respecting any partnership, joint venture, strategic alliance or other similar Contract or arrangement; (j) all employment, severance or change in control Contracts binding upon Westminster; (k) any Contract relating

to the purchase, sale, ownership, leasing, subleasing, transfer, use of real property or any similar Contract; (l) provides for non-monetary obligations on the part of Westminster, the non-performance of which obligations would reasonably be expected to have a Material Adverse Effect; (m) relates to the acquisition or sale by Westminster of any business or Person or Contract with respect to the lending of funds; (n) is a conciliation, settlement, or similar agreement with any Governmental Authority; (o) has or would reasonably be expected to have the effect of prohibiting the development, ownership or operation of the Business as currently proposed to be developed, owned or operated by Westminster (including covenants not to compete); (p) grants any power of attorney; (q) to the extent not included in any of the foregoing, any operation and maintenance agreement or module or inverter supply agreement and related warranty terms or agreement relating to such Business; (r) any Contracts related to the sale of the Business or Westminster other than the Transaction Documents; (s) any Contracts relating to the Equity Interests; and (t) each amendment, supplement and modification (whether oral or written) of any of the foregoing.

"**Ownership Interest**" means, with respect to any Person, any share, capital stock, partnership, membership or similar interest or other indicia of equity ownership (including, any option, warrant, profits interests or similar right or right or security convertible, exchangeable or exercisable therefor or other instrument or right the value of which is based on any of the foregoing) in such Person.

"**Permitted Encumbrances**" means (a) those restrictions on transfer imposed by applicable securities Laws; (b) restrictions imposed on transfers set forth in the Charter Documents of Westminster and (c) any Liens created by or through Buyer.

"**Permitted Lien**" means any of the following Liens: (a) any Lien for Taxes not yet due or delinquent; (b) any Lien arising in the ordinary course of business by operation of applicable Law with respect to a Liability that is not yet due or delinquent; (c) imperfections or irregularities of title and other Liens that do not materially detract from the value of the affected property or materially detract from the suitability of the affected property for development of the Business; (d) zoning, planning, and other similar limitations and restrictions, and all rights of any Governmental Authority to regulate any property that do not, in the aggregate, materially detract from the value of the affected property or materially detract from the suitability of the affected property for development of the Business; (e) statutory or common law Liens in favor of carriers, warehousemen, mechanics and materialmen, and statutory or common law Liens to secure claims for labor, materials or supplies with respect to a Liability that is not yet due or delinquent; and (f) any Liens created by or through Buyer.

"**Person**" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability partnership, limited liability company, trust, unincorporated association, institution, Governmental Authority or any other entity.

"**Reasonable Commercial Efforts**" means that means that the obligated party is required to make a diligent, reasonable and good faith effort to accomplish the applicable objective. Such obligation, however, does not require an expenditure of material funds or the incurrence of a liability on the part of the obligated party, nor does it require that the obligated party act in a manner that would be contrary to normal commercial practices in order to accomplish the objective." "**Representatives**" means each Party's respective officers, directors, employees, representatives, agents, attorneys or advisors.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Seller Disclosure Schedules**" means the schedules to Seller' representations and warranties provided pursuant to Article 4.

"**Seller's Knowledge**" means the actual knowledge of the officers and directors of the Seller.

"**Settlement Date**" means the date the settlement fund for class-action claim against Trxade Group, Inc. and its wholly owned subsidiary Westminster Pharmaceutical, LLC, Inc. by Family Medicine Pharmacy, LLC v. Trxade Group, Inc. and Westminster, Inc., Case No.: 1:15-CV-00590-KD-B, United States District Court, Southern District of Alabama, Mobile Division, is funded by the Seller. The Settlement fund is $200,000 and due by Seller and Westminster in early 2017, and $100,000 shall be paid by Buyer to Seller under Section 2.1.1 hereof.

"**Service Provider**" means any Person that provides, or has provided, services to Westminster, including each of the members, managers, officers and independent contractors of Westminster.

"**Software**" means the software and associated contracts listed on **Schedule 6.3**.

"**Tax**" or "**Taxes**" means all taxes, including all charges, fees, duties, imposts, levies or other assessments in the nature of taxes, now or hereafter imposed by any Governmental Authority, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, inheritance, corporation, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp, goods and services, ad valorem, utility, utility users and other taxes, and shall include interest, penalties or additions attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto, and including any amendment thereof.

"**Taxing Authority**" means the IRS and any other Governmental Authority responsible for administration of Taxes under the Laws of any jurisdiction.

"**Transaction Documents**" means, collectively, this Agreement, all certificates delivered pursuant to this Agreement, and all other agreements or instruments between the Parties or their Affiliates entered into pursuant to the terms hereof in order to carry out the Closing Actions and the other transactions contemplated hereby.

"**Warrant Agreement**" means the warrant agreement, attached hereto as **Exhibit D.**

**EXHIBIT B**

- **Convertible Promissory Note Purchase Agreement, executed in the amount of $1,500,000 in October 2015, as amended June 2016.**
- **Note Agreement for $450,000 IN October 2015**
- **Note Agreement for $500,000 in December 2015**
- **Note Agreement for $250,000 in June 2016**
- **Note Agreement for $200,000 in October 2016**
- **Note Agreement for $100,000 in December 2016**

**For a total of $1,500,000 [see attached]**

**Exhibit C**

**Cancellation and Termination of Promissory Note Agreement**

This indenture is made as of this 31st day of December, 2016, by and among Trxade Group, Inc., a Delaware corporation (the "***Parent***"), Westminster Pharmaceutical, LLC, Inc., a Delaware limited liability Company and wholly owned subsidiary of Parent ("***Westminster***") (collectively Westminster and Parent shall be referred to as the "**Borrower**"), and Gajan A. Mahendiran and Amudha Mahendiran (collectively, the "***Lender***").

**RECITALS:**

**WHEREAS**, Borrower and Lender entered into a Convertible Promissory Note Purchase Agreement,(the "***Note Purchase Agreement***") together with multiple Note Agreements and various exhibits attached thereto the "***Notes***"), in October 2015, and as amended in June 2016, for an aggregate principal amount of One Million Five Hundred Thousand Dollars $1,500,000 (the "***Principal***"), as evidenced by a Note Purchase Agreement and Notes, a copy of which is attached hereto as **Exhibit A** and made a part hereof; and together with together with certain warrant agreement to purchase an aggregate of 510,001 shares of Common Stock of the Parent, which have been exercised.

**WHEREAS**, of even date herewith, Parent has entered into a Purchase and Sale Agreement ("***Purchase and Sale Agreement***") with Buyer for the sale of all of Parent's equity interests in exchange for cancellation of the Notes (as described herein), a cash payment and the issuance of additional warrants totaling 1,500,000 shares of Common Stock;

**NOW, THEREFORE**, in consideration of the premises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to Purchase and Sale Agreement, the parties mutually agree as follows:

1. Lender Represents other than the obligations and amounts of outstanding Principal under the Notes referenced above, and 833,334 shares of Common Stock of the Parent and warrants to purchase 510,001 shares of Common Stock beneficially owned by the Lender, neither Westminster nor Parent has any other obligation to Lender.

2. Upon consummation of the Purchase and Sale Agreement (a) all amounts owing under the Note shall be deemed to have been paid in full, (b) Borrower shall have no further Obligations to Lender under the Note and all obligations, liabilities, covenants and agreements of Borrower, under or in connection with the Note shall be terminated and canceled and are of no further force and effect, (c) all of Lender's security interest in, security titles to and other liens on all real and personal assets and property of Borrower shall be terminated automatically without any further action, (d) Borrower, and their attorneys and agents, are authorized to (1) file UCC-3 Termination Statements for each of the UCC-1 Financing Statements previously filed by Lender against Borrower, (2) file releases of security interest in trademarks previously filed with the United States Patent and Trademark Office (if any), and(3) take such other action to release and terminate the security interests and liens in favor of Lender, and (e) Lender shall promptly execute and deliver to each Borrower such documents and instruments reasonably requested by such Borrower as shall be necessary to evidence termination of all security interests given by such Borrow to Lender under the Note.

2. Counterparts. This instrument may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this instrument on the day and year first above written.

**LENDER: Gajan A. Mahendiran and Amudha Mahendiran**

By: ______________________
**Gajan A. Mahendiran**

By: ______________________
**Amudha Mahendiran**

**PARENT:**

**TRXADE GROUP, INC.**

By: ______________________
**Suren Ajjarapu, CEO**

*[Signature Page Cancellation and Termination of Promissory Note Agreement]*

**Exhibit C:**

**Warrant Agreement**

**Exhibit D:**

**Financial Statements Dated December 31, 2016**



**Exhibit E.**

**Limited Liability Company**
**Agreement**
**of**
**WESTMINSTER PHARMACEUTICALS, LLC**

This Limited Liability Company Agreement is entered into as of the 1st day of June, 2013 by Trxade Group, Inc., a Delaware corporation (the "Member"), as the sole member of WESTMINSTER PHARMACEUTICALS, LLC The Member desires to form a limited liability company pursuant to the Act upon the following terms and conditions:

**ARTICLE I**

*Name and Place of Business*

The name of the Company is WESTMINSTER PHARMACEUTICALS, LLC Its registered office is located at 108 West 13th St, Wilmington Delaware, 19801 and its registered agent at such address is the Company itself. Its principal place of business is 17537 Darby, Lane Lutz, FL 33558 or such other place or places as the Member may hereafter determine.

**ARTICLE II**

*Business, Purpose, and Term of Company*

Section 2.1 *Purposes.* The purpose of the Company shall be to do all such things for which limited liability companies may be formed under the Act.

Section 2.2 *Term of Company.* The term of the Company commenced on the date the Certificate of Formation is filed with the Delaware Secretary of State in accordance with the provisions of the Act and shall continue on a perpetual basis unless dissolved pursuant to Article VI of this Agreement.

Section 2.3. *Powers of the Company*

(i) In addition to the purpose set forth in Section 2.1 above, the Company shall have the power:

(a) to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(b) to acquire, by purchase, mortgage, lease, contribution of property or otherwise, and to own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(c) to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Member or any person or other entity that directly or indirectly controls, is



controlled by, or is under common control with the Member, or any agent of the Company necessary to, in connection with, convenient to, or incidental to, the accomplishment of the purpose of the Company.

(d) to lend or borrow money and to invest its funds;

(e) to sue and be sued;

(f) to appoint employees and fix their compensation;
(g) to indemnify any person; and

(h) to guarantee obligations of an affiliate or subsidiary.

## ARTICLE III

*Capital Contributions*

Section 3.1 *Capital Contribution by the Member*. Upon the formation of the Company, the Member shall not be required to make a Capital Contribution. Capital Contributions shall be made from time to time as the Member shall determine.

Section 3.2 *Capital Accounts*. A Capital Account shall be maintained for the Member to which shall be credited (i) the Member's Capital Contributions, if any and (ii) all Company revenues. The Capital Account shall be debited with (i) all costs, expenses, and lósses of the Company and (ii) the amount of any distributions (including return of capital) made to the Member. No interest shall be paid on the Member's Capital Account.

## ARTICLE IV

*Allocation of Profits and Distributions*

Section 4.1 *Allocation of Profits and Losses*. All profits and losses of the Company shall be allocated to the Member.

Section 4.2 *Allocation of Distributions*. All distributions of cash or other assets of the Company shall be made to the Member when and as determined by the Member.

## ARTICLE V

*Management of the Company*

Section 5.1 *General*. The Member shall be the Managing Member and shall be responsible for the management of the Company. The Managing Member shall have the right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company.

Section 5.2 *Delegation of Powers of Managing Member*. The Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to delegate the management, control, administration, and operation of the business and affairs of the Company or the custody of the Company's assets for all purposes stated in this Agreement. Such delegation shall be as provided in such documentation



as the Managing Member shall determine. Any such delegation shall not cause the Managing Member to cease to be the Managing Member.

Section 5.3 *Officers*. The Managing Member may appoint individuals with or without such titles as it may elect, including the titles of President, Vice President, Treasurer, and Secretary, to act on behalf of the Company with such power and authority as the Managing Member may delegate in writing to any such persons.

Section 5.4 *Powers of Managing Member*. The Managing Member shall have the right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done any and all acts deemed by the Managing Member to be necessary or appropriate to effectuate the business, purposes and objectives of the Company at the expense of the Company, including but not limited to the execution of all documents or instruments in all matters necessary, desirable, convenient or incidental to the purpose of the Company or the making of investments of Company funds.

Section 5.5 *Reliance by Third Parties*. Any person or entity dealing with the Company may rely on a certificate signed by the Managing Member as to:

(i) the identity of the Managing Member;

(ii) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Managing Member or are in any matter germane to the affairs of the Company;

(iii) the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(iv) any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

Section 5.6 *Actions Requiring Member Approval*. Not withstanding any other provision of this Agreement, the written consent of the Member shall be required to approve the following matters:

(i) the dissolution or winding up of the Company;

(ii) the merger or consolidation of the Company;

(iii) the sale, transfer, contribution, exchange, mortgage, pledge, encumbrance, lease or other disposition or transfer of all or substantially all of the assets of the Company;

(iv) the declaration of any distributions by the Company; and

(v) amendments to this Agreement.

**ARTICLE VI**

*Dissolution*

The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

(a) the determination by the Member to dissolve the Company; or

(b) the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act.

**ARTICLE VII**

*Governing Law and Jurisdiction*

This Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

**ARTICLE VIII**

*Indemnification*

Section 8.1 *Indemnification and Liability.* (a) To the maximum extent permitted by applicable law, the Managing Member shall not be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, or (iii) for losses due to any such mistakes, action or inaction.

(b) Except as may be restricted by applicable law, the Managing Member shall not be liable for and the Company shall indemnify the Managing Member against, and agrees to hold the Managing Member harmless from, all liabilities and claims (including reasonable attorney's fees and expenses in defending against such liabilities and claims) against the Managing Member, arising from the Managing Member's performance of its duties in conformance with the terms of this Agreement.

(c) The Managing Member may consult with legal counsel or accountants selected by the Managing Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d) The Company shall also have the power to indemnify the Trustee to the extent, and under the conditions and terms, as may be provided in the Trust Agreement.

**ARTICLE IX**

*Assignment of Interests*

The Member may Transfer all or part of its Membership Interest in the Company.

**ARTICLE X**

*Winding Up and Distribution of Assets*

Section 10.1 *Winding Up.* If the Company is dissolved, the Member shall wind up the affairs of the Company.

Section 10.2 *Distribution of Assets.* Upon the winding up of the Company, subject to the provisions of the Act, the Member shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or

unmatured claims and obligations that are known to the Member but for which the identity of the claimant is unknown. If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full. If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefor. Any remaining assets shall be distributed to the Member.

## ARTICLE XI

### *Definitions*

As used herein, the following terms shall have the indicated definitions.

**"Act"** means the Delaware Limited Liability Company Act, 6 *Del. C.* § 18-101 et seq., as may be amended from time to time.

**"Agreement"** means this Limited Liability Company Agreement, as may be amended from time to time.

**"Capital Account"** means a separate accounting maintained with respect to the Member pursuant to section 3.2 of this Agreement.

**"Capital Contribution"** means the contribution by the Member to capital of the Company.

**"Certificate of Formation"** means the Certificate of Formation of the Company as originally filed with the Delaware Secretary of State on December 19, 2012, amended April 1, 2013, and as the same may be further amended from time to time.

**"Company"** means WESTMINSTER PHARMACEUTICALS, LLC, a Delaware limited liability company.

**"Managing Member"** means the Member.

**"Member"** means Trxade Group, Inc., a Delaware corporation.

**"Membership Interest"** means the ownership interest of the Member in the Company, including any and all rights, powers, benefits, duties or obligations conferred or imposed on the Member under the Act or this Agreement.

**"Transfer"** means a transfer, assignment, pledge or encumbrance relative to any Membership Interest in the Company.

**IN WITNESS WHEREOF**, the Member has executed and delivered this Limited Liability Company Agreement the day and year first above written.

**SOLE MEMBER: Trxade Group, Inc.**

Suren Ajjarapu, CEO

**SCHEDULES**

**Schedule 4.1.6**

**Litigation**

On November 19, 2015, Family Medicine Pharmacy, LLC filed a class-action claim against Trxade Group, Inc. and its wholly owned subsidiary Westminster Pharmaceutical, LLC, Inc. (Family Medicine Pharmacy, LLC v. Trxade Group, Inc. and Westminster, Inc., Case No.: 1:15-CV-00590-KD-B, United States District Court, Southern District of Alabama, Mobile Division). Family Medicine has served Trxade for allegedly utilizing a "junk fax" advertising program. On June 6, 2016, we entered into a binding memorandum of understanding will the plaintiff related to this litigation to resolve all claims in exchange for Trxade funding a settlement fund in the amount of $200,000. This settlement was approved by the courts in September. A payment of $200,000 is due by Seller and Westminster in early 2017, which will be paid by Seller, and half of which ($100,000) shall be payable by Buyer to Seller on the Settlement Date, pursuant to Section 2.1.1.



**Schedule 4.2.6**

**Inventory and Other Tangible Personal Property**

**Inventory List-see separate attachment**

Mississippi Property

| Quantity | Item |
|---|---|
| 6 | 2 tier pallet racks tall |
| 1 | 2 tier pallet racks short |
| 1 | forklift |
| 2 | Pallet jacks |
| 5 | 6 foot white tables |
| 1 | Fridge/Freezer |
| 1 | 2 door black cabinet 6 foot |
| 1 | Small black desk |
| 1 | Small grey desk |
| l | Walk up ladder on wheels |
| 1 | 12 foot standing ladder |
| 5 | 6 foot x 3 foot shelves |
| 2 | CPU |
| 5 | Monitor |
| 1 | Fed Ex Scale |
| 1 | Fed Ex Label Printer |
| 2 | Printer |
| 2 | Red carts small |
| 5 | Office chairs |
| 200 | small red storage bins |
| 118 | tiny red storage bins |
| 1 | brown u shaped desk |
| 1 | 4 shelf staorage |
| 1 | microwave |
| 1 | coffee poy |
| 1 | round table |
| 1 | water dispenser |
| 1 | 9 foot corkboard |
| 3 | small chairs |
| 1 | 4 foot filing cabinet |
| 1 | v shaped desk |
| 1 | 2 drawer filing cabinet tall |
| 1 | 2 drawer filing cabinet short |



| | |
|---|---|
| 1 | shredder |
| 2 | laptops |
| | monitor for camera |
| 1 | system |
| 10 | cameras |

Odessa Property:

| | |
|---|---|
| 2 | Wooden desks 4 feet |
| 1 | Small black desk |
| 1 | Lapton held by Darren Aitken |
| 4 | Chairs |
| 1 | 5ft Filing Cabinet 5 drawer tall |
| 1 | 4ft Filing Cabinet 3 drawer long |
| 3 | 3ft Filing Cabinet 2 drawer tall |
| 1 | Curio Cabinet |
| 3 | Computer Monitors |
| 1 | CPU |
| 1 | Shredder |
| 1 | 2 piece front desk set |
| 1 | Wall Sign Westminster Pharmaceuticals, LLC |

**Schedule 4.2.2**
**Material Contracts**

- DISTRIBUTION AGREEMENT, dated as of November 2015, by and between Sciegen Pharmaceuticals Ltd, a company organized under the laws of New York and located at 89 Arkay Drive, Hauppauge, NY 117880, and Westminster Pharmaceuticals, LLC.
- DISTRIBUTION AGREEMENT, dated as of February, 2016, by and between Vivamed Labs USA, Inc., a Delaware corporation having its office in 1100 Cornwall Road, Suite 160, Monmouth Junction, NJ 08852 and wholly owned-subsidiary of Vivimed Labs (ALATHUR) PRIVATE LIMITED, a company organized under the laws of India and having its registered office at Plot No. 101 to 108 & 153, SIDCO Pharmaceutical Complex, Alathur 603 110, India, and Westminster Pharmaceuticals, LLC.
- DISTRIBUTION AGREEMENT, dated as of November 2015, by and between Blu Pharmaceuticals, LLC, a company organized under the laws of the State of Kentucky, and Westminster Pharmaceuticals, LLC.
- THIS LICENCE, SUPPLY AND DISTRIBUTION AGREEMENT, as of October 2015, by and between Indoco Remedies Limited, a company incorporated under the laws of India, having its registered office at Indoco House, 166 C.S.T. Road, Kalina, Santacruz (East) Mumbai, India 400 098 and Westminster Pharmaceuticals LLC.
- ADT Security Services Contract with Westminster, dated 8/21/15,
- Liason Delta/ECS Support Agreement between Enable Info Solutions, Inc. and Westminster, dated 8/12/16
- Letter Agreement between Westminster and ADMAR PR PSC for prescription drug registration services in Puerto Rico, dated 12/22/16
- Lease Agreement with DDI Leasing and Westminster, undated.
- Logistics Agreement between RX Ship and Westminster, dated September 30, 2015
- Lease Agreement with Car-Tech Tool & Die, Inc. and Westminster, dated August 30, 2016
- Licensing Services Agreement with CDR Resource Center and Westminster, dated October 12, 2016
- Consulting Agreement between Jagedish Rajan and Trxade Group, Inc., dated May 1, 2016.
- Track-Trace Services Agreement between Epedigree Solutions and Westminster, dated June 22, 2015.
- Sales Representative Agreement, between VDS Services, LLC and Westminster, dated April 11, 2016.
- Izeen Otc. LLC Agreement with Westminster.

**Schedule 6.3**
**SOFTWARE**

Software associated with the following contracts:

- SAP Support Agreement for 10 user license, dated April 20, 2015, by and between RxXpert, LLC and Emergys Corporation.
- Software License Agreement, Payment Terms and Conditions, SAP America, Inc., and RxXpert, LLC, effective April 20, 2015
- Software License Agreement, Software Order Form for Indirect Sales No. 1, by and between SAP America, Inc., and RxXpert, LLC, effective April 20, 2015
- SAP Enterprise Support Schedule en USv5-2016
- Sap Service Description, SAP Implementation – On Premise and Private Cloud v10-2015

