UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JITENDRA JAIN, MANISH ARORA,
HARSH DATTA, BALVANT ARORA,
and SCARIYA KUMARAMANGALAM,

    Plaintiffs,

v.                      Case No. 8:20-cv-2263-VMC-JSS

NEXGEN MEMANTINE, INC.,
SUREN AJJARAPU,
ANNAPURNA GUNDLAPALLI,
GAJAN MAHENDIRAN,
NEXGEN LIFE SCIENCES LLC,
G&S COAL TRADERS, LLC,
and TRXADE GROUP, INC.,

    Defendants.

_____/

## ORDER

    This matter comes before the Court upon consideration of Defendant Suren Ajjarapu's Motion to Dismiss Verified Amended Complaint (Doc. # 140), Defendant Annapurna Gundlapalli's Motion to Dismiss Verified Amended Complaint (Doc. # 141), and Defendant Nexgen Memantine, Inc.'s Motion to Dismiss Counts I, III, V, and X of the Verified Amended Complaint (Doc. # 142), filed on April 6, 2021. Plaintiffs Jitendra Jain, Manish Arora, Harsh Datta, Balvant Arora, and Scariya Kumaramangalam have responded. (Doc. ## 145, 146, 147). The

1

Motions are granted in part and denied in part as set forth herein.

I.   **Background**

"Beginning in November 2015 and continuing through February 2016 (the 'Solicitation Period'), [] Ajjarapu and [] Mahendiran, on behalf of Nexgen Memantine [], solicited the sale of securities in the form of preferred stock to" Plaintiffs as private investors. (Doc. # 136 at 3). Mahendiran is Nexgen Memantine's president, and Ajjarapu is Mahendiran's partner as well as CEO of "Trxade Group Inc., a publicly traded and well-established company in the pharmaceutical industry." (Id. at 4). Mahendiran allegedly represented that "while Ajjarapu was not 'on paper,' that he was managing and controlling Nexgen Memantine along with Mahendiran." (Id.). Gundlapalli is the vice president and secretary of Nexgen Memantine. (Id. at 18, 24).

Nexgen Memantine allegedly is a business that intended to manufacture and sell "a generic version of the currently existing memantine drug, which is used as a form of treatment for Alzheimer's disease, once it was approved by the United States Food and Drug Administration ('FDA')." (Id. at 4). On "November 15, 2015, Ajjarapu and Mahendiran told [Plaintiff] Datta that Ajjarapu's company, Trxade Group, was majorly

involved in controlling Nexgen Memantine, and that Trxade
Group would handle the logistics of pricing and marketing
Nexgen Memantine's product." (Id.). "Ajjarapu and Mahendiran
explained to Datta that they had already invested some of
their own money into Nexgen Memantine and secured other
private investments totaling approximately $4-5 million, but
that they were still looking to secure approximately $1
million to go towards funding the production of the pending
generic memantine drug." (Id. at 5).

"While soliciting Plaintiff Investors, Ajjarapu and
Mahendiran provided misleading information to Plaintiff[]
Investors, in the form of false statements,
misrepresentations, and material omissions." (Id. at 3).
"Plaintiff Investors would not have invested in Nexgen
Memantine [] but for the false statements,
misrepresentations, and material omissions." (Id.).
"Plaintiff Investors relied on the misinformation provided by
Ajjarapu and Mahendiran, and lost their entire investment
principal as a result of their investments in Nexgen
Memantine." (Id.). In total, Plaintiffs invested $425,000 in
Nexgen Memantine. (Id. at 16-17).

The alleged misrepresentations in the verified amended
complaint include, among other things:

(1)   In a December 15, 2015 email sent to Plaintiff Datta, "Mahendiran falsely represented that Nexgen Memantine had a distribution network built (setup through Trxade Group)" even though "Nexgen Memantine had no agreements with any distributors at the time, nor would it make any such agreements in the future." (Id. at 5-6)

(2)   Mahendiran attached to the same email a "'Nexgen Teaser,' which stated that Nexgen Memantine had partnered with a pharmaceutical manufacturer in Hyderabad, India" even though "Nexgen Memantine had no partnership agreements finalized with any pharmaceutical manufacturers in Hyderabad, India." (Id. at 6).

(3)   The "Nexgen Teaser" stated that Ajjarapu was the "Manager" of Nexgen Memantine, even though "Ajjarapu was not, and never has been, a manager of Memantine in any official capacity." (Id. at 6).

(4)   Mahendiran emailed Plaintiffs a presentation about Trxade Group, of which Ajjarapu is CEO, "to support Ajjarapu and Mahendiran['s] representations that Trxade would use its knowledge as a pharmaceutical industry insider and its control of Trxade to directly control and market Nexgen Memantine's generic memantine drug in the United States, at a lower price than competitors." (Id. at 6-7).

(5)   "Throughout the Solicitation Period, Ajjarapu and Mahendiran consistently represented that Nexgen Memantine was controlled by and partnered with Trxade Group, and that Trxade was in control of marketing and distribution of the drug." (Id. at 7).

(6)   "Throughout the Solicitation Period, Ajjarapu represented to Plaintiff Investors in phone and in-person conversations that he was the CEO of Trxade Group, and that Trxade Group had a pecuniary interest in Nexgen Memantine's business and pending generic memantine drug." (Id.).

4

(7) "At times during the Solicitation Period, Ajjarapu and Mahendiran also represented to Plaintiff Investors that there was a high likelihood that Trxade Group Inc. might buy the rights to Nexgen Memantine's generic memantine drug or would seek to acquire the corporation itself" even though "this representation was false and/or misleading because after an investigation with the FDA it appears the drug was never submitted for approval at all." (Id. at 8).

(8) "Throughout the Solicitation Period, during telephone calls and inperson meetings with Plaintiff Investors, Ajjarapu and Mahendiran represented that Nexgen Memantine had an agreement to sell the generic memantine drug to the United States Veterans Administration ('VA')," which was "false and/or misleading as Mahendiran and Nexgen Memantine have since admitted that the corporation did not have an agreement to sell the generic memantine drug to the VA." (Id.).

(9) "At some point during the Solicitation Period, Ajjarapu and Mahendiran provided Plaintiff Investors with another presentation on Nexgen Memantine" that stated "MEMANTINE IS ALREADY FDA APPROVED AND MANUFACTURING UNIT IN INDIA IS ALSO USA/FDA APPROVED TO PRODUCE IT !!." (Id.). "This was false and/or misleading because Nexgen Memantine's generic memantine drug had not yet been approved by the FDA, and Plaintiff Investors were later told by Mahendiran that delays in Nexgen Memantine's business were the result of the Indian manufacturer's difficulty getting FDA approval." (Id. at 8-9).

(10) This same presentation also stated that "[c]urrently Nexgen has partnered with Westminster to distributor [sic] products thru [sic] wholesale partnership," which was "false and/or misleading because Westminster Pharmaceuticals LLC has since denied any partnership agreement with Nexgen Memantine existed at the time the representation was made." (Id. at 9).

(11) A third presentation from January 2016 stated that, "[o]n a conservative basis Nexgen will have 3% market share of pie . . . based on current wholesale distributors who are already buying drugs [list omitted] from us." (<u>Id.</u> at 9). "[T]his representation was false and/or misleading because Nexgen Memantine was not selling any drugs to wholesale distributors at the time the representation was made, as the company had only been incorporated a few months earlier in November of 2015." (<u>Id.</u>).

(12) During a January 4, 2016 conference call, Ajjarapu and Mahendiran "reiterated Trxade Group's relation to, and pecuniary interest in, Nexgen Memantine"; "represented to Plaintiff Investors that manufacturing of the generic memantine drug through an Indian pharmaceutical manufacturing partner would begin by June 2016" and "that distribution of the generic memantine drug would begin by the end of 2016"; "represented that Nexgen Life Sciences LLC, which Ajjarapu and Mahendiran claimed was the 'parent company' of Nexgen Memantine, would guarantee that any investment by Plaintiff Investors, or equity held by Plaintiff Investors, in Nexgen Memantine would be safe"; "represented that Plaintiff Investors would receive interest payments on their principal sums regardless of income generated by Nexgen Memantine, in addition to distributions that would be received only as the corporation generated income"; "represented that Ajjarapu and Mahendiran had already invested their own personal money into Nexgen Memantine" and "that Nexgen Memantine as a company had been evaluated at $12.9 million"; and "represented that FDA would approve Nexgen Memantine's generic memantine drug in the immediate future, specifically at some time in 2016." (<u>Id.</u> at 10-12).

(13) "Throughout the Solicitation Period, Ajjarapu and Mahendiran represented that Nexgen Memantine was a functioning business" even though "Nexgen Memantine is a mere shell with no employees, partnered manufacturers or distributors, or source

of income other than private investments through the sale of securities." (Id. at 13).

(14) "Throughout the Solicitation Period, Ajjarapu and Mahendiran consistently represented to Plaintiff Investors that securities in Nexgen Memantine were of low risk or otherwise a safe and guaranteed investment," which was "false and or misleading because the risk was substantial, as the investors stood a higher than average risk of losing all of their principal, which turned out to be the eventual result." (Id. at 13).

(15) "Throughout the Solicitation Period, Ajjarapu and Mahendiran represented that Plaintiff Investors would receive Preferred Stock in exchange for their investments, that would come with a 12% interest guaranteed dividend." (Id. at 14).

(16) "On December 21, 2015, Ajjarapu directly emailed Plaintiff Datta regarding the sale of securities in Nexgen Memantine, offering to structure a corporate guarantee for the Plaintiff Investors through convertible debt in order to further lower the risk of the potential investment." (Id. at 15). Therein, "Ajjarapu stated that if Nexgen Memantine failed to produce revenue, 'you have corporate [guarantee] to pay the Principle [sic] and interest,'" which "was false and/or misleading because despite Nexgen Memantine's inability to gain FDA approval and lack of income, the Plaintiff Investors have not been repaid their principal investments." (Id.).

(17) Attached to the email was a "NMI Bridge Loan 12.21.15" document, stating that "Nexgen Memantine, the 'Payor,' promises to pay the Plaintiff Investors, as 'Holders,' the principal sum of their investment with 12% interest per year on the outstanding principal amount." (Id.). Similarly attached to the email was a "Corporate Guarantee" document "in which Nexgen Memantine as both the 'Borrower' and 'Guarantor' promises to pay back the principal amount of the Plaintiff Investors' investments." (Id. at 16).

Between their investments in early 2016 and November 2018, Plaintiffs allege they were generally kept uninformed of the progress of Nexgen Memantine. (Id. at 17-18). When they called Mahendiran to check the progress, "Mahendiran represented that he made sufficient income from his medical practice to repay the combined principal amount that the Plaintiff Investors had invested into Nexgen Memantine, $425,000.000, and promised to personally repay the Plaintiff Investors in the event that Nexgen Memantine did not gain FDA approval for its generic memantine drug." (Id. at 18).

Then, on "November 1, 2018, Plaintiff Investors received a notice of special meeting from [] Gundlapalli in her capacity as secretary of Nexgen Memantine." (Id.). "To the surprise of Plaintiff Investors and other parties present, Ajjarapu presided over the [November 27, 2018] meeting in Gundlapalli's stead, despite no notice by Gundlapalli or approval by the shareholders of such a proxy." (Id. at 19).

"It was at this special meeting that the Plaintiff Investors first learned of the various transfers of funds out of Nexgen Memantine's accounts for no consideration or exchange. It was also at this meeting Plaintiff Investors first began to fear the business was not running slow, but they were possibly defrauded." (Id.). "According to Ajjarapu,

his attorney, and the attorney for Nexgen Memantine, on several instances in 2016, money began to leave Nexgen Memantine's accounts for no apparent reason, with some labeled as 'Trxade Invest.' Said transfers amounted to $1,185,000.00." (Id.). Ajjarapu allegedly claimed at the meeting that Mahendiran had transferred the money to Mahendiran's own accounts. (Id. at 20).

But "three individuals had the ability to transfer money out of Nexgen Memantine's accounts: (a) Mahendiran; (b) Gundlapalli; and (c) Ajjarapu, by extension of Gundlapalli." (Id. at 19-20). "Upon information and belief, Plaintiff Investors believe that Ajjarapu and Mahendiran are both responsible for unauthorized and illegal transfers of funds from Nexgen Memantine to [Defendant] G&S Coal Traders. The basis for this belief is that Ajjarapu moved the money first into G&S Coal, and then out of G&S Coal to Mahendiran." (Id. at 20).

Plaintiffs initiated this action on September 25, 2020. (Doc. # 1). They subsequently filed an amended complaint on February 1, 2021. (Doc. # 97). They then filed a verified amended complaint on March 30, 2021. (Doc. # 136). The verified amended complaint asserts the following claims: fraud under Section 10(b) of the Exchange Act and Rule 10b-5

9

against Ajjarapu, Mahendiran, and Nexgen Memantine (Count I); controlling person liability under 15 U.S.C. § 78t against Gundlapalli, Nexgen Life Sciences, LLC, and Trxade Group, Inc. (Count II) fraudulent securities transactions under Florida Statutes §§ 517.301, 517.211 against Ajjarapu, Mahendiran, and Nexgen Memantine (Count III); common law fraud against Ajjarapu, Mahendiran, and Nexgen Memantine (Count IV); civil conspiracy against Ajjarapu, Mahendiran, Nexgen Memantine, Gundlapalli, Nexgen Life Sciences, Trxade Group, and G&S Coal Traders (Count V); civil theft against Ajjarapu and Mahendiran (Count VII); unjust enrichment against Ajjarapu and Mahendiran (Count VIII); promissory estoppel against Mahendiran (Count IX); a derivative claim for breach of fiduciary duty against Ajjarapu, Mahendiran, and Gundlapalli (Count X); and breach of oral contract against Nexgen Life Sciences (Count XI). (Id.).

Now, Ajjarapu, Gundlapalli, and Nexgen Memantine have moved to dismiss. (Doc. ## 140, 141, 142). Plaintiffs have responded (Doc. ## 145, 146, 147), and the Motions are ripe for review.

II.   **Legal Standard**

A.   **Rule 12(b)(6)**

On a motion to dismiss pursuant to Rule 12(b)(6), this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, the Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990). But,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court must limit its consideration to well-pleaded factual allegations, documents central to or referenced in the complaint, and matters

judicially noticed. <u>La Grasta v. First Union Sec., Inc.</u>, 358 F.3d 840, 845 (11th Cir. 2004).

### B. <u>Rule 9(b)</u>

The Federal Rules of Civil Procedure accord a heightened pleading standard to claims for fraud, requiring that they be pled with particularity. Fed. R. Civ. P. 9(b). Under Rule 9(b), the "plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiffs; and (4) what the defendants gained by the alleged fraud." <u>Am. Dental Ass'n v. Cigna Corp.</u>, 605 F.3d 1283, 1291 (11th Cir. 2010)(quoting <u>Brooks v. Blue Cross & Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1380-81 (11th Cir. 1997)).

This "requirement serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." <u>W. Coast Roofing and Waterproofing, Inc. v. Johns Manville, Inc.</u>, 287 F. App'x 81, 86 (11th Cir. 2008)(quoting <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001)).

C.   **PSLRA**

The Private Securities Litigation Reform Act of 1995 ("PSLRA") "imposes additional heightened pleading requirements for Rule 10b-5(b) actions." In re Galectin Therapeutics, Inc. Sec. Litig., 843 F.3d 1257, 1269 (11th Cir. 2016). "For Rule 10b-5(b) claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" Id. (quoting 15 U.S.C. § 78u-4(b)(1)).

"And for all private Rule 10b-5(b) actions requiring proof of scienter, 'the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter].'" Id. at 1269-70 (quoting 15 U.S.C. § 78u-4(b)(2)). "Although factual allegations may be aggregated to infer scienter, scienter must be alleged with respect to each defendant and with respect to each alleged violation of the

statute." Id. at 1270. "To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007).

"If these PSLRA pleading requirements are not satisfied, the court 'shall' dismiss the complaint." In re Galectin Therapeutics, Inc. Sec. Litig., 843 F.3d at 1270 (quoting 15 U.S.C. § 78u-4(b)(3)(A)).

III. **Analysis**

    A.   **Ajjarapu's Motion**

        1.   **Count I**

First, Ajjarapu argues that Count I against him for fraud under Section 10(b) of the Exchange Act and Rule 10b-5 fails to satisfy the pleading requirements of Rule 9(b) and the PSLRA. (Doc. # 140 at 6).

To state a claim for fraud under section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the

loss." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011)(citation omitted). Such a claim must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. Id.

Ajjarapu argues that this claim must be dismissed against him because "Plaintiffs fail to allege that Ajjarapu made the [] claimed misrepresentations" because the vast majority of the misstatements were alleged to be made by "Ajjarapu and Mahendiran" together, without specifying which Defendant actually made each statement. (Doc. # 140 at 7-8). Indeed, most of the alleged misstatements were supposedly made by "Ajjarapu and Mahendiran" together during meetings and phone calls. (Doc. # 136 at 7-14).

Although claims may sometimes be asserted against more than one defendant collectively, the Court agrees with Ajjarapu that the lumping of Ajjarapu and Mahendiran together here is impermissible. See W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc., 287 F. App'x 81, 86 (11th Cir. 2008)("In a case with multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient."). "For purposes of Rule 10b-5, the maker of a statement is the person or entity

with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011). Thus, it is important that Plaintiffs specify who exactly made the alleged misrepresentations during the calls and meetings that both Ajjarapu and Mahendiran attended, as simply being present when a misrepresentation is made would not render Ajjarapu responsible for such statement. See Id. at 143 ("[I]t is the speaker who takes credit — or blame — for what is ultimately said."). The statements attributed to Ajjarapu and Mahendiran collectively cannot support this claim and must be repled.

Additionally, in light of the unspecified lumping of Mahendiran and Ajjarapu for these statements, the verified amended complaint fails to create a strong inference that Ajjarapu made these misstatements with scienter.

Nor does one of the only statements alleged to have been made by Ajjarapu alone support Plaintiffs' claims. (Doc. # 136 at 15-16). Ajjarapu offered to structure Plaintiffs' investment in Nexgen Memantine as a loan in conjunction with a corporate guarantee. (Id.; Doc. # 136-8). But Plaintiffs never executed the loan agreement to which the corporate guarantee Ajjarapu described was related. (Doc. # 136-9).

16

Instead, they invested through a subscription agreement. (Doc. # 136-10). Thus, as Ajjarapu persuasively puts it, "[w]ithout an allegation that Plaintiffs executed a debt instrument, Plaintiffs cannot plausibly claim that representations by Ajjarapu related to a guarantee of a debt instrument were material to their equity investments in [Nexgen] Memantine." (Doc. # 140 at 10-11). Therefore, this statement by Ajjarapu cannot support Plaintiffs' claim.

In short, the verified amended complaint fails to state a claim against Ajjarapu because it does not sufficiently identify material misstatements made by Ajjarapu or allege scienter. Count I is therefore dismissed with leave to amend.

### 2.   **Counts III and IV**

In Counts III and IV, Plaintiffs assert claims for violations of the Florida Securities and Investor Protection Act ("FSIPA") and common law fraud.

Section 517.301 provides that it is unlawful for an individual "in connection with the offer, sale, or purchase of any investment or security" to do any of the following: (1) "employ any device, scheme, or artifice to defraud;" (2) "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light

of the circumstances under which they were made, not misleading;" or (3) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person." Fla. Stat. § 517.301(1)(a)(1)-(3).

"The essential elements of common-law fraud are: (1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person." Gandy v. Trans World Computer Tech. Grp., 787 So. 2d 116, 118 (Fla. 2d DCA 2001). As both of these claims involve fraud, they must satisfy the pleading requirements of Rule 9(b).

The Court agrees with Ajjarapu that these counts fail to satisfy Rule 9(b) for the same reasons as Count I discussed above. The statements attributed to both Mahendiran and Ajjarapu without differentiation cannot support these claims. Likewise, the statement by Ajjarapu offering a corporate guarantee if Plaintiffs' provided a loan cannot support these claims as Plaintiffs did not loan Nexgen Memantine money — instead they invested in exchange for equity.

Thus, these claims must be repled.

### 3.   Count V

In Count V, Plaintiffs assert a claim for civil conspiracy against Ajjarapu.

"Under Florida Law, the elements of civil conspiracy are: '(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.'" HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc., 302 F. Supp. 3d 1319, 1324-25 (M.D. Fla. 2016)(quoting United Techs. Corp v. Mazer, 556 F.3d 1260, 1271 (11th Cir. 2009)), aff'd, 703 F. App'x 814 (11th Cir. 2017). "An actionable conspiracy requires an actionable underlying tort or wrong." Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cnty., 616 So. 2d 562, 565 (Fla. 5th DCA 1993).

To the extent Count V is based on the underlying wrong of fraud, this claim must be dismissed because the various fraud claims against Ajjarapu have been dismissed with leave to amend. See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1067 (11th Cir. 2007)("[A] claim that is found not to be actionable cannot serve as the basis for a conspiracy claim.").

This count is also based on the underlying tort of civil theft. But, for the reasons explained below, the verified amended complaint fails to state a claim for civil theft against Ajjarapu. Therefore, Count V fails to state a claim for civil conspiracy based on the alleged civil theft.

Count V is dismissed with leave to amend.

### 4.   Count VII

Plaintiffs assert a claim for civil theft against Ajjarapu in Count VII.

"Under Florida law, a plaintiff is entitled to treble damages if he proves by clear and convincing evidence that he has been injured by the defendant's violation of Section 812.014, Florida Statutes – the criminal theft statute." Omnipol, a.S. v. Worrell, 421 F. Supp. 3d 1321, 1346 (M.D. Fla. 2019)(citing Fla. Stat. § 772.11(1)). "Thus, to state a claim for civil theft, the plaintiff must allege an injury resulting from a violation of the criminal theft statute." Id. "To do this, the plaintiff must allege the defendant: (1) knowingly (2) obtained or used, or endeavored to obtain or use, the plaintiff's property with (3) 'felonious intent' (4) either temporarily or permanently to (a) deprive the plaintiff of the right or benefit of the property, or (b)

appropriate the property to the defendant's own use or the use of another." Id.

"To establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." Heldenmuth v. Groll, 128 So. 3d 895, 896 (Fla. 4th DCA 2013)(quoting Gasparini v. Pordomingo, 972 So.2d 1053, 1056 (Fla. 3d DCA 2008)). "If there was no factual basis to support a claim for conversion, there can be no cause of action for civil theft." Id.

To state a claim for conversion of money under Florida law, a plaintiff must allege: "(1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so." United States v. Bailey, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003), aff'd, 419 F.3d 1208 (11th Cir. 2005). Under Florida law, "[m]oney is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or where the wrongful possession of such property is obtained." Tambourine Comercio Internacional SA v. Solowsky, 312 F. App'x 263, 272 (11th Cir. 2009)(citation omitted).

Thus, "there must be an obligation to keep intact or deliver the specific money in question, so that money can be identified." Gasparini v. Pordomingo, 972 So.2d 1053, 1056 (Fla. 3d DCA 2008)(citation omitted); see also In re Mouttet, 493 B.R. 640, 662 (Bankr. S.D. Fla. 2013)("Money cannot be converted unless the money is a specifically identifiable fund such as an escrow account, a bag of gold coins, or the like." (citation omitted)).

Ajjarapu argues that "Plaintiffs fail to allege that their capital investment in [Nexgen] Memantine was meant for any specific purpose, was held in a separate account, or is able to be identified as required under Florida law." (Doc. # 140 at 18). The Court agrees with Ajjarapu. Plaintiffs' allegation that its money — paid to Nexgen Memantine in exchange for stock — "was intended to be used to repay Plaintiff Investors their principal investments in the corporation" is not plausible. (Doc. # 136 at 40). And the verified amended complaint does not allege Plaintiffs' investment was held in separate account to be kept intact.

Additionally, Ajjarapu is correct that Plaintiffs fail to allege that Ajjarapu acted with felonious intent, as required to state a claim for civil theft. (Doc. # 140 at 19).

For these reasons, Count VII is dismissed with leave to amend.

5. __Count VIII__

In Count VIII, Plaintiffs assert a claim of unjust enrichment against Ajjarapu in the alternative to Count VII.

"A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." United States Stepe v. RS Compounding LLC, 325 F.R.D. 699, 710 (M.D. Fla. 2017)(quoting Virgilio v. Ryland Grp., Inc., 680 F.3d 1329, 1337 (11th Cir. 2012)).

Ajjarapu argues that this count should be dismissed because "Plaintiffs have failed to allege that Plaintiffs conferred a benefit on Ajjarapu or that Ajjarapu has voluntarily accepted and retained any benefit." (Doc. # 140 at 20-21).

The Court agrees that Plaintiffs' allegations are internally inconsistent. Although Plaintiffs allege that the assets were "conferred upon Mahendiran and Ajjarapu" and that "Mahendiran and Ajjarapu currently retain the full benefit of Plaintiff Investors' money," they also allege that their

23

money is "currently in Mahendiran's possession." (Doc. # 136 at 42). Thus, without further allegations, the verified amended complaint fails to plausibly allege that Ajjarapu — rather than Mahendiran — has retained the benefit of Plaintiffs' money.

The Motion is granted as to Count VIII with leave to amend.

### 6.   Count X

Finally, Ajjarapu moves to dismiss Count X, the derivative breach of fiduciary duty claim. (Doc. # 140 at 22-23). First, he argues that the verified amended complaint does not satisfy the requirements of Federal Rule of Civil Procedure 23.1 because it fails to "allege that [] [P]laintiffs were shareholders or members at the time of the transaction complained of, that [] [P]laintiffs' share or membership later devolved on it by operation of law, or the noncollusiveness of the action." (Id. at 22); see Fed. R. Civ. P. 23.1(b) (stating that the complaint must allege, among other things, "that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law" and "that the action is not a collusive one to confer jurisdiction that the court would otherwise lack").

The Court agrees. Although Plaintiffs allege that they are "all currently shareholders" of Nexgen Memantine (Doc. # 136 at 45), they fail to allege that they were shareholders at the time of the relevant transactions. Additionally, Plaintiffs never allege that this "action is not a collusive one to confer jurisdiction that the court would otherwise lack." Fed. R. Civ. P. 23.1(b)(2). Thus, Count X must be dismissed to rectify these deficiencies.

Additionally, the Court agrees that this count is also due to be dismissed for failing to allege the statutory demand. Under Wyoming Statute § 17-16-742,

> No shareholder may commence a derivative proceeding until: (i) A written demand has been made upon the corporation to take suitable action; and (ii) Ninety (90) days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety (90) day period.

Wyo. Stat. § 17-16-742.

The statute contains no explicit exception for futility. See In re Guidant S'holders Derivative Litig., 841 N.E.2d 571, 574 (Ind. 2006)(noting that Section 17-16-742 is a "universal demand statute"). And the parties have not presented any case law in which a futility exception to Section 17-16-742's demand requirement has been applied.

Thus, it appears that there is no futility exception to this statute.

Although the verified amended complaint alleges that a demand would be futile, it does not allege that a demand was made or that Plaintiffs waited the required amount of time. Therefore, when amending this claim, Plaintiffs should be sure to properly allege their compliance with the demand requirement.

**B.**   **Gundlapalli's Motion**

Gundlapalli moves to dismiss all the claims against her.

**1.**   **Count II**

In Count II, Plaintiffs assert a claim for controlling person liability under 15 U.S.C. § 78t against Gundlapalli.

To state a claim under Section 78t, a plaintiff "must allege three elements: (1) a primary violation of the securities laws; (2) that the individual defendant had the power to control the general business affairs of the corporation; and (3) that the individual defendant had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability." MAZ Partners LP v. First Choice Healthcare Sols., Inc., No. 6:19-cv-619-PGB-LRH, 2019 WL 5394011, at *7 (M.D. Fla. Oct. 16, 2019)(citation and internal

quotation marks omitted), <u>report and recommendation adopted</u>, 6:19-cv-619-PGB-LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020).

Here, Gundlapalli argues that this claim should be dismissed because "Plaintiffs have failed to properly allege an underlying violation of federal securities law" given that Plaintiffs' claim against her "hinges on the alleged securities fraud of" Ajjarapu. (Doc. # 141 at 7). Because the Court has found that Plaintiffs failed to state a claim for securities fraud against Ajjarapu, the Court agrees with Gundlapalli that Plaintiffs have not stated a claim for controlling person liability against her. See <u>Mizzaro v. Home Depot, Inc.</u>, 544 F.3d 1230, 1237 (11th Cir. 2008)("Because a primary violation of the securities laws is an essential element of a [Section] 20(a) derivative claim, we have held that a plaintiff adequately pleads a [Section] 20(a) claim only if the primary violation is adequately pleaded."). This alone requires dismissal of this claim.

Accordingly, Count II is dismissed with leave to amend.

### 2.   <u>Count V</u>

Count V is a claim for civil conspiracy against Gundlapalli. (Doc. # 136 at 34). This claim is based on alleged fraud and theft.

The Court agrees with Gundlapalli that the verified amended complaint fails to state a claim for civil conspiracy against Gundlapalli. (Doc. # 141 at 10-13). Gundlapalli argues the verified amended complaint "lacks any allegation that Gundlapalli had an agreement with Ajjarapu or others to commit fraud, that Gundlapalli had actual knowledge of the alleged fraud, or that Gundlapalli took any overt action in furtherance of alleged fraud." (Id. at 11).

Indeed, the allegations against Gundlapalli are thin and conclusory and, thus, insufficient to satisfy Rule 9(b). For example, as to an agreement to commit fraud, the verified amended complaint conclusorily alleges that "there was an agreement between Ajjarapu, Mahendiran, [and] Gundlapalli . . . to systematically defraud and deprive Plaintiff Investors of their money." (Doc. # 136 at 34). Further detail regarding Gundlapalli's involvement in the alleged conspiracy are required.

For these reasons, Count V is dismissed with leave to amend.

### 3.   Count X

Finally, Gundlapalli moves to dismiss Count X, the derivate breach of fiduciary duty claim. (Doc. # 141 at 13-15).

Count X is dismissed with leave to amend for the reasons explained in connection with Ajjarapu's Motion. Thus, Gundlapalli's Motion is granted as to Count X.

**C.    Nexgen Memantine's Motion**

Nexgen Memantine moves to dismiss Counts I, III, V, and X.

**1.    Count I**

Nexgen Memantine argues that Count I for securities fraud should be dismissed because Plaintiffs have supposedly not stated claims for fraud against Ajjarapu, Gundlapalli, or Mahendiran. (Doc. # 142 at 7-8); see Mizzaro, 544 F.3d at 1254 ("Corporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them.").

This argument fails. Although the Court agrees that Plaintiffs have not stated a claim under Section 10(b) of the Exchange Act and Rule 10b-5 against Ajjarapu and Gundlapalli, the verified amended complaint states a claim against Mahendiran.

Although Mahendiran is lumped together with Ajjarapu for many of the alleged misrepresentations, the verified amended complaint alleges numerous misrepresentations made by Mahendiran alone. For example, Mahendiran alone sent

29

Plaintiffs the "Nexgen Teaser" document that stated "Nexgen
Memantine had partnered with a pharmaceutical manufacturer in
Hyderabad, India." (Doc. # 136 at 6). This was false because
"Nexgen Memantine had no partnership agreements finalized
with any pharmaceutical manufacturers in Hyderabad, India."
(Id.). Likewise, in December 2015, Mahendiran emailed
Plaintiffs, stating that Nexgen Memantine already had a
distribution network in place, which was "false and/or
misleading because Nexgen Memantine had only been
incorporated the month prior . . . [and] had no agreements
finalized with distributors at the time." (Id. at 13-14).
When Plaintiffs later expressed their dissatisfaction "with
the slowness of the project," Mahendiran also allegedly
stated during a telephone call that "he made sufficient income
from his medical practice to repay the combined principal
amount that the Plaintiff Investors had invested into Nexgen
Memantine, $425,000.000, and promised to personally repay the
Plaintiff Investors in the event that Nexgen Memantine did
not gain FDA approval for its generic memantine drug." (Id.
at 18). Yet, Plaintiffs have not been repaid.

Additionally, the verified amended complaint
sufficiently alleges Mahendiran's scienter. The allegations
regarding Mahendiran's alleged misrepresentations above,

taken together with the allegation that Mahendiran currently possesses Plaintiffs' money after transferring it out of Nexgen Memantine's account (Id. at 39), create a strong inference of scienter. See Tellabs, Inc., 551 U.S. at 314 ("To qualify as 'strong' within the intendment of § 21D(b)(2), . . . an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."). The most compelling inference from these allegations is that Mahendiran intended to defraud Plaintiffs of their investment and his scienter can be imputed to Nexgen Memantine.

Thus, to the extent the claim against Nexgen Memantine is based on Mahendiran's underlying fraud, this claim survives.

### 2.   Count III

Nexgen Memantine argue that this FSIPA claim should be dismissed because "Plaintiffs' allegations in Count III suffer the same pleading deficiencies as in Count I." (Doc. # 142 at 9).

However, for the same reasons the Court denied the Motion as to Count I against Nexgen Memantine, the Court denies the Motion as to Count III. The verified amended complaint

31

sufficiently states a FSIPA claim against Mahendiran, which supports the FSIPA claim against Nexgen Memantine.

### 3. Count V

Nexgen Memantine argues that Count V, for civil conspiracy, must be dismissed under the intracorporate conspiracy doctrine. (Doc. # 142 at 10-11). Under the intracorporate conspiracy doctrine, "a corporation's employees, acting as agents of the corporation, are deemed incapable of conspiring among themselves or with the corporation." Hollins v. Fulton Cnty., 422 F. App'x 828, 833 (11th Cir. 2011)(quoting Dickerson v. Alachua Cnty. Comm'n, 200 F.3d 761, 767 (11th Cir. 2000)).

However, there is an exception to this doctrine: "a corporation cannot conspire with its own agents or employees unless the co-conspiring corporate agents are alleged to possess a personal stake in achieving the object of the conspiracy which is separate and distinct from the corporation's interest." McLeod v. Barber, 764 So. 2d 790, 793 (Fla. 5th DCA 2000); see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc., 302 F. Supp. 3d 1319, 1325 (M.D. Fla. 2016)("Under [the personal stake] exception, a corporate employee may be liable for conspiring with his or her corporation or with other corporate agents where 'the agent

has a personal stake in the activities that are separate and distinct from the corporation's interest.'" (citation omitted)), aff'd, 703 F. App'x 814 (11th Cir. 2017). "[T]he personal stake exception requires more than some incidental personal benefit — the exception applies only 'where corporate employees are shown to have been motivated *solely* by personal bias.'" HRCC, Ltd., 302 F. Supp. 3d at 1325 (citation omitted).

According to Nexgen Memantine, the verified amended complaint "does not allege that the exception to the intra-corporate conspiracy doctrine applies" because "Plaintiffs have failed to allege that the agents and employees had a personal stake separate and distinct from that of" Nexgen Memantine. (Doc. # 142 at 11).

Plaintiffs argue that they have sufficiently pled that the exception to the intra-corporate conspiracy doctrine applies. (Doc. # 147 at 12-13). They emphasize that they "have alleged that numerous sums of money were removed from [] Nexgen Memantine's accounts for no apparent reason and that it is believed that some of this money was moved into [] Ajjarapu and [] Mahendiran's personal accounts." (Id. at 12).

The Court disagrees and finds that the narrow personal stake exception is not sufficiently pled. The verified

33

amended complaint alleges that Plaintiffs' investment was transferred out of Nexgen Memenantine's accounts to G&S Coal Traders, with some of that money then being transferred to Mahendiran somehow. (Doc. # 136 at 20). And the only allegation that these transfers were made for the personal benefit of any of the individual Defendants is the allegation that, at a meeting in November 2018, "Ajjarapu claims that the withdrawals had all been conducted by Mahendiran, who transferred the money to his own accounts." (Id.).

These allegations are not enough to plausibly support that Mahendiran, Ajjarapu, and Gundlapalli had separate and distinct personal stakes in achieving the object of the conspiracy. Thus, while the Court believes that Plaintiffs should be given another opportunity to plead the applicability of the exception, they have not sufficiently stated a claim for civil conspiracy. Count V is dismissed with leave to amend.

### 4.   Count X

The Court agrees with Nexgen Memantine that the derivative claim, Count X, must be dismissed for the reasons discussed regarding Ajjarapu's Motion and Gundlapalli's Motion. Count X is dismissed with leave to amend.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Suren Ajjarapu's Motion to Dismiss Verified Amended Complaint (Doc. # 140) is **GRANTED.** All claims against Ajjarapu are dismissed with leave to amend.

(2)   Defendant Annapurna Gundlapalli's Motion to Dismiss Verified Amended Complaint (Doc. # 141) is **GRANTED.** All claims against Gundlapalli are dismissed with leave to amend.

(3)   Defendant Nexgen Memantine, Inc.'s Motion to Dismiss Counts I, III, V, and X of the Verified Amended Complaint (Doc. # 142) is **GRANTED** in part and **DENIED** in part. Counts I and II survive against Nexgen Memantine to the extent they are based on the actions of Mahendiran. Counts V and X are dismissed with leave to amend.

(4)   Plaintiffs may file a second amended complaint to correct the deficiencies identified herein by **May 6, 2021.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 22nd day of April, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE