**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JITENDRA JAIN,
MANISH ARORA,
SCARIYA KUMARAMANGALAM,
HARSH DATTA, and
BALVANT ARORA, as individuals, and derivatively
on behalf of NEXGEN MEMANTINE INC.

            Case No. 8:20-cv-2263-T-33JSS

       Plaintiffs,

v.

            Derivative Action

NEXGEN MEMANTINE INC.,
SUREN AJJARAPU,
ANNAPURNA GUNDLAPALLI,
GAJAN MAHENDIRAN,
NEXGEN LIFESCIENCES LLC,
TRXADE GROUP, INC., and
G&S COAL TRADERS, LLC

       Defendants.

_____/

**SECOND AMENDED VERIFIED COMPLAINT**

      Plaintiffs, Jitendra Jain, Manish Arora, Scariya Kumaramangalam, Harsh Datta and

Balvant Arora, by and through their undersigned counsel, file suit against Defendants, Nexgen

Memantine, Inc., Suren Ajjarapu, Annapurna Gundlapalli, Gajan Mahendiran, Nexgen

LifeSciences LLC, Trxade Group, Inc., and G&S Coal Traders, LLC and allege as follows:

**PARTIES AND JURISDICTION**

1.      Plaintiff Jitendra Jain is a resident of Madison County, Alabama.

2.      Plaintiff Manish Arora is a resident of Limestone County, Alabama.

3.      Plaintiff Scariya Kumaramangalam is a resident of Madison County, Alabama.

4.      Plaintiff Harsh Datta is a resident of Prince William County, Virginia.

5.      Plaintiff Balvant Arora is a resident of Stafford County, Virginia.

6.      Upon information and belief, Defendant Suren Ajjarapu resides at 19814 Sea Rider Way, Lutz, Florida 33559.

7.      Upon information and belief, Defendant Annapurna Gundlapalli resides at 19814 Sea Rider Way, Lutz, Florida 33559.

8.      Defendant Gajan Mahendiran resides at 4427 Corral Road, Warrenton, Virginia 20187.

9.      Nexgen Memantine Inc. is a Wyoming corporation with a principal place of business and offices at 8913 Regents Park Drive Suite # 550, Tampa, Florida 33647.

10.     Nexgen LifeSciences LLC is a Wyoming limited liability company with a principal place of business and offices at 8913 Regents Park Drive Suite #550, Tampa, Florida 33647.

11.     Trxade Group, Inc. is a Delaware corporation with a principal place of business and offices at 3840 Land O' Lakes Boulevard, Land O' Lakes, Florida 34639.

12.     G&S Coal Traders LLC is a Wyoming corporation with a principal place of business and offices at 8913 Regents Park Drive Suite #550, Tampa, Florida 33647.

13.     This Court has proper jurisdiction under 28 U.S.C. § 1331 as there are civil claims arising under the Constitution, laws, or treatises of the United States.

14.     This District Court is the proper venue under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Hillsborough County, Florida, involving corporations with business addresses in Hillsborough County, Florida.

## GENERAL ALLEGATIONS

### Background

15.     Beginning in November 2015 and continuing through February 2016 (the "Solicitation Period"), Suren Ajjarapu and Gajan Mahendiran, on behalf of Nexgen Memantine Inc., solicited the sale of securities in the form of preferred stock to Jitendra Jain, Manish Arora, Scariya Kumaramangalam, Harsh Datta, and Balvant Arora (collectively, the "Plaintiff Investors").

16.     During the Solicitation Period, Defendant Ajjarapu and Defendant Mahendiran solicited the sale of securities in Nexgen Memantine Inc. to Plaintiff Investors through email, text messages, phone calls, and in-person meetings.

17.     While soliciting Plaintiff Investors, Defendant Ajjarapu and Defendant Mahendiran provided misleading information to Plaintiffs Investors in the form of false statements, misrepresentations, and material omissions.

18.     Plaintiff Investors would not have invested in Nexgen Memantine Inc. but for the false statements, misrepresentations, and material omissions.

19.     Plaintiff Investors relied on the misinformation provided by Defendant Ajjarapu and Defendant Mahendiran, and lost their entire investment principal as a result of their investments in Nexgen Memantine Inc.

**First Solicitations by Defendant Ajjarapu and Defendant Mahendiran**

20.     Plaintiff Datta and Defendant Mahendiran initially met through their mutual employment some time in 2015.

21.     Defendant Mahendiran approached Plaintiff Datta about an investment opportunity in his business, Nexgen Memantine Inc. ("Nexgen Memantine / Defendant Nexgen").

22.     Defendant Mahendiran ostensibly represented himself as the President of Nexgen Memantine, and had a partner in Tampa, Florida – Defendant Ajjarapu – who was coming to Virginia to meet with Defendant Mahendiran. Defendant Mahendiran invited Plaintiff Datta to join and discuss the opportunity with them.

23.     Defendant Mahendiran also represented to Datta that Defendant Ajjarapu was the CEO of Trxade Group Inc., a publicly traded and well-established company in the pharmaceutical industry, and that while Defendant Ajjarapu was not "on paper," he was managing and controlling Nexgen Memantine along with Defendant Mahendiran.

24.     Meeting with Datta at a Panera Bread located at 2328 Woodland Crossing Drive, Herndon, Virginia 20171, on November 15, 2015, Defendant Ajjarapu told Datta that Defendant Ajjarapu's company, Trxade Group, was majorly involved in controlling Nexgen Memantine, and that Trxade Group would handle the logistics of pricing and marketing Nexgen Memantine's product, a generic version of the currently existing memantine drug, which is used as a form of treatment for Alzheimer's disease, once it was approved by the United States Food and Drug Administration ("FDA"). Defendant Mahendiran repeated and confirmed Defendant Ajjarapu's statements as true and thereby adopted them as his own.

25.     Defendant Ajjarapu and Defendant Mahendiran both explained to Datta that they had already invested some of their own money into Nexgen Memantine and secured other private investments totaling approximately $4-5 million, but that they were still looking to secure approximately $1 million to go towards funding the production of the pending generic memantine drug.

26.     Datta was unwilling to invest the entire $1 million on his own, so Defendant Mahendiran and Defendant Ajjarapu asked Datta to reach out to the other Plaintiff Investors about the opportunity.

27.     Plaintiff Balvant Arora was a friend and business partner of Datta's, and through Plaintiff Balvant Arora and another of Datta's friends, Plaintiff Manish Arora, Datta became acquainted with the remaining two Plaintiff Investors, Plaintiffs Jain and Kumaramangalam.

28.     The Plaintiff Investors decided they were interested in the opportunity presented by Defendant Ajjarapu and Defendant Mahendiran, and agreed to continue discussions with Defendant Ajjarapu and Defendant Mahendiran.

**Defendant Ajjarapu and Defendant Mahendiran's False and Misleading Statements Regarding Nexgen Memantine**

29.     Unbeknownst to Plaintiff Investors, neither Defendant Ajjarapu nor Defendant Mahendiran were registered brokers, or exempt from such registration, as required by 15 U.S.C. § 78o(a)(1), despite both meeting the SEC's classification of a "broker" under 17 C.F.R. § 240.3a4-1. Defendant Ajjarapu and Defendant Mahendiran both omitted this information during the solicitation process and sale of securities.

30.     On December 15, 2015, Defendant Mahendiran emailed Plaintiff Datta, inviting Plaintiff Datta to share the contents of the email with the other Plaintiff Investors. A true and correct copy of that email is attached hereto as **Exhibit A**.

31.     Defendant Ajjarapu was also a recipient of the December 15, 2015 email and its attachment. *See* Exhibit A**.** At no time did Defendant Ajjarapu correct any of the misrepresentations within the email or its attachments and allowed Defendant Mahendiran to make material misrepresentations to Plaintiff Datta and the other Plaintiff Investors.

32.     In the December 15, 2015 email, Defendant Mahendiran falsely represented that Nexgen Memantine had a distribution network built (setup through Trxade Group.) *See* Exhibit A. Upon information and belief, Nexgen Memantine had no agreements with any distributors at the time, nor would it make any such agreements in the future.[1]

33.     In the December 15, 2015 email, Defendant Mahendiran sent Plaintiff Datta, and by extension the Plaintiff Investors, a document dubbed "Nexgen Teaser," which stated that Nexgen Memantine had partnered with a pharmaceutical manufacturer in Hyderabad, India. Upon information and belief, Nexgen Memantine had no partnership agreements finalized with any pharmaceutical manufacturers in Hyderabad, India. A true and correct copy of the "Nexgen Teaser" is attached hereto as **Exhibit B**.[2]

34.     In the Nexgen Teaser, Defendant Ajjarapu is listed as the "Manager" of Nexgen Memantine, and Defendant Mahendiran is listed as the "Managing Member" of the company,

---

[1] These beliefs are based upon information learned later at a special meeting called by Defendant Ajjarapu in late 2018, requesting shareholder approval to investigate Defendant Mahendiran for wrongdoing. The aftermath of this meeting and the conversations that followed revealed there was likely no distribution network setup during the solicitation period.

[2] *See Id*. fn. 1. The aftermath of this special meeting revealed there were no partnership agreements in operation during the solicitation period.

with an office for the company at 8913 Regents Park Drive Suit #550, Tampa, Florida 33647. *See* Exhibit B.

35.     Defendant Ajjarapu was not, and never has been, a manager of Nexgen Memantine in any official capacity. Despite being copied on the email containing the misleading Exhibit B (stating Defendant Ajjarapu was a "manager" of Nexgen Memantine), Defendant Ajjarapu did not correct these misrepresentations.

36.     On December 17, 2015, Defendant Mahendiran again emailed Plaintiff Datta in an attempt to communicate with Plaintiff Investors. This email contained a presentation for Plaintiff Investors on Trxade Group, Inc., identified as "Suren's [Defendant Ajjarapu] company." A true and correct copy of that email is attached hereto as **Exhibit C**. That email contained an attachment, titled "Trxade Group, Inc. Presentation, October 2015" (the "Trxade Presentation") which is attached hereto as **Exhibit D**.

37.     Defendant Ajjarapu is the CEO of Trxade Group, Inc. *See* Exhibit D, page 22.

38.     The Trxade Presentation was given to Plaintiff Investors to support Defendant Ajjarapu and Defendant Mahendiran representations that Trxade would use its knowledge as a pharmaceutical industry insider and that Trxade would directly control and market Nexgen Memantine's generic memantine drug in the United States at a lower price than competitors.

39.     This unique arbitrage opportunity was solely a product of Trxade Group Inc.'s propriety and confidential information and use of this information was a key pillar of the Plaintiff Investor's decision to invest. Similarly, Defendant Ajjarapu's representations regarding Trxade Group's direct involvement with Nexgen Memantine was a material factor in Plaintiff Investors' decision to invest.

40.     Defendant Ajjarapu provided the Trxade Presentation to Defendant Mahendiran with the intent that Defendant Mahendiran would in turn present the presentation to Plaintiff Investors for the purpose of soliciting the sale of securities in Nexgen Memantine.

41.     Throughout the Solicitation Period, both Defendant Ajjarapu and Defendant Mahendiran, individually and together, consistently represented to Plaintiff Investors that Nexgen Memantine was controlled by and partnered with Trxade Group, and that Trxade was in control of marketing and distribution of the drug.

42.     Throughout the Solicitation Period, Defendant Ajjarapu represented to Plaintiff Investors in phone and in-person conversations that he was the CEO of Trxade Group, and that Trxade Group had a pecuniary interest in Nexgen Memantine's business and pending generic memantine drug.

43.     At times during the Solicitation Period, Defendant Ajjarapu and Defendant Mahendiran also represented to Plaintiff Investors that Nexgen Memantine's generic memantine drug was at some stage of the FDA approval process. Upon information and belief this representation was false and/or misleading because the drug was never submitted to the FDA for approval at all.[3]

44.     Throughout the Solicitation Period, during telephone calls and in-person meetings with Plaintiff Investors, both Defendant Ajjarapu and Defendant Mahendiran, individually and together, represented that Nexgen Memantine had an agreement to sell the generic memantine drug to the United States Veterans Administration ("VA"). This statement was false and/or

---

[3] This belief is based upon Plaintiff Investors' own investigation and conversations with the FDA who reveal they have no record of the Nexgen Memantine drug ever being submitted for approval.

misleading as Defendant Mahendiran and Nexgen Memantine have since admitted that the corporation did not have an agreement to sell the generic memantine drug to the VA.

45.     On January 30, 2016, Defendant Mahendiran emailed Plaintiff Datta with another presentation on Nexgen Memantine for the purpose of soliciting the Plaintiff Investors (the "Second Nexgen Presentation"), attached hereto as **Exhibit E.**

46.     Defendant Ajjarapu had knowledge of the representations made by Defendant Mahendiran in the Second Nexgen Presentation, as he was also a party to the January 30, 2016 email. A true and correct copy of that email is attached hereto as **Exhibit F**.

47.     The Second Nexgen Presentation made the representation that, "MEMANTINE IS ALREADY FDA APPROVED AND MANUFACTURING UNIT IN INDIA IS ALSO USA/FDA APPROVED TO PRODUCE IT !!." *See* Exhibit E, page 8. This was false and/or misleading because Nexgen Memantine's generic memantine drug had not yet been approved by the FDA, and Plaintiff Investors were later told by Defendant Mahendiran that delays in Nexgen Memantine's business were the result of the Indian manufacturer's difficulty getting FDA approval.

48.     The Second Nexgen Presentation also made the representation that, "[c]urrently Nexgen has partnered with Westminster to distributor [sic] products thru [sic] wholesale partnership." *See* Exhibit E, pages 8-9. This was false and/or misleading because Westminster Pharmaceuticals LLC has since denied any partnership agreement with Nexgen Memantine existed at the time the representation was made.

49.     On January 30, 2016, Defendant Mahendiran provided Plaintiff Investors with a third presentation on Nexgen Memantine (the "Third Nexgen Presentation"), attached hereto as **Exhibit G**.

50.     The Third Nexgen Presentation stated that, "[o]n a conservative basis Nexgen will have 3% market share of pie . . . based on current wholesale distributors who are already buying drugs [list omitted] from us." *See* Exhibit G, page 2. Upon information and belief, this representation was false and/or misleading because Nexgen Memantine was not selling any drugs to wholesale distributors at the time the representation was made, as the company had only been incorporated a few months earlier in November of 2015.[4]

51.     The Third Nexgen Presentation also stated that, "[t]he incorporation with ties to TRXADE, has 128 trade accounts open, so the 3% is our bottom line number." *See* Exhibit G, page 2. Both Defendant Ajjarapu and Defendant Mahendiran, individually and together, represented to Plaintiff Investors that Nexgen Memantine was guaranteed some amount of success because of its ties to Trxade Group. This statement was false and/or misleading because Nexgen Memantine and Trxade Group have since claimed that no partnership or direct relationship between the companies existed at the time this representation was made.

52.     Defendant Ajjarapu often communicated with Plaintiff Investors through Defendant Mahendiran or through telephone calls. Copies of text messages between Defendant Mahendiran and Plaintiff Datta, attached hereto as **Exhibit H**, show that Defendant Ajjarapu participated in the solicitation of the sale of securities in Nexgen Memantine along with Defendant Mahendiran.

---

[4] This belief is based upon later information which revealed that the company maintained no financial records, and had no factual basis whatsoever to make these claims.

53.     On January 4, 2016, Defendant Ajjarapu and Defendant Mahendiran held a conference call over telephone with Plaintiff Investors, as well as non-party individual Surenda Tank (the "January 2016 Conference Call").

54.     During the January 2016 Conference Call, both Defendant Ajjarapu and Defendant Mahendiran, individually and together:

    a.      identified Defendant Ajjarapu to Private Investors as CEO of Trxade Group Inc.;

    b.      reiterated Trxade Group's relation to, and pecuniary interest in, Nexgen Memantine;

    c.      represented to Plaintiff Investors that manufacturing of the generic memantine drug through an Indian pharmaceutical manufacturing partner would begin by June 2016, which was false and/or misleading because, Nexgen Memantine did not have an agreement finalized with the Indian manufacturer at this point in time, nor was the Indian manufacturer able to gain FDA approval to manufacture the generic memantine drug at any point through 2018;

    d.      represented that distribution of the generic memantine drug would begin by the end of 2016, which was false and/or misleading because at no point through 2018 did Nexgen Memantine gain FDA approval to distribute its generic memantine drug in the United States, and after an investigation with the FDA it appears the drug was never submitted for approval at all;

e.      represented that Nexgen LifeSciences LLC, which both Defendant Ajjarapu and Defendant Mahendiran claimed was the "parent company" of Nexgen Memantine, would guarantee that any investment by Plaintiff Investors, or equity held by Plaintiff Investors, in Nexgen Memantine would be safe, which was false and/or misleading as Nexgen LifeSciences has since refused to return Plaintiff Investors' principal investments, despite Nexgen Memantine's inability to gain FDA approval and the withdrawal of funds from Nexgen Memantine;

f.      represented that Plaintiff Investors would receive interest payments on their principal sums regardless of income generated by Nexgen Memantine, in addition to distributions that would be received only as the corporation generated income, which was false and/or misleading as the Plaintiff Investors never received any interest payments on their principal investments. Defendant Mahendiran and Defendant Ajjarapu knew these payments would not be made when they individually promised them;

g.      represented that Defendant Ajjarapu and Defendant Mahendiran had already invested their own personal money into Nexgen Memantine, which was false and/or misleading because Defendant Ajjarapu and Defendant Mahendiran never invested any of their own money into Memantine;

h.   represented that Nexgen Memantine as a company had been evaluated at $12.9 million, which was false and/or misleading because, upon information and belief, no such evaluation was ever conducted;

i.   represented that the FDA would approve Nexgen Memantine's generic memantine drug in the immediate future, specifically at some time in 2016, which was false and/or misleading because Defendant Ajjarapu and Defendant Mahendiran not only could not have known what the FDA would do, but after an investigation with the FDA it appears the drug was never submitted for approval at all.

55.   All of the representations enumerated above were made directly by Defendant Ajjarapu, but Defendant Mahendiran also made comments during the call. Each and every time Defendant Mahendiran made comments, he asked Defendant Ajjarapu to confirm the accuracy of his statements, saying something substantially similar in word and effect to "Is that correct Suren? Did I say that correctly?"

56.   Upon information and belief, Defendant Ajjarapu and Defendant Mahendiran never had a professional valuation of Nexgen Memantine conducted, and if they did, they were aware that a $12.9 million evaluation was grossly overinflated.

57.   Throughout the Solicitation Period, both Defendant Ajjarapu and Defendant Mahendiran, individually and together, represented that Nexgen Memantine was a functioning business. However, upon information and belief, Nexgen Memantine is a mere shell with no employees, partnered manufacturers or distributors, or source of income other than private investments through the sale of securities, as Plaintiff Investors have not communicated with any

13

parties related to Nexgen Memantine other than Defendant Ajjarapu, Defendant Mahendiran, and Annapurna Gundlapalli in her capacity as secretary of Nexgen Memantine, and are unaware of any business transactions Nexgen Memantine has ever engaged in, other than those falsely represented to them.

58.     Despite Defendant Ajjarapu's representations that he was involved in managing Nexgen Memantine's operations and recorded efforts in soliciting the sale of securities in Nexgen Memantine (*see* Exhibits B and H, defined below), Defendant Ajjarapu now claims that he was not involved in such ways.

### Defendant Ajjarapu and Defendant Mahendiran's False and Misleading Statements Regarding the Level Risk of Investments in Nexgen Memantine

59.     Throughout the Solicitation Period, both Defendant Ajjarapu and Defendant Mahendiran, individually and together, consistently represented to Plaintiff Investors that securities in Nexgen Memantine were of low risk or otherwise a safe and guaranteed investment. This was false and or misleading because the risk was substantial, as the investors stood a higher-than-average risk of losing all of their principal, which turned out to be the eventual result.

60.     In the December 15, 2015 email to Plaintiff Investors, Defendant Mahendiran stated, "[r]emember I want to point out that the security in this molecule for you and your partners investments comes from the fact that we already have a distribution network already [sic] built." *See* Exhibit A. Mahendran's statement was false and/or misleading because Nexgen Memantine had only been incorporated the month prior, in November 2015, and because, upon information and belief, Nexgen Memantine had no agreements finalized with distributors at the time this representation was made.

61.     In the Nexgen Teaser sent to Plaintiff Investors on December 15, 2015, Defendant Mahendiran claimed that the generic memantine drug pending approval with the FDA was a "low risk growth vehicle." *See* Exhibit B. This statement was false and/or misleading because the investment was actually a high risk, as an investigation with the FDA confirms the drug was never submitted for approval at any time.

62.     Upon information and belief, the Trxade Presentation emailed to Plaintiff Investors by Defendant Mahendiran on December 17, 2015, was partly intended to mislead Plaintiff Investors into believing that securities in Nexgen Memantine were a safe investment due to Nexgen Memantine's involvement with Trxade Group, a publicly traded and well-established company in the pharmaceutical industry.

63.     Throughout the Solicitation Period, both Defendant Ajjarapu and Defendant Mahendiran, individually and together, represented to Plaintiff Investors that they would receive Preferred Stock in exchange for their investments, that would come with a 12% interest guaranteed dividend. The representation was made numerous times by both Defendant Mahendiran and Defendant Ajjarapu, but can also be seen in the Third Nexgen Presentation – "As a Preferred stock holder you will be getting 12% dividend rate on your investment plus 8% net profit sharing on every $1 million invested." *See* Exhibit G, page 3. This representation was false and/or misleading because the Plaintiff Investors never received any interest payments on their investments, and the company had no profits or money (other than proceeds from other investors) to pay preferred dividends.

64.     On December 21, 2015, Defendant Ajjarapu directly emailed Plaintiff Datta regarding the sale of securities in Nexgen Memantine, offering to structure a corporate guarantee

for the Plaintiff Investors through convertible debt in order to further lower the risk of the potential investment. A true and correct copy of Defendant Ajjarapu's email to Datta is attached hereto as **Exhibit I**.

65.     In the December 21, 2015 email sent to Plaintiff Investors, Defendant Ajjarapu stated that if Nexgen Memantine failed to produce revenue, "you have corporate [guarantee] [sic] to pay the Principle [sic] and interest." *See* Exhibit I. Defendant Ajjarapu's representation was false and/or misleading because despite Nexgen Memantine's inability to gain FDA approval and lack of income, the Plaintiff Investors have not been repaid their principal investments.

66.     In the December 21, 2015 email sent to Plaintiff Investors, Defendant Ajjarapu included a form document labeled "NMI Bridge Loan 12.21.15" (the "Loan Agreement"), which is attached hereto as **Exhibit J.**

67.     The Loan Agreement states that Nexgen Memantine, the "Payor", promises to pay the Plaintiff Investors, as "Holders", the principal sum of their investment with 12% interest per year on the outstanding principal amount. *See* Exhibit J, page 1. This document, provided and endorsed by Defendant Ajjarapu, was false and/or misleading because the Plaintiff Investors never received any interest payments on their investments.

68.     In the December 21, 2015 email sent to Plaintiff Investors, Defendant Ajjarapu also included a form document labeled "Corporate Guarantee," in which Nexgen Memantine as both the "Borrower" and "Guarantor" promises to pay back the principal amount of the Plaintiff Investors' investments. This document is not attached as an exhibit as it can be found in each of the Plaintiff Investors' Subscription Agreements, which are attached below. This document,

provided and endorsed by Defendant Ajjarapu, was false and/or misleading because the Plaintiff Investors have not been repaid their principal investments.

69.    Despite the consistent promises and representations of both Defendant Ajjarapu and Defendant Mahendiran, and agreements which guaranteed, that Plaintiff Investors would receive 12% interest paid annually towards the principal sum of their investment in Nexgen Memantine, not one of the Plaintiff Investors ever received any such interest payment and have lost all of their principal with no explanation as to how or where the money was spent.[5]

**Plaintiff Investors Invest in Nexgen Memantine**

70.    The Plaintiff Investors each signed and executed all the necessary documents in order to invest in Nexgen Memantine, receive a 12% interest payment annually, and distributions from the company. Each Plaintiff Investor signed on the following days, for the following amounts, and copies of the executed documents are attached as Exhibits:

a.    Harsh Datta, on January 13, 2016, for $100,000.00 - attached hereto as **Exhibit K**;

b.    Manish Arora on January 13, 2016, for $100,000.00 - attached hereto as **Exhibit L**;

c.    Jitendra Jain on February 3, 2016, for $75,000.00 - attached as hereto as **Exhibit M**;

d.    Scariya Kumaramangalam on February 3, 2016, for $100,000.00 - attached hereto as **Exhibit N**; and

e.    Balvant Arora, for $50,000.00.

---

[5] Defendant Arrajapu told Plaintiff Investors that Defendant Mahendiran took the money. Defendant Mahendiran has told Plaintiff investors that Defendant Ajjarapu has taken the money. A question the Court must resolve is: "Where is the money?"

**Plaintiff Investors Are Kept Uninformed**

71.     After investing in Nexgen Memantine, Plaintiff Investors relied on Defendant Mahendiran, the ostensible President and Treasurer of the corporation, for updates as to Nexgen Memantine's progress.

72.     It appeared to the Plaintiff Investors initially that business progress was slower than expected, with such expectations based on Defendant Ajjarapu and Defendant Mahendiran's individual representations that the manufacturing of the generic memantine drug would begin in June 2016 and distribution would begin by the end of that year. Despite some of the Plaintiff Investors having business experience, none had ever been part of a business involved in pharmaceuticals, and trusted the updates provided by both Defendant Ajjarapu and Defendant Mahendiran.

73.     On several instances between February 2016 and November 2018, Plaintiff Investors asked for updates as to why Nexgen Memantine had not yet begun to manufacture or distribute its generic memantine drug, and why the Plaintiff Investors had not received any of the promised 12% annual interest payments.

74.     Despite the officers and directors of Nexgen Memantine not providing Plaintiff Investors with any financial documents, bank statements, or reports, or communications with the FDA which might shed light on the approval process for Nexgen Memantine's generic memantine drug, Plaintiff Investors were satisfied by Defendant Mahendiran's explanations that the process was still on track, although moving slower than expected. Plaintiff Investors trusted and relied on such statements by Defendant Mahendiran. The Plaintiff Investors' confidence was continually kept strong by Defendant Mahendiran.

75.     At some point in 2017, Plaintiff Datta, on behalf of the Plaintiff Investors, called Defendant Mahendiran. The Plaintiff Investors were upset with the lack of progress Nexgen Memantine was making, and Datta demanded answers to the continuous delays on production and FDA approval.

76.      During this telephone conversation between Datta and Defendant Mahendiran, Datta expressed the Plaintiff Investors' unhappiness with the slowness of the project.

77.     Defendant Mahendiran represented that he made sufficient income from his medical practice to repay the combined principal amount that the Plaintiff Investors had invested into Nexgen Memantine, $425,000.000, and promised to personally repay the Plaintiff Investors in the event that Nexgen Memantine did not gain FDA approval for its generic memantine drug. In exchange, Defendant Mahendiran requested the Plaintiff Investors to be calm and patient.

78.     Plaintiff Investors were again satisfied that their money was safe, the business was in good shape, albeit moving slowly, and Defendant Mahendiran would bring the project to completion as promised.

**The Special Meeting and Discovery of Fraudulent Transfers**

79.     On November 1, 2018, Plaintiff Investors received a notice of special meeting from Annapurna Gundlapalli in her capacity as secretary of Nexgen Memantine.

80.     On November 27, 2018, the special meeting was held. To the surprise of Plaintiff Investors and other parties present, Defendant Ajjarapu presided over the meeting in Defendant Gundlapalli's stead, despite no notice by Defendant Gundlapalli or approval by the shareholders of such a proxy. None of the attorneys present, including the attorney representing Defendant

Ajjarapu or the attorney representing Nexgen Memantine, gave any justification for Defendant Ajjarapu's presence at the special meeting.

81.     It was at this special meeting that the Plaintiff Investors first learned of the various transfers of funds out of Nexgen Memantine's accounts for no consideration or exchange. It was also at this meeting Plaintiff Investors first began to fear the business was not running slow, but they were possibly defrauded.

82.     According to Defendant Ajjarapu, his attorney, and the attorney for Nexgen Memantine, on several instances in 2016, money began to leave Nexgen Memantine's accounts for no apparent reason, with some labeled as "Trxade Invest." Said transfers amounted to $1,185,000.00 and occurred as follows:

    a.      on April 1, 2016, a transfer of $135,000.00;

    b.      on May 3, 2016, a transfer of $500,000.00;

    c.      on June 23, 2016, a transfer of $250,000.00;

    d.      on September 28, 2016, a transfer of $200,000.00; and

    e.      on December 20, 2016, a transfer of $100,000.00.

83.     Upon information and belief, only three individuals had the ability to transfer money out of Nexgen Memantine's accounts: (a) Defendant Mahendiran; (b) Defendant Gundlapalli; and (c) Defendant Ajjarapu, by extension of Defendant Gundlapalli. At this time, it is the Plaintiff Investors' belief that Defendant Mahendiran and Defendant Ajjarapu both conducted the transfers.

84.     At the special meeting on November 27, 2018, Defendant Ajjarapu claimed that the withdrawals had all been conducted by Defendant Mahendiran, who transferred the money to

his own accounts.[6] However, Keeto Sabhuruwual, attorney for Defendant Mahendiran, specifically alleged that Defendant Ajjarapu had been making unauthorized and illegal transfers of funds between corporate entities he controlled, including Nexgen Memantine and G&S Coal Traders LLC.

85.    G&S Coal Traders is a Wyoming limited liability company with a principal place of business that is identical to that listed for both Nexgen Memantine and Nexgen LifeSciences. Upon information and belief, Plaintiff Investors believe that Defendant Ajjarapu and Defendant Mahendiran are both responsible for unauthorized and illegal transfers of funds from Nexgen Memantine to G&S Coal Traders. The basis for this belief is that Defendant Ajjarapu moved the money first into G&S Coal, and then out of G&S Coal to Defendant Mahendiran.

86.    Plaintiff Investors were never provided any records of Nexgen Memantine from which they could have learned of these transfers prior to November 27, 2018. Plaintiff Investors likewise did not receive any bank statements or financial documents from Nexgen Memantine at the special meeting on that date (or at any time since).

### COUNT I - FRAUD UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER
(PLAINTIFF INVESTORS AGAINST SUREN AJJARAPU, GAJAN MAHENDIRAN, AND NEXGEN MEMANTINE INC.)

87.    Plaintiffs incorporate all allegations contained in paragraphs 1 through 86, as if set out fully herein.

88.    Defendant Ajjarapu, while soliciting the sale of securities in Nexgen Memantine, mislead Plaintiff Investors to believe, through representations:

---

[6] *See supra* footnote 5.

a.  that Nexgen Memantine was a properly organized corporation in compliance with all laws and regulations (¶ 54);

b.  that Defendant Ajjarapu was authorized to sell securities on behalf of Nexgen Memantine (he was not since he is neither an issuer or a registered broker (¶¶ 29-70);

c.  that Nexgen Memantine partnered with pharmaceutical manufacturer(s) in India (¶¶ 54(c), 55; Exhibits A, B, E, and F);

d.  that Nexgen Memantine had agreements with distributors for distribution of the generic memantine drug in the United States (¶¶ 29, 54(d), 55; Exhibits E and F);

e.  that Nexgen Memantine was associated with Trxade Group, Inc., who would support Nexgen Memantine's business and growth, and that Trxade Group had a pecuniary interest in Nexgen Memantine (¶¶ 24, 30-42, 54(b), 55);

f.  that investments in Nexgen Memantine were low-risk, safe, and guaranteed (¶¶ 54(e)-(f), 59-69, Exhibits A, B, H, I, J and K);

g.  that he personally invested into Nexgen Memantine and was sharing the risk with Plaintiff Investors (¶¶ 25, 54(g), 55);

h.  that Nexgen Memantine had an agreement with the VA to distribute its generic memantine drug (¶ 44); and

i.      that Nexgen Memantine had applied to the FDA for approval of its generic memantine drug, and that such approval would come quickly (¶¶ 24, 54(i); 55.

89.     Defendant Ajjarapu was present during in-person and telephone conversations with Defendant Mahendiran and Plaintiff Investors throughout the Solicitation Period (¶¶ 24-25, 49-55), and was also included in email chains between Defendant Mahendiran and Plaintiff Investors (¶¶ 29-32, Exhibits A, B, E, and F). Defendant Ajjarapu was aware of these misrepresentations made by Defendant Mahendiran. Defendant Ajjarapu made material omissions to Plaintiff Investors by intentionally failing to correct Defendant Mahendiran's misrepresentations, including that Nexgen Memantine had an existing distribution network (¶¶ 32, 48) and manufacturer in India (¶¶ 33, 47), that Nexgen Memantine's generic memantine drug was FDA approved (¶ 47), and that Defendant Ajjarapu was a "manager" of Nexgen Memantine (¶ 34).

90.     Defendant Mahendiran, while soliciting the sale of securities in Nexgen Memantine, mislead Plaintiff Investors on numerous occasions by representing:

a.      that Nexgen Memantine was a properly organized corporation in compliance with all laws and regulations (¶ 54);

b.      that Defendant Mahendiran was authorized to sell securities on behalf of Nexgen Memantine (he was not since he is neither an issuer or a registered broker (¶ 29-70);

c.      that Nexgen Memantine was partnered with pharmaceutical manufacturer(s) in India (¶¶ 33, 47; Exhibits B and E);

d.   that Nexgen Memantine had agreements with distributors for distribution of the generic memantine drug in the United States (¶¶ 32, 48, 50, 60; Exhibits A, E, and F);

e.   that Nexgen Memantine was associated with Trxade Group, Inc., who would support Nexgen Memantine's business and growth, and that Trxade Group had a pecuniary interest in Nexgen Memantine (¶¶ 23-24, 32, 36-39, 41, 49, 51; Exhibits C, D, and G);

f.   that investments in Nexgen Memantine were low-risk, safe, and guaranteed (¶¶ 50-52, 59-63; Exhibits A, B, and G);

g.   that Nexgen Memantine had an agreement with the VA to distribute its generic memantine drug (¶ 44);

h.   that Defendant Mahendiran personally invested into Nexgen Memantine and would share the risk with Plaintiff Investors (¶ 25); and

i.   that Nexgen Memantine had applied to the FDA for approval of its generic memantine drug, and that such approval would come quickly (¶¶ 24, 43, 61; Exhibits B and E).

91.   These representations described above were material to the Plaintiff Investor's decision to purchase securities in Nexgen Memantine.

92.   These material representations and omissions made by both Defendant Ajjarapu and Defendant Mahendiran were false and misleading in the following ways:

a.      Nexgen Memantine was not a properly organized corporation but instead a shell company with improperly issued shares, and improperly appointed officers and directors ;

b.      Nexgen Memantine did not have any partnerships with pharmaceutical manufacturers in India at the time of soliciting Plaintiff Investors;

c.      Nexgen Memantine did not have any agreements with distributors for distribution of its generic memantine drug in the United States;

d.      Trxade Group, Inc. now alleges that it was never involved with Nexgen Memantine;

e.      investments in Nexgen Memantine were highly risky due to lack of business, income, and partnerships, despite a coordinated and intentional effort to market the securities as low risk, and even "guaranteed";

f.      Nexgen Memantine had no final agreement with the VA to distribute its generic memantine drug;

g.      upon information and belief, and based on Plaintiff Investors' own communications with the FDA, Nexgen Memantine never applied to the FDA for approval of a generic memantine drug; and

h.      neither Defendant Ajjarapu or Defendant Mahendiran are authorized to sell shares on behalf of Nexgen Memantine as neither are registered brokers and neither are officers, directors, or issuers (¶ 29).

93.     Upon information and belief, Defendant Ajjarapu and Defendant Mahendiran made these false statements, misrepresentations, and omissions of material facts in order to

secure Plaintiff Investors' investments in Nexgen Memantine, with the premeditated intent to ultimately use the funds for improper personal purposes if the Memantine drug never came to market.

94.     In addition to these false statements, representations, and omissions, both Defendant Ajjarapu and Defendant Mahendiran failed to disclose to Plaintiff Investors that neither Defendant Ajjarapu or Defendant Mahendiran were registered as brokers with the Securities Exchange Commission, or exempt from such registration, as required by 15 U.S.C. § 78o(a)(1).

95.     Plaintiff Investors relied on the false statements, misrepresentations, and omissions made by Defendant Ajjarapu and Defendant Mahendiran, believing that securities in Nexgen Memantine were a low-risk investment with high potential for growth due to an existing business, partnerships, existing distribution network, and existing relationship with Trxade Group.

96.     Plaintiff investors invested a combined total of $425,000.00 into Nexgen Memantine, purchasing Preferred Stock, with corporate guarantees and convertible debt which were useless instruments provided by Defendant Ajjarapu and Defendant Mahendiran for the sole purpose of making the investment seem less risky. *See* ¶ 70.

97.     Plaintiff Investors were economically harmed when Nexgen Memantine failed to secure any business, partnerships, funding, or approval for its generic memantine drug in the coming years.

98.     Plaintiff Investors were further harmed when approximately $1,185,000.000 of funds were wrongfully taken from Nexgen Memantine's accounts by at least one Nexgen

Memantine director, officer, or other fiduciary over the course of several wire transfers throughout 2016. *See* ¶¶ 82, 84.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants Suren Ajjarapu, Gajan Mahendiran, and Nexgen Memantine Inc. for fraud under 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5 for compensatory damages for such securities paid for, and investments made by Plaintiffs, plus the legal rate, together with attorney's fees, cost, reasonable expenses, and further relief as this Court deems fair and just.

### COUNT II - CONTROLLING PERSON LIABILITY UNDER 15 U.S.C. § 78t
(PLAINTIFF INVESTORS AGAINST ANNAPURNA GUNDLAPALLI, NEXGEN
LIFESCIENCES, LLC, AND TRXADE GROUP, INC.)

99.     Plaintiffs incorporate all allegations contained in paragraphs 1 through 86, as if set out fully herein.

100.    According to the Articles of Incorporation for Nexgen Memantine, Annapurna Gundlapalli is the Vice President and Secretary of the corporation.

101.    On November 1, 2018, Defendant Gundlapalli notified Plaintiff Investors of a special meeting of shareholders for Nexgen Memantine. When the meeting occurred on November 27, 2018, Plaintiff Investors learned that Defendant Ajjarapu was acting as a proxy for Defendant Gundlapalli.

102.    Upon information and belief, at all times, including during the Solicitation Period, Defendant Ajjarapu acted as a proxy for Defendant Gundlapalli as both Vice President and Secretary of Nexgen Memantine. Other than email notifications of meetings, Plaintiff Investors have never communicated directly with Defendant Gundlapalli.

103.     Defendant Gundlapalli, as a director and officer of Nexgen Memantine, had the power to cause the direction of the actions and policies of a proxy acting in her stead.

104.     Defendant Ajjarapu is alleged to have committed an underlying violation of securities law and regulations promulgated thereunder acting as a proxy of Defendant Gundlapalli in employing deceptive devices while soliciting the sale of securities in Nexgen Memantine.

105.     Nexgen LifeSciences, LLC is an 80% shareholder of Nexgen Memantine, and is a limited liability company controlled by two members - Defendant Mahendiran and Defendant Ajjarapu.

106.     With far more shares than all other shareholders combined, Nexgen LifeSciences possessed the ability to control the directors, policies, and management of Nexgen Memantine.

107.     Defendant Mahendiran and Defendant Ajjarapu are alleged to have committed an underlying violation of securities law and regulations promulgated thereunder acting on behalf of Nexgen Memantine, a corporation dominated by Nexgen LifeSciences, in employing deceptive devices while soliciting the sale of securities in Nexgen Memantine.

108.     Defendant Ajjarapu is also the CEO of Trxade Group, Inc.

109.     Defendant Ajjarapu and Defendant Mahendiran identified Defendant Ajjarapu as an agent and the CEO of Trxade Group to Plaintiff Investors during the Solicitation Period, and provided Plaintiff Investors with materials regarding Trxade Group to influence their decision to invest in Nexgen Memantine.

110.   Trxade Group, its board of directors, and shareholders possess, directly or indirectly, the power to cause the direction of the management of policies employed by Trxade Group's CEO and agent, Defendant Ajjarapu.

111.   Upon information and belief, Trxade Group was aware of Defendant Ajjarapu's involvement in the solicitation of sale of securities in Nexgen Memantine, and his claims to Plaintiff Investors that Trxade Group would support Nexgen Memantine's business and growth. Among other things, this belief is based upon Defendant Ajjarapu's duty of loyalty and care to Trxade Group and his duty to inform his board of directors of the actions being taken in Trxade Group's name with respect to the development of the Memantine drug and Defendant Ajjarapu's solicitation of investments to fund the same.

112.   Defendant Ajjarapu is alleged to have committed an underlying violation of securities law and regulations promulgated thereunder acting as an agent of Trxade Group while employing deceptive devices while soliciting the sale of securities in Nexgen Memantine.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgement against Defendants Annapurna Gundlapalli, Nexgen LifeSciences, LLC, and Trxade Group, Inc., for joint and several liability under 15 U.S.C. § 78t(a)-(b) for compensatory damages for such securities paid for and investments made by Plaintiffs, plus the legal rate, together with attorney's fees, cost, reasonable expenses, and further relief as this Court deems fair and just.

## COUNT III - FRAUDULENT SECURITIES TRANSACTIONS UNDER FLA. STAT. §§ 517.301, 517.211
### (PLAINTIFF INVESTORS AGAINST SUREN AJJARAPU, GAJAN MAHENDIRAN, AND NEXGEN MEMANTINE)

113.   Plaintiffs incorporate all allegations contained in paragraphs 1 through 86, as if set out fully herein.

114.    The Florida Securities and Investor Protection Act ("FSIPA") applies because there is a territorial nexus to the State of Florida: the principal place of business for Nexgen Memantine is located in Florida; Defendant Ajjarapu is a Florida resident; and Defendant Mahendiran has engaged in business related to Nexgen Memantine and the solicitation of sale of securities for the corporation in Florida. Florida has a legitimate interest in eliminating the base of fraudulent operations located within its borders.

115.    Defendant Ajjarapu, while soliciting the sale of securities in Nexgen Memantine, represented on numerous occasions to Plaintiff Investors:

   a.    that Nexgen Memantine was a functioning corporation (¶ 54);

   b.    that Nexgen Memantine was partnered with pharmaceutical manufacturer(s) in India (¶¶ 54(c), 55; Exhibits A, B, E, and F);

   c.    that Nexgen Memantine had agreements with distributors for distribution of the generic memantine drug in the United States (¶¶ 29, 54(d), 55; Exhibits E and F);

   d.    that Nexgen Memantine was associated with Trxade Group, Inc., who would support Nexgen Memantine's business and growth, and that Trxade Group had a pecuniary interest in Nexgen Memantine (¶¶ 24, 30-42, 54(b), 55);

   e.    that investments in Nexgen Memantine were low-risk, safe, and guaranteed (¶¶ 54(e)-(f), 59-69; Exhibits A, B, H, I, J, and K);

   f.    that he had personally invested into Nexgen Memantine and thus would share the risk with Plaintiff Investors (¶¶ 25, 54(g), 55);

g.    that Nexgen Memantine had an agreement with the VA to distribute its generic memantine drug (¶ 44); and

h.    that Nexgen Memantine had applied to the FDA for approval of its generic memantine drug, and that such approval would come quickly (¶¶ 24, 54(i), 55; Exhibits A, B, E, and F)..

116.    Defendant Ajjarapu was present during in-person and telephone conversations with Defendant Mahendiran and Plaintiff Investors throughout the Solicitation Period (¶¶ 24-25, 49-55), and was also included in email chains between Defendant Mahendiran and Plaintiff Investors (¶¶ 29-32, Exhibits A, B, and F). Defendant Ajjarapu made material omissions to Plaintiff Investors by failing to state material facts necessary to make Defendant Mahendiran's statements not misleading. *See* Fla. Stat. § 517.301(1)(a)(2). These statements made Defendant Mahendiran and not corrected by Defendant Ajjarapu included that Nexgen Memantine had an existing distribution network (¶¶ 32, 48) and manufacturer in India (¶¶ 33, 47), that Nexgen Memantine's generic memantine drug was FDA approved (¶ 47), and that Defendant Ajjarapu was a "manager" of Nexgen Memantine (¶ 34).

117.    Defendant Mahendiran, while soliciting the sale of securities in Nexgen Memantine, represented on numerous occasions to Plaintiff Investors:

a.    that Nexgen Memantine was a properly organized corporation in compliance with all laws and regulations (¶ 54);

b.    that Nexgen Memantine was partnered with pharmaceutical manufacturer(s) in India (¶¶ 33, 47; Exhibits B and E);

c.  that Nexgen Memantine had agreements with distributors for distribution of the generic memantine drug in the United States (¶¶ 32, 48, 50, 60; Exhibits A, E, and F);

d.  that Nexgen Memantine was associated with Trxade Group, Inc., who would support Nexgen Memantine's business and growth, and that Trxade Group had a pecuniary interest in Nexgen Memantine (¶¶ 23-24, 32, 36-39, 41, 49, 51; Exhibits C, D, and G);

e.  that investments in Nexgen Memantine were low-risk, safe, and guaranteed (¶¶ 50-52, 59-63; Exhibits A, B, and G);

f.  that Nexgen Memantine had an agreement with the VA to distribute its generic memantine drug (¶ 44);

g.  that Defendant Mahendiran personally invested into Nexgen Memantine and would share the risk with Plaintiff Investors (¶ 25); and

h.  that Nexgen Memantine had applied to the FDA for approval of its generic memantine drug, and that such approval would come quickly (¶¶ 24, 43, 61; Exhibits B and E).

118.  These representations described above were material to the Plaintiff Investor's decision to purchase securities in Nexgen Memantine.

119.  These material representations and omissions made by both Defendant Ajjarapu and Defendant Mahendiran were false and misleading in the following ways:

a.  that Nexgen Memantine was a properly organized corporation in compliance with all laws and regulations (¶ 54);

b.      that Defendant Mahendiran was authorized to sell securities on behalf of Nexgen Memantine (he was not since he is neither an issuer nor a registered broker (¶ 29-70);

c.      that Nexgen Memantine was partnered with pharmaceutical manufacturer(s) in India (¶¶ 33, 47; Exhibits B and E);

d.      that Nexgen Memantine had agreements with distributors for distribution of the generic memantine drug in the United States (¶¶ 32, 48, 50, 60; Exhibits A, E, and F);

e.      that Nexgen Memantine was associated with Trxade Group, Inc., who would support Nexgen Memantine's business and growth, and that Trxade Group had a pecuniary interest in Nexgen Memantine (¶¶ 23-24, 32, 36-39, 41, 49, 51; Exhibits C, D, and G);

f.      that investments in Nexgen Memantine were low-risk, safe, and guaranteed (¶¶ 50-52, 59-63; Exhibits A, B, and G);

g.      that Nexgen Memantine had an agreement with the VA to distribute its generic memantine drug (¶ 44);

h.      that Defendant Mahendiran personally invested into Nexgen Memantine and would share the risk with Plaintiff Investors (¶ 25); and

i.      that Nexgen Memantine had applied to the FDA for approval of its generic memantine drug, and that such approval would come quickly (¶¶ 24, 43, 61; Exhibits B and E).

120.    Upon information and belief, Defendant Ajjarapu and Defendant Mahendiran made these false statements, misrepresentations, and omissions of material facts in order to secure Plaintiff Investors' investments in Nexgen Memantine, with the premeditated intent to ultimately use the funds for improper personal purposes if the Memantine drug never came to market.

121.    Plaintiff Investors relied on the false statements, misrepresentations, and omissions made by Defendant Ajjarapu and Defendant Mahendiran, believing that securities in Nexgen Memantine were a low-risk investment with high potential for growth due to an existing business, partnerships, existing distribution network, and existing relationship control of marketing through Trxade Group, and various guarantees promised by Defendant Mahendiran and Defendant Ajjarapu.

122.    Plaintiff investors invested a combined total of $425,000.00 into Nexgen Memantine, purchasing Preferred Stock, with corporate guarantees and convertible debt which were useless instruments provided by Defendant Ajjarapu and Defendant Mahendiran for the sole purpose of making the investment seem less risky. *See* ¶ 70.

123.    Plaintiff Investors were economically harmed when Nexgen Memantine failed to secure any business, partnerships, funding, or approval for its generic memantine drug in the coming years.

124.    Plaintiff Investors were further harmed when approximately $1,185,000.000 of funds were wrongfully taken from Nexgen Memantine's accounts by at least one Nexgen Memantine director, officer, or other fiduciary over the course of several wire transfers throughout 2016. *See* ¶ 82, 84.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants Suren Ajjarapu, Gajan Mahendiran, and Nexgen Memantine Inc. for fraudulent sale of securities under Fla. Stat. §§ 517.301 and 517.211, for compensatory damages for such securities paid for and investments made by Plaintiffs, plus the legal rate, together with attorney's fees, cost, reasonable expenses, and further relief as this Court deems fair and just.

### COUNT V - BREACH OF COMMON LAW FIDUCIARY DUTY
(PLAINTIFF INVESTORS AGAINST SUREN AJJARAPU, GAJAN MAHENDIRAN, AND NEXGEN MEMANTINE, INC.)

125.    Plaintiffs incorporate all allegations contained in paragraphs 1 through 86, as if set out fully herein.

126.    Florida courts recognize a breach of fiduciary duty claim at common law.

127.    Suren Ajjarapu and Gajan Mahendiran, acting as brokers when soliciting Plaintiff Investors to purchase securities in Nexgen Memantine, Inc., owed a fiduciary duty of care and loyalty to Plaintiff Investors.

128.    Defendant Ajjarapu and Defendant Mahendiran's fiduciary responsibilities included a duty to inform the Plaintiff Investors of the risks involved in purchasing securities in Nexgen Memantine and a duty to not misrepresent any material fact to the transaction.

129.    Defendant Ajjarapu breached his fiduciary duty to Plaintiff Investors by failing to properly inform Plaintiff Investors of the risks involved in purchasing securities in Nexgen Memantine (¶¶ 58-69; Exhibits A, B, I, J, and K) and by making material misrepresentations and omissions as to various aspects of Nexgen Memantine's business and operations (¶¶ 24-25, 29-43, 45-47, 51-57; Exhibits A-F, and I).

130.    Defendant Mahendiran breached his fiduciary duty to Plaintiff Investors by failing to properly inform Plaintiff Investors of the risks involved in purchasing securities in Nexgen Memantine (¶¶ 58-62, Exhibits A, B, and D) and by making material misrepresentations and omissions as to various aspects of Nexgen Memantine's business operations (¶¶ 24-25, 29-57; Exhibits A-G).

131.    Defendant Mahendiran and Defendant Ajjarapu breached their fiduciary duties to Plaintiff Investors when they misappropriated Plaintiff Investors money to their own benefit, and by failing to disclose the substantial conflict of interests both Defendants posed as sellers of securities to Plaintiff Investors.

132.    But for both Defendant Ajjarapu and Defendant Mahendiran's breaches of fiduciary duties to the Plaintiff Investors, the Plaintiff Investors would not have been damaged through their total investment of $425,000.00 into Nexgen Memantine. ¶ 70.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants Suren Ajjarapu and Gajan Mahendiran for breach of fiduciary duty, for compensatory damages, and further relief as this Court deems fair and just.

## COUNT VI - VIOLATION OF FLORIDA RICO ACT
### (PLAINTIFF INVESTORS AGAINST SUREN AJJARAPU, GAJAN MAHENDIRAN, AND ANNAPURNA GUNDLAPALLI)

133.    Plaintiffs incorporate all allegations contained in paragraphs 1 through 86, as if set out fully herein.

134.    This cause of action is brought for injunctive relief under the civil remedies provisions of Fla. Stat. § 895.05(6), and money damages and other relief under the civil remedies granted by Fla. Stat. § 772.103, 104.

135.    The foregoing activities of Suren Ajjarapu and Gajan Mahendiran constitute violation of the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, Fla. Stat. § 895.03(3), which makes it "unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of unlawful debt; and Fla. Stat. § 895.03(4) which makes it unlawful to conspire or endeavor to violate subsection (3).

136.    Defendant Ajjarapu and Defendant Mahendiran, as individuals, in their capacity to control corporations, business trusts, or other legal entities, and as a group of individuals associated in fact although not a legal entity, constitute an "enterprise" as that term is defined under Fla. Stat. § 895.02(5).

137.    Defendant Ajjarapu and Defendant Mahendiran engaged in "racketeering activity" as that term is defined in § 895.02(8)(a) by:

a.      committing, attempting to commit, or conspiring to commit a crime that is chargeable by petition, indictment, or information under Fla. Stat. § 517.301, the Florida Securities and Investor Protection Act, which makes it unlawful to engage in any transaction involving the sale of an investment or security which operates or would operate as a fraud or deceit upon a person; and

b.      engaging in conduct defined as "racketeering activity" under the Federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(1), which defines racketeering activity to include any offense involving fraud in the sale of securities.

138.    Defendant Ajjarapu and Defendant Mahendiran's ongoing scheme to defraud investors in Nexgen Memantine, Inc., including Plaintiff Investors, through false, misleading, and fraudulent misrepresentations and omissions of material fact and other acts as set out above, constitute a "pattern of racketeering activity" as defined under Fla. Stat. § 895.02(7).

139.    Defendant Ajjarapu and Defendant Mahendiran have engaged in at least two incidents of racketeering conduct from 2015 until the present date, including:

a.    Soliciting the investments of at least 12 individual investors, all of whom lost all or substantially all of their money;

b.    this includes a group of 7 John Doe investors who invested in Defendant Nexgen as a result of material misrepresentations and/or material omissions of facts by Defendants Ajjarapu and Mahendiran[7];

c.    making numerous false, misleading, and fraudulent statements or omissions of material facts to Plaintiff Investors while soliciting their investment in Nexgen Memantine, Inc.

140.    Defendant Ajjarapu and Defendant Mahendiran have conducted and participated in the conduct and affairs of the RICO enterprise alleged above through a pattern of racketeering activity knowing their predicate acts were part of a pattern of racketeering activities and agreeing to the commission of the acts alleged to further the schemes as described above.

141.    Defendant Gundlapalli has acted as a willing accomplice of this enterprise by allowing Defendant Ajjarapu to exert control over Nexgen Memantine through her position as a director, Vice President, and Secretary of the company.

---

[7] Upon information and belief, the 7 John Doe investors have settled their claims with Defendant Ajjarapu.

142.    As a result of Defendant Gundlapalli's actions, Defendant Ajjarapu was able to operate as an authorized representative of Nexgen Memantine (¶¶ 79-81), access and make transfers out of the company's bank accounts (¶¶ 82-84), and generally treat both the company and its assets as his own personal property, all of which were necessary throughout the Solicitation Period and after Plaintiff Investors had purchased securities in order to fully realize the benefit of the fraud.

143.    Defendant Gundlapalli's derogation of her fiduciary duties to Nexgen Memantine and its shareholders enabled Defendant Ajjarapu to operate his scheme to defraud investors and shareholders, including Plaintiff Investors.

144.    There is a pattern since all of these acts took place over a long period of time and threaten to continue well into the future.

145.    As a direct and proximate result of the Defendant Ajjarapu and Defendant Mahendiran's conspiracy to commit these racketeering activities and their overt acts in furtherance of the racketeering activity, Plaintiffs were damaged when they purchased securities in a company controlled by Defendant Ajjarapu and Defendant Mahendiran, and when Defendant Ajjarapu and Defendant Mahendiran took funds out of the company with no justification for their own gain.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants Suren Ajjarapu and Gajan Mahendiran for violation of the Florida RICO Act, Fla. Stat. § 895.03, and Annapurna Gundlapalli for accomplice liability, for threefold damages sustained by Plaintiffs, attorney's fees, cost, and reasonable expenses, requiring that the

Defendants divest any interest in the enterprise, and further relief as this Court deems fair and just.

### COUNT IX - DECLARATORY JUDGMENT (CONTRACT *VOID AB INITIO*)
(PLAINTIFF INVESTORS AGAINST NEXGEN MEMANTINE)

146.    Plaintiffs incorporate all allegations contained in paragraphs 1 through 70, as if set out fully herein.

147.    This claim arises from the various Subscription Agreements signed by Plaintiff Investors. Exhibits L, M, N, and O.

148.    Section 8 of each Subscription Agreement provides for California state law as governing.

149.    Each Subscription Agreement was signed and executed by Defendant Mahendiran as President of Nexgen Memantine.

150.    Defendant Mahendiran has since denied that he is, or was, President of Nexgen Memantine.

151.    In Plaintiff Investors' Verified Amended Complaint, allegations were made regarding Defendant Mahendiran's representations and status as President of Nexgen Memantine, including:

a.    "[In 2015] Defendant Mahendiran represented that he was the President of Nexgen Memantine, but that he had a partner operating in Tampa, Florida - by the name of Suren Ajjarapu - who was coming to Virginia to meet with Defendant Mahendiran and invited Datta to join and discuss the opportunity with them." Doc. 136, ¶ 22.

     b.    "Defendant Mahendiran became the President and Treasurer of Nexgen Memantine, with Gundlapalli as the Vice President and Secretary. Upon information and belief, as with Nexgen LifeSciences, Defendant Ajjarapu acted as Gundlapalli's proxy in her positions, effectively pulling the strings from behind the curtain." Doc. 136, ¶ 133.

     c.    "Gajan Defendant Mahendiran is a director and the President and Treasurer of Nexgen Memantine." Doc. 136, ¶ 181.

152.    In his Verified Answer, Defendant Mahendiran, under penalty of perjury, gave the following responses to each of the above enumerated allegations:

     a.    "Dr. Defendant Mahendiran denies Plaintiffs' Paragraph No. 22." Doc. 129, ¶ 22.

     b.    "Dr. Defendant Mahendiran is without sufficient information to admit or deny Plaintiffs' Paragraph No. 133 and accordingly denies the same." Doc. 129, ¶ 133.

     c.    "Dr. Defendant Mahendiran denies Plaintiffs' Paragraph No. 181." Doc. 129, ¶ 181.

153.    Based on the foregoing responses, Defendant Mahendiran has essentially represented that he was not the President of Nexgen Memantine when he signed the Subscription Agreements in 2016.

154.    Regardless of his status as President of Nexgen Memantine, Defendant Mahendiran was not a broker registered or exempt from registration as required by 15 U.S.C. §

78o(a)(1) when executing the Subscription Agreements and selling securities to Plaintiff Investors. ¶ 29.

155.   California law prohibits brokers of securities from effectuating any transaction related to securities unless the broker has first been licensed to do so. Cal. Corp. Code § 25210(a).

156.   As Defendant Mahendiran was not a broker registered in accordance with the Securities Exchange Act, he was not exempt from the license requirements of California. Cal. Corp. Code § 25200.

157.   All Subscription Agreements violated both Federal (15 U.S.C. § 78o(a)(1)) and California law (Cal. Corp. Code § 25210(a)) upon their execution, as they were executed by Defendant Mahendiran, who was without any form of registration or exemption from such registration as a broker of security, and therefore illegal and void.

158.   Additionally, the Subscription Agreements make warranties and representations that are breached by Defendant Mahendiran and Defendant Ajjarapu, including:

   a.   Section 3(a), represents that Nexgen Memantine "is a corporation duly organized and validly existing." *See* Exhibit K. This is called into question as Defendant Mahendiran has denied his role as a director, President, or Treasurer of Nexgen Memantine despite being listed as at least one of these roles in annual reports filed with the Wyoming Secretary of State from 2016-2018. Those annual reports are attached hereto as **Exhibit O**.

Included in Exhibit O is also the annual report for 2019, where Mahendiran is not listed in any official capacity with Nexgen Memantine.[8]

b.     Section 3(c) represents the Subscription Agreements "have been duly authorized, executed, and delivered . . . and are valid and binding agreements, enforceable in accordance with their terms," and subject to various laws, including fraudulent transfer. *See* Exhibit K. However, if Defendant Mahendiran nor Defendant Ajjarapu were not authorized representatives of the company, or registered brokers, the agreements could not have been duly executed as they were executed in violation of California and Federal law.

159.   If Defendant Mahendiran was not President of Nexgen Memantine when he executed the Subscription Agreements on the company's behalf in such capacity, then the Subscription Agreements are *void ab initio*, and never had any legal inception, as the agreements were never executed by a duly authorized representative of Nexgen Memantine.

160.   Even if Defendant Mahendiran was acting as President of Nexgen Memantine when he executed the Subscription Agreements on the company's behalf in such capacity, the governing law of those agreements precluded Defendant Mahendiran from executing the agreements without being a registered broker.

WHEREFORE, Plaintiffs respectfully request this Court to grant declaratory judgment and find the Subscription Agreements through which Plaintiffs purchased securities in Nexgen Memantine, Inc. be found *void ab initio*, and for a declaration of rescission, further ordering the

---

[8] Defendant Mahendiran has similarly denied that Nexgen LifeSciences holds any interest in Nexgen Memantine (*see* Doc. 136, ¶ 132 and Doc. 129, ¶ 132), implying that at the time of the execution of investors in early 2016, Nexgen Memantine had no shareholders.

Plaintiff Investors should be given their money back, with interest, both pre- and post-judgment, and any other relief the Court finds just.

**COUNT XI - BREACH OF FIDUCIARY DUTY**
(PLAINTIFFS ON BEHALF OF NEXGEN MEMANTINE INC. AGAINST SUREN AJJARAPU, GAJAN MAHENDIRAN, AND ANNAPURNA GUNDLAPALLI)

161.    Plaintiffs incorporate all allegations contained in paragraphs 1 through 86, as if set out fully herein.

162.    This claim is not ripe until 90 days after nominal defendant Nexgen Memantine has received, and refused to act on, Plaintiff Investors' demand for the action described in this claim. Plaintiff Investors sent this demand to counsel for Nexgen Memantine on May 14, 2021.

163.    This claim will be moot in the event that Plaintiff Investors succeed in their claim for declaratory judgment for contract *void ab initio*, as Plaintiff Investors would no longer be shareholders of Nexgen Memantine.

164.    This is a derivative action pursuant to Wyo. Stat. Ann. § 17-16-746 against Suren Ajjarapu, Gajan Mahendiran, and Annapurna Gundlapalli for breach of fiduciary duty.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

165.    Plaintiff Investors bring derivative claims in the right and for the benefit of nominal defendant Nexgen Memantine to redress injuries suffered and to be suffered by the company as a direct result of Defendants Ajjarapu, Mahendiran, and Gundlapalli's wrongdoings.

166.    Nexgen Memantine Inc. is a Wyoming corporation with a principal place of business and offices in Florida. Therefore, Wyoming law governs the standards of conduct for directors and officers of Nexgen Memantine.

167.    Plaintiff Investors were all shareholders at the times relevant to this action and had a combined total of 8% of the voting power in Nexgen Memantine.

168.    Plaintiff Investors, as current shareholders, have standing to bring this lawsuit and will adequately and fairly represent the interests of Nexgen Memantine in enforcing and prosecuting its rights.

169.    Gajan Mahendiran is a director and the President and Treasurer of Nexgen Memantine.

170.    Annapurna Gundlapalli is a director and the Vice President and Secretary of Nexgen Memantine.

171.    Upon information and belief, Suren Ajjarapu has operated on behalf of Defendant Gundlapalli in a manner similar to a director and officer of Nexgen Memantine, whether as a proxy or through power of attorney or other agreement. *See* ¶¶ 23, 59-69, 79-83; Exhibits H-K.

172.    Pursuant to Wyo. Stat. Ann. § 17-16-830, corporate directors are required to act (a) in good faith, (b) in a manner reasonably believed to be in the best interest of the corporation, and (c) in a reasonably informed manner while acting in their decision-making function or devoting attention to their oversight function.

173.    Pursuant to Wyo. Stat. Ann. § 17-16-842, corporate officers are required to act in (a) good faith, (b) with the care that a person in a like position would reasonably exercise under similar circumstances, and (c) in a manner the officer reasonably believes to be in the best interests of the corporation.

174.    Defendant Mahendiran breached the following fiduciary duties as both a director and officer of Nexgen Memantine in the following circumstances:

a.  his fiduciary duty of good faith through misleading potential investors, including Plaintiff Investors, during the Solicitation Period while soliciting the sale of securities in Nexgen Memantine (¶¶ 24-53, 55-57, 59-63; Exhibits A-H);

b.  his fiduciary duty of good faith through continuing to mislead Plaintiff Investors even as shareholders, by giving false updates on the corporation's business and refusing to share financial information related to the corporation (¶¶ 71-78);

c.  his fiduciary duties of good faith and care by undermining a potential partnership with a pharmaceutical manufacturer that would have been beneficial to the corporation (*see* Doc. 32 ¶ 31); and

d.  his fiduciary duty of loyalty by participating in making unauthorized wire transfers in the total amount of $1,185,000.00 from Nexgen Memantine's accounts to his own accounts, or to other entities controlled by him, for no consideration. ¶¶ 82-84).

175.  Upon information and belief, Defendant Mahendiran's transfers of money from Nexgen Memantine's accounts were not authorized as required by Wyo. Stat. Ann. §§ 17-16-862 (director approval) or 17-16-863 (shareholder approval). It is therefore Defendant Mahendiran's burden to show that the transactions between Nexgen Memantine and himself were fair to the corporation.

176.  Defendant Gundlapalli breached her fiduciary duty of care as both a director and officer of Nexgen Memantine in the following circumstances:

a.      through dereliction of duty and failure of oversight during the Solicitation Period, while Defendant Ajjarapu and Defendant Mahendiran made misleading representations to potential investors, including Plaintiff Investors;

b.      through failing to control or otherwise manage Defendant Ajjarapu, the individual operating on her behalf and in her capacity as a director and officer of Nexgen Memantine as he misled Plaintiff Investors and other shareholders of the corporation (¶¶ 79-80); and

c.      through failing to act when she knew, or should have reasonably known, that Defendant Mahendiran and Defendant Ajjarapu were making unauthorized withdrawals from Nexgen Memantine's accounts for their personal benefit (¶¶ 82-84).

177.    Defendant Ajjarapu breached his fiduciary duty of good faith, operating as or on behalf of a director or officer of Nexgen Memantine, in the following circumstances:

a.      through misleading potential investors, including Plaintiff Investors, during the Solicitation Period while soliciting the sale of securities in Nexgen Memantine (¶¶ 24-25, 29-49, 52-69) ; Exhibits A, B, and D-K); and

b.      by participating in making unauthorized wire transfers in the total amount of $1,185,000.00 from Nexgen Memantine's accounts to his own accounts, or to other entities controlled by him, for no consideration. (¶¶ 82-84).

178.    Regardless of Defendant Ajjarapu's actions in a manner similar to or on behalf of a corporate director and officer, Defendant Ajjarapu owed a fiduciary duty to Plaintiff Investors as a promoter of Nexgen Memantine during the Solicitation Period, with special knowledge of the corporation's business, structure, and finances. *See*, e.g., *Bergh v. Mills*, 763 P.2d 214 (Wyo. 1988) (holding that promoters of a corporation owed a fiduciary duty to disclose material facts to individuals induced to purchase stock in the corporation).

179.    The actions of Defendant Mahendiran and Defendant Ajjarapu towards potential investors, shareholders, and Plaintiff Investors were not taken in good faith, and such actions were directly detrimental to nominal defendant Nexgen Memantine's ability to conduct future business with potential investors or partners.

180.    Defendant Gundlapalli generally failed in her duty of oversight and to remain reasonably informed about the state of Nexgen Memantine, its affairs and accounts, and the actions being taken by Defendant Mahendiran and Defendant Ajjarapu.

181.    Nominal defendant Nexgen Memantine, and as a result of their investments, the Plaintiff Investors, have been gravely damaged by the bad faith actions of Defendant Mahendiran and Defendant Ajjarapu and the failure to oversee and remain informed of the corporation's management by Defendant Gundlapalli.

WHEREFORE, Plaintiffs, on behalf of all similarly situated shareholders of Nexgen Memantine, respectfully request that this Court enter judgment against Defendants Gajan Mahendiran, Annapurna Gundlapalli, and Suren Ajjarapu for breach of fiduciary duty under Wyo. Stat. Ann. §§ 17-16-830 and 17-16-842, for damages with interest, attorney's fees, cost, reasonable expenses, and further relief as this Court deems fair and just.

## COUNT XIII - BREACH OF ORAL CONTRACT
### (PLAINTIFF INVESTORS AGAINST NEXGEN LIFESCIENCES LLC)

182.   Plaintiffs incorporate all allegations contained in paragraphs 1 through 86, as if set out fully herein.

183.   While soliciting Plaintiff Investors, Defendant Ajjarapu and Defendant Mahendiran represented that Defendant Nexgen LifeSciences, Nexgen Memantine's parent company and largest shareholder, would repay the principal sum of the investments made by Nexgen Memantine's investors, including Plaintiff Investors, in the event that the FDA did not approve the generic memantine drug and Nexgen Memantine was unable to repay its investors. ¶ 54(e).

184.   Upon information and belief, Defendant Mahendiran is at least a 50% shareholder in Nexgen LifeSciences, operated as a director or officer at the time the guarantee was made, and was authorized to make such a guarantee on Nexgen LifeSciences' behalf.

185.   The existence of this agreement is supported by Defendant Ajjarapu's Verified Crossclaim, which states, "[o]n information and belief, Defendant Mahendiran also had knowledge of the responsibility that Nexgen LifeSciences had to the Memantine Investors if the FDA did not approve the Proposed Treatment. Namely that, on information and belief, Nexgen LifeSciences had agreed to use the proceeds from its Agreement with MSN to repay the principal to the Memantine Investors, if needed." *See* Doc. 32, ¶ 20.

186.   Defendant Ajjarapu claims that Defendant Mahendiran, as a member of Nexgen LifeSciences, deliberately caused Nexgen LifeSciences to fail to bring breach of contract claims or other claims against MSN, an Indian pharmaceutical company. *See* Doc. 32, ¶¶ 23-24.

187.    Regardless of the cause, upon information and belief Defendant Nexgen LifeSciences failed to make reasonable efforts to secure and enforce its Agreement with MSN.

188.    Nexgen Memantine is currently unable to repay Plaintiff Investors due to its funds being removed through a series of unauthorized transactions made, at least in part, by Defendant Mahendiran. ¶¶ 82-84.

189.    As per the agreement and direct guarantee made by Nexgen LifeSciences through Defendant Mahendiran on January 4, 2016, with Nexgen Memantine unable to make Plaintiff Investors whole, the responsibility to repay the principal sum of Plaintiff Investors' investments in Nexgen Memantine now falls on Defendant Nexgen LifeSciences.

190.    Despite Defendant Nexgen LifeSciences' failure to make reasonable efforts to secure and enforce its agreement with MSN, Defendant Nexgen LifeSciences now refuses to repay Plaintiff Investors, thus breaching its agreement and guarantee.

191.    Defendant Nexgen LifeSciences is currently considered "dissolved" by the Wyoming Secretary of State as of March 2020 for tax delinquency.

192.    Due to the actions of a 50% member of Defendant Nexgen LifeSciences, the limited liability company has refused to repay Plaintiff Investors despite the agreement with Nexgen Memantine.

193.    As such, Plaintiff Investors have been injured as Defendant Mahendiran, a member of Nexgen LifeSciences and President and Treasurer of Nexgen Memantine, is a direct cause for both companies' inability to repay Plaintiff Investors.

194.     Plaintiff Investors seek to pierce the limited liability company veil of Nexgen LifeSciences, as is necessary to prevent the injustice caused by Nexgen LifeSciences' breach of its agreement with Nexgen Memantine.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Nexgen LifeSciences LLC, and to pierce the limited liability company veil against its members as necessary, for compensatory damages in the amount promised to be paid to Plaintiffs as third-party beneficiaries, and further relief as this Court deems fair and just.

## COUNT XIV - APPOINTMENT OF RECEIVER
### (PLAINTIFF INVESTORS AGAINST NEXGEN MEMANTINE, INC.)

195.     Plaintiffs incorporate all allegations contained in paragraphs 1 through 82, as if set out fully herein.

196.     This is a claim for the appointment of an equitable receiver to assume control of the operations of Nexgen Memantine, the nominal defendant.

197.     Additionally, this claim is for the appointment of an equitable receiver to assume control of any other corporate or unincorporated legal entities that are discovered to be a part of a racketeering enterprise violating the Florida RICO statutes as described in Count __.

198.     Imposition of an equitable receivership in this matter is warranted based on Plaintiff Investors' allegations that Defendants have engaged in fraud and theft.

199.     Plaintiff Investors, as individual shareholders, and derivatively through Nexgen Memantine itself, has standing to request appointment of a receiver.

200.     The Court has jurisdiction over Nexgen Memantine because it is properly joined to this lawsuit.

201.    Defendants Suren Ajjarapu, Gajan Mahendiran and Annapurna Gundlapalli have acted and can reasonably be expected to continue acting in an improper manner with respect to and in the course of carrying out the management and affairs of Nexgen Memantine.

202.    Until the Court renders a judicial determination as to who is responsible for the theft of Plaintiff Investors' money, the appointment of a receiver is necessary to manage Nexgen Memantine *pendente lite*.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment for the appointment of a receiver to manage the affairs of Nexgen Memantine so that a full investigation of the missing funds may be completed and so that the operations of Nexgen Memantine may be stabilized, for an award of attorney's fees and costs, and for any other relief the Court may deem just and proper.

## COUNT XV - "BAD ACTOR" INJUNCTION
### (PLAINTIFF INVESTORS AGAINST GAJAN MAHENDIRAN AND SUREN AJJARAPU)

203.    Plaintiffs incorporate all allegations contained in paragraph 1 through 86, as if fully set out herein.

204.    Defendants Ajjarapu and Mahendiran have behaved as bad actors, as outlined in paragraphs 1 through 86, and elsewhere in this Pleading.

205.    Their illegal acts have defrauded at least 12 victims, and spawned litigation from Wyoming, Virgina, Alabama, and to here, in Florida.

206.    This is a claim seeking a declaration that Defendants Mahendiran and Ajjarapu are "bad actors" for the purposes of  17 C.F.R. § 230.506(d)(1)(ii), and to enter an injunction preventing Defendants Mahendiran and Ajjarapu from further violations of the Securities Exchange Act of 1934, and from generally participating in any conduct or practice in connection

with the purchase or sale of any security, involving the making of any false filing with the Securities Exchange Commission, or conduct related to activities as brokers or securities for five years.

207.    Plaintiff Investors have suffered an irreparable injury that cannot be remedied by money damages alone. Plaintiff Investors have been injured not only as investors that have been defrauded, but as shareholders of a company that has been treated as the personal property of Defendants Mahendiran and Ajjarapu.

208.    Additionally, no money damages will prevent Defendants Mahendiran or Ajjarapu from engaging in similar behavior in the future, and there is no adequate remedy at law other than an order from this Court specifically enjoining such behavior.

209.    Plaintiff Investors have suffered significant hardship due to the fraudulent and manipulative actions of Defendants Mahendiran and Ajjarapu. An injunction preventing Defendants Mahendiran and Ajjarapu from engaging in specific actions related to securities for five years would not be a hardship that would tip the balance against entering an injunction.

210.    Finally, enjoining Defendants Mahendiran and Ajjarapu from engaging in specific actions related to securities would undoubtedly further both the public interest and public policy in general. Defendants Mahendiran and Ajjarapu have acted outside the bounds of the laws of the United States and multiple states, and have accumulated wealth by taking advantage of investors, at least 12 of which are currently known, including Plaintiff Investors. If allowed to continue to act in the manner described throughout this Complaint, Defendants Mahendiran and Ajjarapu may cause significant damage to investors, the securities market, and the pharmaceutical industry at large.

WHEREFORE, Plaintiffs respectfully request this Court enter an injunction against Gajan Mahendiran and Suren Ajjarapu, enjoining them from engaging in activities enumerated in 17 C.F.R. § 230.506(d)(1)(ii) for five years, and any further relief as this Court deems fair and just.

**FOUR RIVERS LAW FIRM**

By: /s/ Joseph F. Southron
Joseph F. Southron
Florida Bar No. 122109
400 N. Ashley Drive, Suite 1720
Tampa, Florida 33602
Tel. (813) 773-5105
Fax (813) 773-5103
Primary E-Mail: joe@fourriverslaw.com
Secondary E- Mail:  eservice@fourriverslaw.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed on  May 14, 2021 with the Court via CM/ECF system, which will send electronic notification of such filing to all parties and counsel of record.

/s/ Joseph F. Southron
Joseph F. Southron
Florida Bar No. 122109
For the Firm