**THIS CONVERTIBLE PROMISSORY NOTE AND SHARES CONVERTIBLE THEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO SALE OR DISPOSITION MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SAID ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE HOLDER, SATISFACTORY TO THE PAYOR, THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.**

<u>CONVERTIBLE PROMISSORY NOTE</u>

$_____                                                                                                                December 15th 2015,
2015

Tampa, Florida

FOR VALUE RECEIVED, NEXGEN MEMANTINE, INC., a Wyoming corporation ("**Payor**") promises to pay to _____ or his or her assigns ("**Holder**"), under the terms of this convertible promissory note (this "**Note**"), the principal sum of $_____ with interest on the outstanding principal amount at the rate of Twelve percent (12%) per annum, compounded annually based on a 365-day year. Interest shall commence with the date hereof and shall continue on the outstanding principal until paid in full.

1. All payments of interest and principal shall be in lawful money of the United States of America. All payments shall be applied first to accrued interest and thereafter to principal. Payor may prepay this Note at any time without penalty.

2. Conversion

(a) If Payor closes on a financing of at least $2,000,000 on terms substantially similar to or better than those set forth in the term sheet attached hereto as <u>**Exhibit A**</u> (the "**Term Sheet**"), which Term Sheet contemplates the sale of shares of its Series A Preferred Stock (the "**Series A Financing**") to investors for $1.15 per share, prior to <u>December 1, 2017</u> (the "**Maturity Date**"), then the outstanding principal balance and unpaid accrued interest of this Note shall automatically convert in whole into the shares of Series A Stock in the Series A Financing (the "**Shares**") at a conversion price equal to the price per share paid by the investors for the Series A Financing and in all other respects on the same terms and conditions as given to the investors. The amount of this Note shall be considered part of the Series A Financing.

(b) If there is a (i) sale of substantially all of the assets of the Payor, (ii) a merger or consolidation in which the Payor is not the surviving corporation (other than a merger or consolidation in which stockholders immediately before the merger or consolidation have, immediately after the merger or consolidation, greater stock voting power); or (iii) any transaction or series of related transactions in which in excess of fifty percent (50%) of the Payor's voting power is transferred (collectively, a "**Merger**"), prior to the Series A Financing and prior to the Maturity Date, then the outstanding principal balance and unpaid accrued interest of this Note shall be automatically due and payable.

(c) If the Series A Financing or a Merger has not occurred by the Maturity Date, Holder at his or here option (i) may extend the Maturity Date for an additional 180 days by delivering written notice to Payor, (ii) demand conversion into Common Stock at the price of $1.15 per share, or (iii) demand payment of principal and interest. Holder shall provide written notice of this election fifteen (15) days prior to the Maturity Date to elect (i) or (ii).

3. Unless this Note has been converted or extended in accordance with the terms of Section 2 above, the entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on the Maturity Date.

4. The terms of this Note shall be construed in accordance with the laws of the State of Wyoming.

5. Representations by Holder**.**  In consideration of the Payor's acceptance of this Note, Holder makes the following representations and warranties to the Payor and to its principals, jointly and severally, which warranties and representations shall survive any acceptance of this Note by the Payor:

(a)     Prior to the time of purchase of the Note, Holder received a copy of the Private Placement Memorandum, dated November 30th , 2015 and (the "**Memorandum**") attached hereto as **Exhibit C**.  Holder has reviewed the Memorandum and the Term Sheet and Holder has had the opportunity to ask questions and receive any additional information from persons acting on behalf of the Payor to verify Holder's understanding of the terms thereof and of the Payor's business and status thereof.  <u>Holder understands that the terms of the Shares reflected in the Memorandum are not the final terms of the Series A Preferred Stock, and those term may be modified pending closing of the Series A Financing</u>.  Holder acknowledges that no officer, director, broker-dealer, placement agent, finder or other person affiliated with the Payor has given Holder any information or made any representations, oral or written, other than as provided in the Memorandum, on which Holder has relied upon in deciding to invest in the Note and Shares convertible thereunder, including without limitation, any information with respect to future acquisitions, financings, projections, or future operations of the Payor or the economic returns which may accrue as a result of the issuance the Note and Shares convertible thereunder.

(b)     The acceptance of the Memorandum and constitutes an agreement on the part of the Holder hereof that to the extent the Memorandum contains any material non-public information about the Payor, Holder agrees to abstain from trading in the Payor's securities, and shall refrain from disclosing any such information, until such information is made publicly available by the Payor.

(c)     Holder acknowledges that Holder has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the Note and Shares convertible thereunder.

(d)     The Note and Shares convertible thereunder are being purchased for Holder's own account for long-term investment and not with a view to immediately re-sell the Shares.  No other person or entity will have any direct or indirect beneficial interest in, or right to, the Shares.

(e)     Holder acknowledges that the Note and Shares convertible thereunder have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or qualified under any other applicable state securities laws, in reliance, in part, on Holder's representations, warranties and agreements made herein.

(f)     Other than the rights specifically set forth in herein, Holder represents, warrants and agrees that the Payor and the officers of the Payor (the "**Payor's Officers**") are under no obligation to register or qualify the the Note and Shares convertible thereunder under the

2

Securities Act or under any state securities law, or to assist the undersigned in complying with any exemption from registration and qualification.

(g) Holder represents that Holder meets the criteria for participation because: (i) Holder has a preexisting personal or business relationship with the Payor or one or more of its partners, officers, directors or controlling persons; or (ii) by reason of Holder's business or financial experience, or by reason of the business or financial experience of its financial advisors who are unaffiliated with, and are not compensated, directly or indirectly, by the Payor or any affiliate or selling agent of the Payor, Holder is capable of evaluating the risk and merits of an investment in the Note and Shares convertible thereunder and of protecting its own interests;

(h) Holder represents that Holder is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act and Holder has executed the Certificate of Accredited Investor Status, attached hereto as **Exhibit B**.

(i) Holder understands that the Note and Shares convertible thereunder are illiquid, and until registered with the Securities Exchange Commission, or an exemption from registration becomes available, cannot be readily sold as there will not be a public market for them, and that Holder may not be able to sell or dispose of the Note and Shares convertible thereunder, or to utilize the Shares as collateral for a loan.  Holder must not purchase the Note and Shares convertible thereunder unless Holder has liquid assets sufficient to assure Holder that such purchase will cause it no undue financial difficulties, and that Holder can still provide for current and possible personal contingencies, and that the commitment herein for the Note and Shares convertible thereunder, combined with other investments of Holder, is reasonable in relation to its net worth.

(j) Holder understands that the right to transfer the Note and Shares convertible thereunder will be restricted unless the transfer is not in violation of the Securities Act, and any other applicable state securities laws (including investment suitability standards), that the Payor will not consent to a transfer of the Note and Shares convertible thereunder unless the transferee represents that such transferee meets the financial suitability standards required of an initial Holder, and that the Payor has the right, in its absolute discretion, to refuse to consent to such transfer.

(k) Holder has been advised to consult with its own attorney or attorneys regarding all legal matters concerning an investment in the Payor and the tax consequences of purchasing the Note and Shares convertible thereunder, and have done so, to the extent Holder considers necessary.

(l) Holder acknowledges that the tax consequences of investing in the Payor will depend on particular circumstances, and neither the Payor, the Payor's officers, any other investors, nor the partners, shareholders, members, managers, agents, officers, directors, employees, affiliates or consultants of any of them, will be responsible or liable for the tax consequences to Holder of an investment in the Payor.   Holder will look solely to and rely upon its own advisers with respect to the tax consequences of this investment

(m) All information which Holder has provided to the Payor concerning Holder, its financial position and its knowledge of financial and business matters, and any information found in the attached Certificate of Accredited Investor Status, is truthful, accurate, correct, and complete as of the date set forth herein.

(l)  Each certificate or instrument representing securities issuable pursuant to this Note will be endorsed with the following legend:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE TRANSFER IS MADE IN COMPLIANCE WITH RULE 144 PROMULGATED UNDER SUCH ACT OR THE PAYOR RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES WHICH IS SATISFACTORY TO THE PAYOR, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

6. This Note shall be construed in accordance with the laws of the State of Wyoming. Any proceeding or dispute arising under this Agreement shall be instituted in the State of Florida.

IN WITNESS WHEREOF, the Payor has duly executed this Convertible Promissory Note on the date first above written.

**NEXGEN MEMANTINE, INC.**

By: _____
Gajan Mahindran, President

HOLDER:

_____
Name:

4

**Exhibit A**

**Term Sheet**

Under our Amended and Restated Articles of Incorporation ("Amended Articles"), filed November 18th 2015, we are currently authorized to issue 10,000,000 shares of common stock, $0.00001 par value per share , and 5,000,000 shares of Preferred Stock, , $0.00001 par value per share, of which of which 1,000,000 shares have been designated "Series A Convertible Preferred Stock. Our Amended and Articles, further permits our Board of Directors to fix the rights, preferences, and privileges of, and issue, remaining unissued shares of preferred stock with voting, conversion, dividend and other rights and preferences that could adversely affect the voting power or other rights of our shareholders. The following summary of our Common Stock and Series A Preferred Stock does not purport to be complete description of the terms and conditions of our securities, and these terms are subject to change.

**Series A Preferred Stock at $1.15 per Share**.

The rights, preferences, and limitations of the Series A Convertible Preferred Stock are summarized as follows:

*Liquidation Preference.* In the event of a liquidation, dissolution or winding-up, the proceeds shall be distributed to the stockholders as follows: First pay 1x the original purchase price plus declared but unpaid dividends on each share of Series A Preferred Stock. Any remaining proceeds shall be paid to the holders of Common Stock.

*Dividends*. Annual 5% dividend on the Series A Preferred Stock, payable when and if declared by Board, and prior and in preference to any declaration or payment of other dividends; dividends are not cumulative. For any other dividends or similar distributions, Preferred Stock participates with Common Stock on an as-converted basis.

*Voting Rights*. The Series A Preferred Stock will vote together with the Common Stock and not as a separate class except as specifically provided or as otherwise required by law. Each share of Series A Preferred shall have a number of votes equal to the number of shares of Common Stock then issuable upon conversion of such share of Series A Preferred.

*Optional Conversion*. The holders of the Series A Preferred Stock shall have the right to convert the Series A Preferred Stock, at any time, into shares of Common Stock. The initial conversion rate shall be 1:1 at the Original Purchase Price ("Conversion Price"), subject to adjustment as provided in the Amended and Restated Certificate of Incorporation.

*Mandatory Conversion*. The Series A Preferred Stock shall be automatically converted into Common Stock, at the then applicable Conversion Price, if the Company becomes publicly traded under the Securities Exchange Act, or if the Company consummates a merger with a company publicly traded under the Securities Exchange Act.

*Preemption*. The holders of Series A Preferred Stock have no preemptive rights and they are not subject to further calls or assessments by us.

*Redemption*. There are no redemption or sinking fund provisions applicable to the Series A Preferred Stock. The outstanding shares of Series A Preferred Stock are fully paid and

nonassessable.

**EXHIBIT B**

**CERTIFICATE OF ACCREDITED INVESTOR STATUS**

Except as may be indicated by the undersigned below, the undersigned is an "accredited investor," as that term is defined in Regulation D under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").  The undersigned has initialed the box below indicating the basis on which he is representing his status as an "accredited investor":

____   a bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "<u>Securities Exchange Act</u>"); an insurance company as defined in Section 2(13) of the Securities Act; an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; a small business investment company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, and such plan has total assets in excess of $5,000,000; an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are "accredited investors";

____   a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

____   an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

____   a natural person whose individual net worth, or joint net worth with the undersigned's spouse, at the time of this purchase exceeds $1,000,000;

____   a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with the undersigned's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

____   a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment;

____   an entity in which all of the equity holders are "accredited investors" by virtue of their meeting one or more of the above standards; or

____   an individual who is a director or executive officer of Nexgen Memantine, Inc

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Accredited Investor Status effective as of _____, 2015.

_____