<u>EXHIBIT A</u>

## NEXGEN MEMANTINE, INC.
## SUBSCRIPTION AGREEMENT

**Restricted Series A Convertible Preferred Stock at $1.15 per Share**

1.      **Subscription:**

(a)      The undersigned (individually and/or collectively, the "**Participant**") hereby applies to purchase shares of restricted Series A Preferred Stock (the "**Shares**" or the "**Preferred Stock**") of Nexgen Memantine, Inc., a Wyoming corporation (the "**Company**"), in accordance with the terms and conditions of (1) this Subscription Agreement (the "**Subscription**"), which is attached as **Exhibit A** to the Company's Confidential Private Placement Memorandum, "), dated November 1, 2015 (the "**Memorandum**"); (2) the Company's Amended and Restated Articles of Incorporation (the "**Amended Articles**"), which attached to the Memorandum as **Exhibit B**; and (3) the Registration Rights Agreement ("**Rights Agreement**"), which is attached to the Memorandum as <u>Exhibit C.</u>

(b)      Before this Subscription is considered, the Participant must complete, execute and deliver to the Company the following:

(i)      This Subscription;

(ii)      The Rights Agreement;

(iii)      The Certificate of Accredited Investor Status, attached hereto as **Exhibit D**; and

*86,957*

(iv)      The Participant's check in the amount of $ _100,000_ in exchange for ~~115,000~~ *(error)* Shares purchased, or wire transfer sent according to the Company's instructions:

*HD/GM* (c)      This Subscription is irrevocable by the Participant.

(d)      This Subscription is not transferable or assignable by the Participant.

(e)      This Subscription may be rejected in whole or in part by the Company in its sole discretion prior to the Closing Date (as defined in Section 1(g) hereof), regardless of whether Participant's funds have theretofore been deposited by the Company).  Participant's execution and delivery of this Subscription and the Rights Agreement will not constitute an agreement between the undersigned and the Company until this Agreement has been accepted and executed by the Company.  In the event this Subscription is rejected by the Company, all funds and documents tendered by the Participant shall be returned and the parties' obligations hereunder, shall terminate.

(f)      This Offering, as defined in the Memorandum, is scheduled to close  no later than December 15, 2015 at 5:00 P.M. Pacific Standard Time (the "**Closing Date**"), <u>provided, however</u>, that the Company, at its sole election, may extend this offering up to an additional ninety days. The target offering is for up to 1,000,000 shares of Preferred Stock, but this offering has no

_HD/Gm_
Participant's Initials                                   1                                   Subscription Agreement
                                                                                            Nexgen Memantine, Inc.

Scanned by CamScanner

prescribed minimum amount and the Company may accept lessor amounts from investors or have multiple closings of this offering.

(g)     Participant hereby agrees not to, and will cause its affiliates not to, enter into any "put equivalent position" as such term is defined in Rule 16a-1 under the Securities Exchange Act of 1934, as amended, or short sale position with respect to the Preferred Stock or Common Stock issuable upon conversion thereof.

**2.     Representations by Participant.**  In consideration of the Company's acceptance of the Subscription, Participant makes the following representations and warranties to the Company and to its principals, jointly and severally, which warranties and representations shall survive any acceptance of the Subscription by the Company:

(a)     Prior to the time of purchase of any Shares, Participant received a copy of the Memorandum and the Amended Articles.  Participant has reviewed the Memorandum, the Amended Articles and Participant has had the opportunity to ask questions and receive any additional information from persons acting on behalf of the Company to verify Participant's understanding of the terms thereof and of the Company's business and status thereof. Participant acknowledges that no officer, director, broker-dealer, placement agent, finder or other person affiliated with the Company has given Participant any information or made any representations, oral or written, other than as provided in the Memorandum, on which Participant has relied upon in deciding to invest in the Shares, including without limitation, any information with respect to future acquisitions, financings, projections, or future operations of the Company or the economic returns which may accrue as a result of the purchase of the Shares.

(b)     The acceptance of the Memorandum and constitutes an agreement on the part of the Participant hereof that to the extent the Memorandum contains any material non-public information about the Company, Participant agrees to abstain from trading in the Company's securities, and shall refrain from disclosing any such information, until such information is made publicly available by the Company.

(c)     Participant acknowledges that Participant has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the Shares.

(d)     The Shares are being purchased for Participant's own account for long-term investment and not with a view to immediately re-sell the Shares.  No other person or entity will have any direct or indirect beneficial interest in, or right to, the Shares.

(e)     Participant acknowledges that the Shares have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or qualified under the California Securities Law, or any other applicable blue sky laws, in reliance, in part, on Participant's representations, warranties and agreements made herein.

(f)     Other than the rights specifically set forth in this Subscription, the Amended Articles and the Rights Agreement, Participant represents, warrants and agrees that the Company and the officers of the Company (the "**Company's Officers**") are under no obligation to register or qualify the Shares under the Securities Act or under any state securities law, or to assist the undersigned in complying with any exemption from registration and qualification.

Participant's Initials                                    2                              Subscription Agreement
                                                                                         Nexgen Memantine, Inc

(g)     Participant represents that Participant meets the criteria for participation because: (i) Participant has a preexisting personal or business relationship with the Company or one or more of its partners, officers, directors or controlling persons; or (ii) by reason of Participant's business or financial experience, or by reason of the business or financial experience of its financial advisors who are unaffiliated with, and are not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, Participant is capable of evaluating the risk and merits of an investment in the Shares and of protecting its own interests;

(h)     Participant represents that Participant is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act and Participant has executed the Certificate of Accredited Investor Status, attached hereto as **Exhibit D**.

(i)     Participant understands that the Shares are illiquid, and until registered with the Securities Exchange Commission, or an exemption from registration becomes available, cannot be readily sold as there will not be a public market for them, and that Participant may not be able to sell or dispose of the Shares, or to utilize the Shares as collateral for a loan. Participant must not purchase the Shares unless Participant has liquid assets sufficient to assure Participant that such purchase will cause it no undue financial difficulties, and that Participant can still provide for current and possible personal contingencies, and that the commitment herein for the Shares, combined with other investments of Participant, is reasonable in relation to its net worth.

(j)     Participant understands that the right to transfer the Shares will be restricted unless the transfer is not in violation of the Securities Act, the California Securities Law, and any other applicable state securities laws (including investment suitability standards), that the Company will not consent to a transfer of the Shares unless the transferee represents that such transferee meets the financial suitability standards required of an initial participant, and that the Company has the right, in its absolute discretion, to refuse to consent to such transfer.

(k)     Participant has been advised to consult with its own attorney or attorneys regarding all legal matters concerning an investment in the Company and the tax consequences of purchasing the Shares, and have done so, to the extent Participant considers necessary.

(l)     Participant acknowledges that the tax consequences of investing in the Company will depend on particular circumstances, and neither the Company, the Company's officers, any other investors, nor the partners, shareholders, members, managers, agents, officers, directors, employees, affiliates or consultants of any of them, will be responsible or liable for the tax consequences to Participant of an investment in the Company. Participant will look solely to and rely upon its own advisers with respect to the tax consequences of this investment

(m)     All information which Participant has provided to the Company concerning Participant, its financial position and its knowledge of financial and business matters, and any information found in the attached Certificate of Accredited Investor Status, is truthful, accurate, correct, and complete as of the date set forth herein.

(l)     Each certificate or instrument representing securities issuable pursuant to this Agreement will be endorsed with the following legend:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH

Scanned by CamScanner

ACT COVERING SUCH SECURITIES, THE TRANSFER IS MADE IN COMPLIANCE WITH RULE 144 PROMULGATED UNDER SUCH ACT OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES WHICH IS SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

3.      **Representations and Warranties by the Company.**   The Company represents and warrants that:

(a)      Due Incorporation.   The Company is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power to own its properties and to carry on its business as now being conducted. The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a material adverse effect on the business, operations or financial condition of the Company.

(b)      Outstanding Stock.   All issued and outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and non-assessable.

(c)      Authority; Enforceability.   This Subscription, the Amended Articles and the Rights Agreement delivered together with this Subscription or in connection herewith have been duly authorized, executed, and delivered by the Company and are valid and binding agreements, enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity; and the Company has full corporate power and authority necessary to enter into this Subscription, the Amended Articles and the Rights Agreement and to perform its obligations hereunder and under all other agreements entered into by the Company relating hereto.

(d)      No General Solicitation.   Neither the Company, nor any of its affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of the Shares.

4.   **Agreement to Indemnify Company.**   Participant hereby agrees to indemnify and hold harmless the Company, its principals, the Company's officers, directors attorneys, and agents, from any and all damages, costs and expenses (including actual attorneys' fees) which they may incur: (i) by reason of Participant's failure to fulfill any of the terms and conditions of this Subscription; (ii) by reason of Participant's breach of any of representations, warranties or agreements contained herein (including the Certificate of Accredited Investor Status); or (iii) with respect to any and all claims made by or involving any person, other than Participant personally, claiming any interest, right, title, power, or authority in respect to the Shares. Participant further agrees and acknowledges that these indemnifications shall survive any sale or transfer, or attempted sale or transfer, of any portion of the Shares.

5.      **Subscription Binding on Heirs, etc.**   This Subscription, upon acceptance by the Company, shall be binding upon the heirs, executors, administrators, successors and assigns of

_KD/4m_
Participant's Initials                                        4                     Subscription Agreement
                                                                                    Nexgen Memantine, Inc

Scanned by CamScanner

the Participant. If the undersigned is more than one person, the obligations of the undersigned shall be joint and several and the representations and warranties shall be deemed to be made by and be binding on each such person and his or her heirs, executors, administrators, successors, and assigns.

6. **Execution Authorized.** If this Subscription is executed on behalf of a corporation, partnership, trust or other entity, the undersigned has been duly authorized and empowered to legally represent such entity and to execute this Subscription and all other instruments in connection with the Shares and the signature of the person is binding upon such entity.

7. **Adoption of Terms and Provisions.** The Participant hereby adopts, accepts and agrees to be bound by all the terms and provisions hereof.

8. **Governing Law.** This Subscription shall be construed in accordance with the laws of the State of California.

9. **Investor Information:** (This must be consistent with the form of ownership selected below and the information provided in the Certificate of Accredited Investor Status (**Exhibit A,** included herewith.)

Name (please print): _Harsh Datta_

If entity named above, By:_____ Its:_____

Social Security or Taxpayer I.D. Number: ████████

Business Address (including zip code): _15204 Spotted Turtle CT. Woodbridge, VA 22193_

Business Phone: _703625 9213_

Residence Address (including zip code): _–Same as above– 15204 Spotted Turtle CT., woodbridge, VA 22193_

Email Address: _Classdoctor @ yahoo.com_

Residence Phone: _703 880 5211_

All communications to be sent to:

_____ Business or ___✓___ Residence Address _____ Email

Participant's Initials

5

Subscription Agreement
Nexgen Memantine, Inc

Scanned by CamScanner

Please indicate below the form in which you will hold title to your interest in the Shares. PLEASE CONSIDER CAREFULLY.  ONCE YOUR SUBSCRIPTION IS ACCEPTED, A CHANGE IN THE FORM OF TITLE CONSTITUTES A TRANSFER OF THE INTEREST IN THE SHARES AND MAY THEREFORE BE RESTRICTED BY THE TERMS OF THIS SUBSCRIPTION, AND MAY RESULT IN ADDITIONAL COSTS TO YOU.  Participants should seek the advice of their attorneys in deciding in which of the forms they should take ownership of the interest in the Shares, because different forms of ownership can have varying gift tax, estate tax, income tax, and other consequences, depending on the state of the investor's domicile and his or her particular personal circumstances.

_____ INDIVIDUAL OWNERSHIP (one signature required)

_____ JOINT TENANTS WITH RIGHT OF SURVIVORSHIP AND NOT AS TENANTS IN COMMON (both or all parties must sign)

_____ COMMUNITY PROPERTY (one signature required if interest held in one name, i.e., managing spouse; two signatures required if interest held in both names)

_____ TENANTS IN COMMON (both or all parties must sign)

_____ GENERAL PARTNERSHIP (fill out all documents in the name of the PARTNERSHIP, by a PARTNER authorized to sign)

_____ LIMITED PARTNERSHIP (fill out all documents in the name of the LIMITED PARTNERSHIP, by a GENERAL PARTNER authorized to sign)

_____ LIMITED LIABILITY COMPANY (fill out all documents in the name of the LIMITED LIABILITY COMPANY, by a member authorized to sign)

_____ CORPORATION (fill out all documents in the name of the CORPORATION, by the President or other officer authorized to sign)

_____ TRUST (fill out all documents in the name of the TRUST, by the Trustee, and include a copy of the instrument creating the trust and any other documents necessary to show the investment by the Trustee is authorized.  The date of the trust must appear on the Notarial where indicated.)

Participant's Initials

6

Subscription Agreement
Nexgen Memantine, Inc

Scanned by CamScanner

Subject to acceptance by the Company, the undersigned has completed this Subscription Agreement to evidence his/her subscription for participation in the Shares of the Company, this ___13___ day of __January__, 2015. 2016

**PARTICIPANT**

_____
(Signature

By: _____

Its: _____


The Company has accepted this subscription this __13__ day of __January__, 2016

**"COMPANY"**

**NEXGEN MEMANTINE, INC., a
Wyoming corporation**

By: _____
        Gajan Mahindran, President



Address for notice:


Nexgen Memantine, Inc

8913 Regents Park Dr. Suite #550
Tampa, FL 33647

Attn: President



_ltp/ln_
Participant's Initials                           7                    Subscription Agreement
                                                                      Nexgen Memantine, Inc

**Exhibit D**

**CERTIFICATE OF ACCREDITED INVESTOR STATUS**

Except as may be indicated by the undersigned below, the undersigned is an "accredited investor," as that term is defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act"). The undersigned has initialed the box below indicating the basis on which he is representing his status as an "accredited investor":

_____ a bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"); an insurance company as defined in Section 2(13) of the Securities Act; an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; a small business investment company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, and such plan has total assets in excess of $5,000,000; an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are "accredited investors";

_____ a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

_____ an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

__ND__ a natural person whose individual net worth, or joint net worth with the undersigned's spouse, at the time of this purchase exceeds $1,000,000;

_____ a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with the undersigned's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

_____ a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment;

_____ an entity in which all of the equity holders are "accredited investors" by virtue of their meeting one or more of the above standards; or

_____ an individual who is a director or executive officer of Nexgen Memantine, Inc

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Accredited Investor Status effective as of

13, January , 2015. 2016

_____Harsh Datta /Neelam Datta_____
Name of Participants

_KD/ hm_
Participant's Initials

1

Subscription Agreement
Nexgen Memantine, Inc

Scanned by CamScanner

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

### OF

### NEXGEN MEMANTINE, INC.

Nexgen Memantine, Inc., a Wyoming corporation, hereby certifies that:

1.     The name of the corporation is Nexgen Memantine, Inc.  The date of filing its original Certificate of Incorporation with the Secretary of State was November 18, 2015 as "Nexgen Memantine, Inc."  A Certificate of Amendment was filed on Novemebr 19th , 2015, with following Amendments."

2.     This Amended and Restated Certificate of Incorporation of the corporation attached hereto as Exhibit "1", which is incorporated herein by this reference, and which restates, integrates and further amends the provisions of the Certificate of Incorporation of this corporation as previously amended or supplemented, has been duly adopted by the corporation's Board of Directors and a majority of the stockholders in accordance with Sections 242 and 245 of the Wyoming General Corporation Law, with the approval of the corporation's stockholders having been given by written consent without a meeting in accordance with Section 228 of the Wyoming General Corporation Law.

IN WITNESS WHEREOF, said corporation has caused this Amended and Restated Certificate of Incorporation to be signed by its duly authorized officer and the foregoing facts stated herein are true and correct.

Dated: _13, January, 2015 2016_            **NEXGEN MEMANTINE, INC.**

By: _____

Gajan Mahendiran, President

Exhibit "1"

# AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## OF

## NEXGEN MEMANTINE, INC

### ARTICLE I

The name of this corporation is Nexgen Memantine, Inc.

### ARTICLE II

The address of the registered office of the corporation in the State of Wyoming is _1908 Thomas Av, Cheyenne_, in the State of Wyoming. The name of its registered agent at that address is Bizfillings.

### ARTICLE III

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Wyoming.

### ARTICLE IV

This Corporation is authorized to issue two (2) classes of shares, designated "Common Stock" and "Preferred Stock." The total number of shares of Common Stock authorized to be issued is Ten million (10,000,000) shares, $0.00001 par value per share. The total number of shares of Preferred Stock authorized to be issued is five million (5,000,000) shares, $0.00001 par value per share, of which One million (1,000,000) shares have been designated "Series A Convertible Preferred Stock."

The undesignated Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby authorized, subject to Article IV, Section 6 of this Amended and Restated Certificate of Incorporation, to fix or alter the rights, preferences, privileges and restrictions of any wholly unissued series of Preferred Stock, and the number of shares constituting any such series or the designation thereof and to increase or decrease the number of shares of any such series subsequent to the issuance of shares of that series, but not below the number of shares of such series then outstanding. In case the number of shares of any series shall so be decreased, the shares constituting such decrease shall resume the status that they had prior to the adoption of the resolution originally fixing the number of such series.

1

## CORPORATE GUARANTEE

**THIS GUARANTEE dated this** ___13___ **day of** ___January___, 20_16_.

**From:** **Nexgen Memantine, Inc** _____.

   (The "Guarantor")

**To:** ___Harsh Datta___    15204 Spotted turtle Ct
                              Woodbridge, Virginia 22193
   (The "Lender")

**Re:** ___Nexgen Memantine, Inc .___ _____.

   (The "Debtor")

**IN CONSIDERATION OF** the Lender extending convertible debt to the Debtor, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantor, guarantees the prompt, full and complete performance of any and all present and future duties, obligations and indebtedness (the "Debt") due to the Lender by the Debtor, under the terms of certain debt agreements (the "Agreement") and under the following terms and conditions:

1. This corporate guarantee is valid till debt is converted into equity as per the following terms and conditions. Once the debt is converted into equity this corporate guarantee is null and void.

2. The Guarantor guarantees that the Debtor will promptly pay the full amount of principal and interest of the Debt as and when the same will in any manner be or become due, either according to the terms and conditions provided by the Agreement or upon acceleration of the payment under the Agreement by reason of a default.

3. The Lender is hereby authorized at any time, in its sole discretion and without notice, to take, change, release or in any way deal with any security securing the Debt without in any way impairing the obligation of the Guarantor.

4. The Lender will be under no obligation to collect or to protect any such security or the Debt, and its neglect or failure to collect or protect the security or the Debt is excused. Acceptance of the Guarantee is waived.

5. The Lender may grant extensions of time or other indulgences and otherwise deal with the Debtor and with other parties and securities as the Lender may see fit without in any way limiting or lessening the liability of the Guarantor under this Agreement.

6. Any impairment of the security, which the Lender may from time to time hold as security for the Debt, will in no way operate to discharge the Guarantor in whole or in part, it being specifically agreed that the Lender is not required to exercise diligence to enforce its rights against the Debtor.

7. The Lender may release, surrender, exchange, modify, impair or extend the periods of duration or the time for performance or payment of any collateral securing the obligations of the Debtor to the Lender, and may also settle or compromise any claim of the Lender against the Debtor or against any other person or corporation whose obligation is held by the Lender as collateral security for any obligation of the Debtor or the Lender.

1

8. The liability of the Guarantor will continue until payment is made of every obligation of the Debtor now or later incurred in connection with the Debt and until payment is made of any loss or damage incurred by the Lender with respect to any matter covered by this Guarantee or any of the Agreement.

9. The Guarantor represents that at the time of the execution and delivery of this Guarantee nothing exists to impair the effectiveness of this Guarantee.

10. The Lender may, at its option, proceed in the first instance against the Guarantor to collect the obligations covered by this Guarantee without first proceeding against any other person, firm or corporation and without resorting to any property held by the Lender as collateral security.

11. All pronouns will include masculine, feminine and/or neuter gender, single or plural number, as the context of this Guarantee may require.

12. This Guarantee is made pursuant to the laws of the State of Wyoming. In the event that this Guarantee must be enforced by the Lender, all reasonable costs and expenses, including attorney's fees, incurred by the Lender will be paid by the Guarantor.

13. The invalidity or unenforceability of any one or more phrases, sentences, clauses or sections in this Guarantee will not affect the validity or enforceability of the remaining portions of this Guarantee or any part of this Guarantee.

14. No alteration or waiver of this Guarantee or of any of its terms, provisions or conditions will be binding upon the Lender unless made in writing over the signature of the Lender or its representative.

15. Words of "Guarantee" contained in this Guarantee in no way diminish or impair the absolute liability created in this Guarantee.

16. Any notice to be given to the Guarantor may be sent by mail, telephone, fax, email or otherwise delivered to the address provided below.

Gajan Mahendiran / Suren Ajjarapu
8913 Regents Park Dr. Suite #550   Tampa, FL 33647
Phone: 201-696-9338
Fax: _____

IN WITNESS WHEREOF the Guarantor has duly affixed its signature under hand and seal on this _13_ day of _January_, 20_16_.

SIGNED, SEALED OR ATTESTED
in the presence of:

_____
Witness

COMPANY NAME

Nexgen Memantine Inc.
Per: _____

2

## CERTIFICATE OF NOTARY PUBLIC

I HEREBY CERTIFY THAT:

1.  _Nexgen MeMantine Inc_ State of W__ the Guarantor in the Guarantee dated the _13_ day of _January_, 20_16_, made between _Nexgen Memantine Inc_ and _Harsh Datta_ which this Certificate is attached to or noted upon, appeared in person before me and acknowledged that he/she had executed the Guarantee.

2.  I satisfied myself by examination of him/her that he/she is aware of the contents of the Guarantee and understands it.

GIVEN AT _____, State of _VA_ this _13th_ day of _Jan_, 20_16_ under my hand and seal of office.

_Nexgen_

A Notary in and for the State of _VA_

The County of _FairQuire_

My commission expires _6/30/2016_

MUSTAPHA SAKA ALLOTEY
NOTARY PUBLIC 7520618
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES JUNE 30, 2016

3

## ARTICLE V

The rights, preferences, privileges, restrictions and other matters relating to the Common Stock and the Series A Convertible Preferred Stock are as follows.

1.      <u>Definitions</u>.  For purposes of this ARTICLE V, the following definitions shall apply:

1.1     "<u>Closing Sales Price</u>" means, for any security as of any date, the last sales price of such security on the principal trading market where such security is listed or traded as reported by Bloomberg Financial Markets (or a comparable reporting service of national reputation selected by the Corporation if Bloomberg Financial Markets is not then reporting closing sales prices of such security) (collectively, "<u>Bloomberg</u>"), or if the foregoing does not apply, the last reported sales price of such security on a national exchange or in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no such price is reported for such security by Bloomberg, the average of the bid prices of all market makers for such security as reported in the "pink sheets" by the National Quotation Bureau, Inc., in each case for such date or, if such date was not a trading day for such security, on the next preceding date that was a trading day.  If the Closing Sales Price cannot be calculated for such security on any of the foregoing bases, the Closing Sales Price of such security on such date shall be the fair market value as reasonably determined by an investment banking firm selected by the Corporation, with the costs of such appraisal to be borne by the Corporation.

1.2     "<u>Convertible Securities</u>" shall mean any evidences of indebtedness, Series A Convertible Preferred Stock, or other securities convertible into or exchangeable for Common Stock.

1.3     "<u>Distribution</u>" shall mean the transfer of cash or other property without consideration whether by way of dividend or otherwise (other than dividends on Common Stock payable in Common Stock), or the purchase or redemption of shares of the Corporation for cash or property other than: (i) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase, (ii) repurchases of Common Stock issued to or held by employees, officers, directors or consultants of the Corporation or its subsidiaries pursuant to rights of first refusal contained in agreements providing for such right, (iii) repurchase of capital stock of the Corporation in connection with the settlement of disputes with any stockholder, (iv) any other repurchase or redemption of capital stock of the Corporation approved by the holders of (a) a majority of the Common Stock and (b) a majority of the Series A Convertible Preferred Stock of the Corporation voting as separate classes.

2

Scanned by CamScanner

1.4     "Dividend Rate" shall mean an annual rate of 12% of the Original Issue Price per share for the Series A Convertible Preferred Stock (as appropriately adjusted for any Recapitalizations).

1.5     "Liquidation Preference" shall mean equal the Original Issue Price per share for the Series A Convertible Preferred Stock (as appropriately adjusted for any Recapitalizations).

1.6     "Options" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

1.7     "Original Issue Date" shall mean the date upon which the first shares of Series A Convertible Preferred Stock are issued.

1.8     "Original Issue Price" shall mean $1.15 per share for the Series A Convertible Preferred Stock (as appropriately adjusted for any Recapitalizations).

1.9     "Recapitalization" shall mean any stock dividend, stock split, combination of shares, reorganization, recapitalization, reclassification or other similar event.

2.      Dividends.

2.1     Series A Convertible Preferred Stock.  In any calendar year, the holders of outstanding shares of Series A Convertible Preferred Stock shall be entitled to receive dividends, when, as and if declared by the Board of Directors, out of any assets at the time legally available therefor, at the Dividend Rate payable in preference and priority to any declaration or payment of any Distribution on Common Stock of the Corporation in such calendar year.  No Distributions shall be made with respect to the Common Stock until all declared dividends on the Series A Convertible Preferred Stock have been paid or set aside for payment to the Series A Convertible Preferred Stock holders.  The right to receive dividends on shares of Series A Convertible Preferred Stock shall not be cumulative, and no right to such dividends shall accrue to holders of Series A Convertible Preferred Stock by reason of the fact that dividends on said shares are not declared or paid in any calendar year.

2.2     Common Stock. Subject to the prior rights of holders of all classes of stock at the time outstanding having prior rights as to dividends, the holders of the Common Stock shall be entitled to receive, when and as declared by the Board of Directors of the Corporation, out of any assets of the Corporation legally available therefor, such dividends as may be declared from time to time by the Board of Directors.

2.3     Non-Cash Distributions.  Whenever a Distribution provided for in this Section 2 shall be payable in property other than cash, the value of such Distribution shall

3

Scanned by CamScanner

be deemed to be the fair market value of such property as determined in good faith by the Board of Directors.

3.    Liquidation Rights.

     3.1    Liquidation Preference.  In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary, the holders of the Series A Convertible Preferred Stock shall be entitled to receive, prior and in preference to any Distribution of any of the assets of the Corporation to the holders of the Common Stock by reason of their ownership of such stock, an amount per share for each share of Series A Convertible Preferred Stock held by them equal to the sum of (i) the Liquidation Preference specified for such share of Series A Convertible Preferred Stock, and (ii) all declared but unpaid dividends (if any) on such share of Series A Convertible Preferred Stock. If upon the liquidation, dissolution or winding up of the Corporation, the assets of the Corporation legally available for distribution to the holders of the Series A Convertible Preferred Stock are insufficient to permit the payment to such holders of the full amounts specified in this Section 3.1, then the entire assets of the Corporation legally available for distribution shall be distributed with equal priority and pro rata among the holders of the Series A Convertible Preferred Stock in proportion to the full amounts they would otherwise be entitled to receive pursuant to this Section 3.1.

     3.2    Remaining Assets.  After the payment to the holders of Series A Convertible Preferred Stock of the full preferential amounts specified above, the entire remaining assets of the Corporation legally available for distribution by the Corporation shall be distributed with equal priority and pro rata among the holders of the Common Stock in proportion to the number of shares of Common Stock held by them.

     3.3    Reorganization.  For purposes of this Section 3, a liquidation, dissolution or winding up of the Corporation shall be deemed to occur upon (a) the acquisition of the Corporation by another entity by means of any transaction or series of related transactions to which the Corporation is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) that results in the voting securities of the Corporation outstanding immediately prior thereto failing to represent immediately after such transaction or series of transactions (either by remaining outstanding or by being converted into voting securities of the surviving entity or the entity that controls such surviving entity) a majority of the total voting power represented by the outstanding voting securities of the Corporation, such surviving entity or the entity that controls such surviving entity, or (b) a sale, lease or other conveyance of all or substantially all of the assets of the Corporation.

     3.4    Valuation of Non-Cash Consideration.  If any assets of the Corporation distributed to stockholders in connection with any liquidation, dissolution, or winding up of the Corporation are other than cash, then the value of such assets shall be their fair market value as determined in good faith by the Board of Directors.  In the event of a

4

Scanned by CamScanner

merger or other acquisition of the Corporation by another entity, the Distribution date shall be deemed to be the date such transaction closes.

4.   Conversion.  The holders of the Series A Convertible Preferred Stock shall have conversion rights as follows (the "Conversion Rights"):

4.1   Right to Convert.  Each share of Series A Convertible Preferred Stock shall be convertible, at the option of the holder thereof ("Optional Conversion"), at any time after the date of issuance of such share at the office of the Corporation or any transfer agent for the Series A Convertible Preferred Stock, into that number of fully-paid, nonassessable shares of Common Stock determined by dividing the Original Issue Price for the Series A Convertible Preferred Stock by the Conversion Price.  In order to effectuate the Optional Conversion under this Paragraph 4.1, the holder must provide the Corporation a written notice of conversion ("Notice of Conversion").  The initial Conversion Price per share of Series A Convertible Preferred Stock shall be the Original Issue Price and shall be subject to adjustment as provided herein.  The number of shares of Common Stock into which each share of Series A Convertible Preferred Stock may be converted is hereinafter referred to as the "Conversion Rate" for each such series.  Upon any decrease or increase in the Conversion Price for the Series A Convertible Preferred Stock, as described in this Section 4, the Conversion Rate shall be appropriately increased or decreased.

4.2   Automatic Conversion.  Each share of Series A Convertible Preferred Stock (but not less than all) shall be automatically converted into a number of fully paid and nonassessable shares of Common Stock determined in accordance with the formula set forth in Paragraph 4.1 of this Article V (an "Automatic Conversion"), unless otherwise prohibited by any law, rule or regulation applicable to the Corporation, upon the occurrence of the earlier of either of the following events:

(a)   the Company (or its successor in interest by way of merger) becomes a publicly reporting company under the Securities and Exchange Act of 1934, as amended; or

(b)   the holders of a majority of the then outstanding shares of Series A Convertible Preferred Stock elect to consummate an Automatic Conversion of all the outstanding shares of Series A Convertible Preferred Stock.

Thereafter, the Corporation and the holders shall follow the applicable conversion procedures set forth in this Paragraph 4 (including the requirement that the holder deliver the Series A Convertible Preferred Stock Certificates representing the Series A Convertible Preferred Stock being converted to the Corporation); provided, however, the holders of Series A Convertible Preferred Stock subject to Automatic Conversion shall not be required to deliver a Notice of Conversion to the Corporation.  Nothing set forth in this Paragraph 4.2 shall prevent any holder of Series A Convertible Preferred Stock from exercising its right to convert pursuant to Paragraph 4.1.  In the event of the occurrence of

Scanned by CamScanner

an Automatic Conversion as set forth herein, all securities convertible into or exchangeable for Series A Convertible Preferred Stock shall automatically become convertible into or exchangeable for Common Stock of the Corporation following the applicable conversion procedures set forth in Paragraph 4.

4.3     Mechanics of Conversion.  In order to effect an Optional Conversion, a holder shall: (i) fax (or otherwise deliver) a copy of the fully executed Notice of Conversion to the Corporation (Attention: Secretary) and (ii) surrender or cause to be surrendered the original certificates representing the Series A Convertible Preferred Stock being converted (the "Preferred Stock Certificates"), duly endorsed, along with a copy of the Notice of Conversion as soon as practicable thereafter to the Corporation.  Upon receipt by the Corporation of a facsimile copy of a Notice of Conversion from a holder, the Corporation shall promptly send, via facsimile, a confirmation to such holder stating that the Notice of Conversion has been received, the date upon which the Corporation expects to deliver the Common Stock issuable upon such conversion and the name and telephone number of a contact person at the Corporation regarding the conversion.  The Corporation shall not be obligated to issue shares of Common Stock upon a conversion unless either the Preferred Stock Certificates are delivered to the Corporation as provided above, or the holder notifies the Corporation that such Preferred Stock Certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates.

4.4     Delivery of Common Stock Upon Conversion.  Upon the surrender of Preferred Stock Certificates accompanied by a Notice of Conversion, the Corporation (itself, or through its transfer agent) shall, no later than the tenth business day following the date of such surrender (or, in the case of lost, stolen or destroyed certificates, after provision of indemnity pursuant to Paragraph 4.3 above) (the "Delivery Period"), issue and deliver (i.e., deposit with a nationally recognized overnight courier service postage prepaid) to the holder or its nominee (x) that number of shares of Common Stock issuable upon conversion of such shares of Series A Convertible Preferred Stock being converted and (y) a certificate representing the number of shares of Series A Convertible Preferred Stock not being converted, if any. Notwithstanding the foregoing, if the Corporation's transfer agent is participating in the Depository Trust Corporation ("DTC") Fast Automated Securities Transfer program, and so long as the certificates therefor do not bear a legend and the holder thereof is not then required to return such certificate for the placement of a legend thereon, the Corporation shall cause its transfer agent to promptly electronically transmit the Common Stock issuable upon conversion to the holder by crediting the account of the holder or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DTC Transfer").  If the aforementioned conditions to a DTC Transfer are not satisfied, the Corporation shall deliver as provided above to the holder physical certificates representing the Common Stock issuable upon conversion.  Further, a holder may instruct the Corporation to deliver to the holder

6

Scanned by CamScanner

physical certificates representing the Common Stock issuable upon conversion in lieu of delivering such shares by way of DTC Transfer.

4.5     Taxes. The Corporation shall pay any and all taxes that may be imposed upon it with respect to the issuance and delivery of the shares of Common Stock upon the conversion of the Series A Convertible Preferred Stock.

4.6     Fractional Shares. If any conversion of Series A Convertible Preferred Stock would result in the issuance of a fractional share of Common Stock (aggregating all shares of Series A Convertible Preferred Stock being converted pursuant to a given Notice of Conversion), such fractional share shall be payable in cash based upon the twenty consecutive trading day average Closing Sales Price of the Common Stock prior to the date of conversion, and the number of shares of Common Stock issuable upon conversion of the Series A Convertible Preferred Stock shall be the next lower whole number of shares. If the Corporation elects not to, or is unable to, make such a cash payment, the holder shall be entitled to receive, in lieu of the final fraction of a share, one whole share of Common Stock.

4.7     Adjustments for Subdivisions or Combinations of Common Stock. In the event the outstanding shares of Common Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Common Stock, without a corresponding subdivision of the Series A Convertible Preferred Stock, the Conversion Price in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event outstanding shares of Common Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Common Stock, without a corresponding combination of the Series A Convertible Preferred Stock, the Conversion Price in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

4.8     Adjustments for Subdivisions or Combinations of Series A Convertible Preferred Stock. In the event the outstanding shares of Series A Convertible Preferred Stock shall be subdivided (by stock split, by payment of a stock dividend or otherwise), into a greater number of shares of Series A Convertible Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the Series A Convertible Preferred Stock in effect immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event outstanding shares of Series A Convertible Preferred Stock shall be combined (by reclassification or otherwise) into a lesser number of shares of Series A Convertible Preferred Stock, the Dividend Rate, Original Issue Price and Liquidation Preference of the Series A Convertible Preferred Stock in effect immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately increased.

Scanned by CamScanner

4.9     Adjustments for Reclassification, Exchange and Substitution.  Subject to Section 3 above ("Liquidation Rights"), if the Common Stock issuable upon conversion of the Series A Convertible Preferred Stock shall be changed into the same or a different number of shares of any other class or classes of stock, whether by capital reorganization, reclassification or otherwise (other than a subdivision or combination of shares provided for above), then, in any such event, in lieu of the number of shares of Common Stock which the holders would otherwise have been entitled to receive each holder of such Series A Convertible Preferred Stock shall have the right thereafter to convert such shares of Series A Convertible Preferred Stock into a number of shares of such other class or classes of stock which a holder of the number of shares of Common Stock deliverable upon conversion of such Series A Convertible Preferred Stock immediately before that change would have been entitled to receive in such reorganization or reclassification, all subject to further adjustment as provided herein with respect to such other shares.

4.10     No Impairment.  The Corporation will not through any reorganization, transfer of assets, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation but will at all times in good faith assist in the carrying out of all the provisions of this Section 4 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of Series A Convertible Preferred Stock against impairment. Notwithstanding the foregoing, nothing in this Section 4.10 shall prohibit the Corporation from amending its Articles of Incorporation with the requisite consent of its stockholders and the Board of Directors.

4.11     Certificate as to Adjustments.  Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to this Section 4, the Corporation at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Series A Convertible Preferred Stock a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based.  The Corporation shall, upon the written request at any time of any holder of Series A Convertible Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of Series A Convertible Preferred Stock.

4.12     Waiver of Adjustment of Conversion Price.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of a majority of the outstanding shares of the Series A Convertible Preferred Stock.  Any such waiver shall bind all future holders of shares of such series of Series A Convertible Preferred Stock.

8

Scanned by CamScanner

4.13    Notices of Record Date.  In the event that this Corporation shall propose at any time:

(a)     to declare any Distribution upon its Common Stock, whether in cash, property, stock or other securities, whether or not a regular cash dividend and whether or not out of earnings or earned surplus;

(b)     to effect any reclassification or recapitalization of its Common Stock outstanding involving a change in the Common Stock; or

(c)     to voluntarily liquidate or dissolve or to enter into any transaction deemed to be a liquidation, dissolution or winding up of the Corporation pursuant to Section 3.3;

then, in connection with each such event, this Corporation shall send to the holders of the Series A Convertible Preferred Stock at least ten business days' prior written notice of the date on which a record shall be taken for such Distribution (and specifying the date on which the holders of Common Stock shall be entitled thereto and, if applicable, the amount and character of such Distribution) or for determining rights to vote in respect of the matters referred to in (b) and (c) above.

Such written notice shall be given by first class mail (or express courier), postage prepaid, addressed to the holders of Series A Convertible Preferred Stock at the address for each such holder as shown on the books of the Corporation and shall be deemed given on the date such notice is mailed.

The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the vote or written consent of the holders of a majority of the Series A Convertible Preferred Stock, voting together as a single class.

(d)     Reservation of Stock Issuable Upon Conversion.  The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of effecting the conversion of the shares of the Series A Convertible Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all then outstanding shares of the Series A Convertible Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Series A Convertible Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

Scanned by CamScanner

5.    Voting.

     5.1    Restricted Class Voting.  Except as otherwise expressly provided herein or as required by law, the holders of Series A Convertible Preferred Stock and the holders of Common Stock shall vote together and not as separate classes.

     5.2    No Series Voting.  Other than as provided herein or required by law, there shall be no series voting.

     5.3    Common Stock.  Each holder of shares of Common Stock shall be entitled to one vote for each share thereof held.

     5.4    Series A Convertible Preferred Stock.  Each holder of Series A Convertible Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which the shares of Series A Convertible Preferred Stock held by such holder could be converted as of the record date.  The holders of shares of the Series A Convertible Preferred Stock shall be entitled to vote on all matters on which the Common Stock shall be entitled to vote.  Holders of Series A Convertible Preferred Stock shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation.  Fractional votes shall not, however, be permitted and any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Series A Convertible Preferred Stock held by each holder could be converted), shall be disregarded.

     5.5    Adjustment in Authorized Common Stock.  The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding) by an affirmative vote of the holders of a majority of the outstanding Common Stock and Series A Convertible Preferred Stock of the Corporation voting together as a single class.

6.    Protective Provisions.

     6.1    Subject to the rights of series of Preferred Stock which may from time to time come into existence, so long as any shares of Series A Convertible Preferred Stock are outstanding, this Corporation shall not without first obtaining the approval (by written consent, as provided by law) of the holders of at least a majority of the then outstanding shares of Series A Convertible Preferred Stock, voting together as a class:

          (a)    Increase or decrease (other than by redemption or conversion) the total number of authorized shares of Series A Convertible Preferred Stock;

          (b)    Effect an exchange, reclassification, or cancellation of all or a part of the Series A Convertible Preferred Stock, including a reverse stock split, but excluding a stock forward split;

10

Scanned by CamScanner

(c)     Effect an exchange, or create a right of exchange, of all or part of the shares of another class of shares into shares of Series A Convertible Preferred Stock;

(d)     Alter or change the rights, preferences or privileges of the shares of Series A Convertible Preferred Stock so as to affect adversely the shares of such series;

(e)     Authorize or issue, or obligate itself to issue, any other equity security, including any other security convertible into or exercisable for any equity security having a preference over, or being on parity with, the Series A Convertible Preferred Stock with respect to voting, dividends or upon liquidation; or

(f)     Amend or waive any provision of the Corporation's Amended and Restated Articles of Incorporation or Bylaws relative to the Series A Convertible Preferred Stock so as to affect adversely the shares of Series A Convertible Preferred Stock.

For clarification, issuances of additional authorized shares of Series A Preferred, under the terms herein, shall not require the authorization or approval of the existing stockholders of Series A Convertible Preferred Stock.

7.     <u>Redemption</u>.  The Corporation shall have no obligation to redeem the Common Stock or Series A Convertible Preferred Stock.

8.     <u>Notices</u>.  Any notice required by the provisions of this Article V to be given to the holders of Series A Convertible Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at such holder's address appearing on the books of the Corporation.

9.     <u>Preemptive Rights</u>.  No stockholder of the Corporation shall have the right to repurchase shares of capital stock of the Corporation sold or issued by the Corporation except to the extent that such right may from time to time be set forth in a written agreement between the Corporation and such stockholder.

## ARTICLE VI

Subject to the limitations contained in this Amended Certificate, the Board of Directors of the Corporation shall have the power to adopt, amend or repeal the Bylaws of the Corporation.

## ARTICLE VII

Election of the members of the Board of Directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

11

## ARTICLE VIII

A director of the Corporation shall, to the fullest extent permitted by the Wyoming General Corporation Law as it now exists or as it may hereafter be amended, not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exception from liability is not permitted under the Wyoming General Corporation Law as the same exists or may hereafter be amended.

Any amendment, repeal or modification of the foregoing provisions of this Article VIII, or the adoption of any provision in an amended or restated Certificate of Incorporation inconsistent with this Article VIII, by the stockholders of the Corporation shall not apply to, or adversely affect, any right or protection of a director of the Corporation existing at the time of such amendment, repeal, modification or adoption.

## ARTICLE IX

To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of, and advancement of expenses to, such agents of the Corporation (and any other persons to which Wyoming law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the Wyoming General Corporation Law, subject only to limits created by applicable Wyoming law (statutory or non-statutory), with respect to actions for breach of duty to the Corporation, its stockholders and others.

Any amendment, repeal or modification of any of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a director, officer, agent or other person existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to such amendment, repeal or modification.

## ARTICLE X

Except as otherwise provided in this Amended and Restated Certificate of Incorporation, whenever the vote of stockholders at a meeting thereof is required or permitted to be taken for or in connection with any corporate action, the meeting and vote of stockholders may be dispensed with and such action may be taken with the written consent of stockholders having not less than the minimum percentage of the vote required by the General Corporation Law of Wyoming for the proposed corporate action, provided that prompt notice shall be given to all stockholders of the taking of corporate action without a meeting and by less than unanimous consent.

Scanned by CamScanner

## ARTICLE XI

In addition to any vote of the holders of any class or series of the stock of this Corporation required by law or by this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of a majority of the voting power of all of the then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend or repeal the provisions of this Amended and Restated Certificate of Incorporation, except to the extent a greater vote is required by this Amended and Restated Certificate of Incorporation or any provision of law.  Notwithstanding any other provisions of this Amended and Restated Certificate of Incorporation or any provision of law that might otherwise permit a lesser or no vote, but in addition to any affirmative vote of the holders of any particular class or series of the capital stock of the Corporation required by law or by this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of not less than seventy-five percent of the outstanding shares of capital stock of the Corporation then entitled to vote upon the election of directors, voting together as a single class, shall be required to amend or repeal, or to adopt any provision inconsistent with, Article VI, Article X, or this Article XI of this Amended and Restated Certificate of Incorporation.

## ARTICLE XII

This Corporation shall not be governed by Section 203 of the General Corporation Law of the State of Wyoming.

Scanned by CamScanner