### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JITENDRA JAIN, MANISH ARORA,
SCARIYA KUMARAMANGALAM,
HARSH DATTA, and
BALVANT ARORA,

        Plaintiffs,

v.                            Case No.: 8:20-cv-2263-T-33JSS

NEXGEN MEMANTINE
INC., SUREN AJJARAPU,
ANNAPURNA
GUNDLAPALLI, GAJAN
MAHENDIRAN, NEXGEN
LIFESCIENCES LLC,
TRXADE GROUP, INC., and
G&S COAL TRADERS, LLC,

        Defendants
_____/

### PLAINTIFFS' MOTION TO COMPEL DEFENDANT NEXGEN MEMANTINE, INC.'S PRODUCTION OF DOCUMENTS

Plaintiffs, Jitendra Jain, Manish Arora, Scariya Kumaramangalam, Harsh Datta, and Balvant Arora (collectively the "Plaintiff Investors"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 37, hereby move this Court to enter an order compelling Defendant, Nexgen Memantine, Inc. ("Defendant Nexgen Memantine"), to produce documents and communications involving Dean Kent, Esq., and Trenam Law, and state the following:

1

1.      On November 30, 2015, Defendants Suren Ajjarapu and Gajan Mahendiran created Defendant Nexgen Memantine, a Wyoming corporation, purportedly to develop and manufacture a generic form of memantine, an Alzheimer's drug.

2.      After the Articles of Incorporation were filed, it is unclear whether any further corporate formalities occurred, including establishing a Board of Directors, appointing directors, passing bylaws, or any other corporate formalities, particularly because Defendant Nexgen Memantine is withholding all corporate documents prior to the first investment by Plaintiff Investors on January 19, 2016.[1]

3.      Defendants Ajjarapu and Mahendiran solicited Plaintiff Investors to invest money in Defendant Nexgen Memantine throughout 2015 and into 2016.

4.      Throughout January and February of 2016, Plaintiff Investors invested a total sum of $425,000 into Defendant Nexgen Memantine, thus becoming shareholders of the company.

5.      Between April 1, 2016, and December 20, 2016, Defendant Ajjarapu laundered a total of $1,185,000 from Defendant Nexgen Memantine to Defendant Mahendiran, through intermediary entities, via six separate wire transfers.

---

[1] Despite Plaintiff Investors' right to corporate records under Wyoming statutes and noticed requests for production, Nexgen Memantine is withholding these documents from Plaintiff Investors.

6.     The transfers described in paragraph 5 effectively occurred in the following manner:



7.     On or before November 27, 2018[2], nearly two years after the six wire transfers to Defendant Mahendiran, Defendant Ajjarapu personally retained Dean Kent ("Attorney Kent") and his law firm, Trenam Law ("Trenam"), to investigate the six transfers described in paragraph 5 and 6 above.

8.     During two Special Shareholder Meetings, on November 27, 2018 (the "2018 Shareholder Meeting") and August 13, 2019 (the "2019 Shareholder Meeting"), Defendant Ajjarapu and Attorney Kent solicited Plaintiff Investors to join the investigation against Defendant Mahendiran.

9.     In the 2018 and 2019 Shareholder Meetings, Attorney Kent claimed he was the attorney for Defendant Nexgen Memantine.

10.    On September 25, 2020, Plaintiff Investors filed this lawsuit, which includes claims against Defendant Ajjarapu and Defendant Nexgen Memantine.

---

[2] The exact date that Attorney Kent was retained by Defendant Ajjarapu is unknown to Plaintiff Investors because the relevant communications and information pertaining to Attorney Kent's representation are being withheld under attorney-client privilege and are partially the subject of this Motion. Fully redacted emails involving Defendant Ajjarapu's email addresses and Attorney Kent dating as far back as September 29, 2017, were produced to Plaintiff Investors, but without access to the contents, Plaintiff Investors are unable to ascertain the start of the representation.

11.     As part of their discovery requests on Defendant Nexgen Memantine, Plaintiff Investors requested production of "any and all documents or information gathered by Trenam Law on behalf of the Corporation regarding that certain investigation of Dr. Gajan Mahendiran and the corporation's bank accounts or funds." This request was made based on Plaintiff Investors' belief that Defendant Nexgen Memantine possessed the responsive documents.

12.     On October 12, 2021, Defendant Nexgen Memantine produced a privilege log which included communications involving Attorney Kent and Trenam, confirming Defendant Nexgen Memantine possessed the responsive communications. A copy of Defendant Nexgen Memantine's privilege log is attached to this Motion as **Exhibit A**[3].

13.     All information involving Attorney Kent was withheld by Defendant Nexgen Memantine under the attorney-client privilege. *See* Ex. A.

14.     On November 5, 2021, Defendant Nexgen Memantine supplemented their production with some, but not all, fully redacted emails involving Attorney Kent and Defendant Ajjarapu's email address, along with unredacted documents that were attached to said emails.

---

[3] For convenience, the privilege log attached as Exhibit A has been modified to only contain the relevant entries for this Motion. Upon request, the entire unmodified privilege log can be provided to the Court.

15.     Since the initial investigation, Defendant Ajjarapu has claimed that he is merely a shareholder of Nexgen Memantine, both individually and through his ownership of Nexgen Lifesciences, LLC ("Nexgen Lifesciences").

16.     As further detailed below, Plaintiff Investors are entitled to all documents and communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine as listed in Defendant Nexgen Memantine's privilege log.

## MEMORANDUM OF LAW

## STANDARD OF REVIEW

A party seeking discovery may move for an order compelling production if a party fails to produce documents as requested under Rule 34. Fed. R. Civ. P. 37(a)(3)(B)(iv). A district court has discretion over a motion to compel discovery. *See, e.g., Holloman v. Mail-Well Corp.*, 443 F.3d 832 (11th Cir. 2006) ("a district court is allowed a 'range of choices' in such matters"). A district court can only deny a motion to compel discovery "if it concludes that the questions are irrelevant." *Commercial Union Ins. Co. v. Westrope*, 730 F.2d 729, 733 (11th Cir. 1984). The party resisting discovery bears the burden of establishing a lack of relevancy or undue burden in supplying the requested information. *Gober v. City of Leesburg*, 197 F.R.D. 519, 521 (M.D. Fla. 2000).

When parties submit a privilege log asserting privileges as to certain documents, "[t]he standard for testing the adequacy of the privilege log is whether, as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." *CSX Transportation, Inc. v. Admiral Insurance Co.*, No. 3:93-cv-00132, 1995 WL 855421 (M.D.Fla. Aug. 23, 1995) at *3. Conclusory statements are not sufficient to support a claim of privilege. *Id.* Here, Defendant Nexgen Memantine bears the burden to establish that every communication listed in their privilege log meets the standard for attorney-client privilege. *See St. Joe. Co. v. Liberty Mutual Co.*, No. 3:05-cv-1266-J-25MCR, 2006 WL 3391208 at *7 (M.D. Fla. Nov. 22, 2006); *Cutrale Citrus Juices USA v. Zurich American Ins. Group*, No. 5:03-CV-420-OC-10GRJ, 2004 WL 5215191 (M.D. Fla. Sep. 10, 2004) at *4.

## I.   The attorney-client privilege does not apply to the communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine as asserted by Defendant Nexgen Memantine.

Defendant Nexgen Memantine cannot sustain its burden of proving that the attorney-client privilege applies to the communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine, because Attorney Kent represented the shareholders first, and Nexgen Memantine second - if at all.

Where the court's jurisdiction is premised upon a federal question, as is the case here, the federal rule of privilege applies. *See Hancock v. Hobbs*, 967 F.2d 462, 467 (11th Cir. 1992). The attorney-client privilege protects communications between a client and his attorney made in confidence and for the purpose of securing legal advice or assistance. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1414 (11th Cir. 1994). "The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and the particular communications were confidential, intended to remain confidential, and under the circumstances were reasonably expected and understood to be confidential." *Id.*

1. Attorney Kent was jointly representing the shareholders of Defendant Nexgen Memantine, not Defendant Nexgen Memantine.

To properly invoke attorney-client privilege, a communication must be "between a lawyer and client not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of legal services, or those reasonably necessary for the transmission of the communication." *Tyne v. Time Warner Entertainment Co.*, 212 F.R.D. 596, 598 (M.D.Fla. 2002). Also, no privilege applies between clients in a joint representation when a dispute arises between the clients. *United States v. Almeida*, 341 F.3d 1318, 1324-1325 (11th Cir. 2003).

Here, the key element is the identities of the "lawyer" and the "client." Defendant Nexgen Memantine, through its privilege log, asserts that it was the

client, Attorney Kent was their attorney, and that all the communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine are not discoverable. However, both the privilege log and discussion at the Special Shareholder Meetings facially contradict this assertion.

The 2018 Shareholder Meeting was held "to consider and vote upon a proposal to engage litigation counsel to pursue potential claims against Gajan Mahendiran arising from his transactions with [Nexgen Memantine] relating to Westminster Pharmaceuticals." *See* relevant portions of the 2018 Shareholder Meeting transcript, attached hereto as **Exhibit B** at 1. Defendant Ajjarapu presided over the 2018 Shareholder Meeting as secretary of Defendant Nexgen Memantine, purportedly by proxy from Annapurna Gundlapalli, who is purportedly Defendant Nexgen Memantine's secretary.[4]

---

[4] Plaintiff Investors are unsure of Defendant Gundlapalli's position in Defendant Nexgen Memantine because Plaintiff Investors have been denied all corporate documents, meeting minutes, and voting records of shareholders and directors from November 30, 2015 (the date of Defendant Nexgen Memantine's inception) through January 25, 2016, which is likely when corporate formalities, if any, were conducted and recorded in Defendant Nexgen Memantine's records. In response to Plaintiff Investors' discovery requests regarding these documents, Defendant Nexgen Memantine's counsel unilaterally decided that only corporate documents after January 26, 2016 to present are relevant and discoverable. According to opposing counsel's responses, production of Nexgen Memantine's corporate documents between November 30, 2015 (the date of inception) to January 25, 2016 is an "overly broad" request that provides opposing counsel with "no relevant timeframe." Plaintiff Investors contend these corporate documents are highly relevant and the requests are not "overly broad" as Plaintiff Investors specified exactly what corporate documents are requested. Notwithstanding this contention, Plaintiff Investors will more fully explore this improper denial of reasonable requests in a separate motion.

8

When Attorney Kent was first introduced by Defendant Ajjarapu's personal attorney, Richard McIntyre, he stated "I *have* been engaged by Nexgen Memantine to determine to what extent it may have claims" against Defendant Mahendiran. *Id.* at 9:19-9:25 (emphasis added). Later, Attorney Kent stated "the scope of my representation *would* entail any personal or contractual dealings between Suren individually, and … Gajan Mahendiran. My role *is* limited to representation of Nexgen Memantine." *Id.* at 11:19-11:23 (emphasis added). Shortly thereafter, Mr. McIntyre explained to Plaintiff Investors that "if there are Memantine assets that need to be protected, that's what Mr. Kent is here to do … I think anybody that's a shareholder would want to hear what their options are before deciding summarily not to proceed." *Id.* at 15:13-15:19. Attorney Kent also provided that "[w]hether [any] claims are acted upon by the shareholders or not is up to the shareholders." *Id.* at 19:5-19:6; *See also id.* at 40:10-40:15.

Upon receipt of the privilege log and heavily redacted emails involving Attorney Kent, Trenam, and purportedly Defendant Nexgen Memantine[5], it is

---

[5] Plaintiff Investors' ability to discern the Nexgen Memantine actor(s) in the communications listed on Defendant Nexgen Memantine's privilege log is further hampered by the fact that Defendant Nexgen Memantine does not have a central email server, so all of its emails are sent and received through Defendant Ajjarapu's personal email accounts. Because the same attorneys represent both Defendant Ajjarapu and Defendant Nexgen Memantine, it is impossible for Plaintiff Investors to know if a "communication constituting legal advice" that lists attorneys, who represent both Defendants Nexgen Memantine and Ajjarapu, along with one of Defendant Ajjarapu's email addresses is a communication involving legal advice for Defendant Ajjarapu or Defendant Nexgen Memantine. It is also curious that despite Defendant Nexgen Memantine claiming the privilege to these communications, many of the emails at issue were sent and received through personal emails that belong to Defendant Ajjarapu but appear to be related to

revealed that communications and the exchange of documents involving Attorney Kent began as far back as September 29, 2017, more than one year prior to the 2018 Shareholder Meeting that was supposed to be the official vote on whether to initiate Attorney Kent's to investigate at all. *See* Ex. A at 6. Since Defendant Ajjarapu personally initiated the investigation in September 2017, the 2018 Shareholder Meeting was merely a sham orchestrated by Defendant Ajjarapu, a theme consistent across the investigation.

It was also emphasized at the 2018 Shareholder Meeting that Defendant Nexgen Memantine failed to conduct some or all of the required corporate formalities when it was incorporated. Indeed, Defendant Ajjarapu's personal attorney, Mr. McIntyre, confirmed the "very legitimate concern" that corporate formalities had not occurred, and advised the shareholders that "with regard to officers, directors, corporate structures, … there's some things to get in order with regard to the general corporate affairs of [Nexgen Memantine]." Ex. B at 22:20-23:2. These "things" were never addressed as no other shareholder meetings ever occurred.

---

other entities that Defendant Ajjarapu is involved with, including Trxade and Sansur Associates. This not only further evidences Attorney Kent was representing Defendant Ajjarapu and Plaintiff Investors as opposed to Defendant Nexgen Memantine, but also increases the need for Plaintiff Investors to review the emails claimed as privileged, as it is not known who, if anyone, was acting on behalf of Defendant Nexgen Memantine and what authority, if any, they had to do so.

Due to Defendant Nexgen Memantine's failure to conduct the requisite corporate formalities, there was no proper creation of a board of directors or appointment of corporate officers. As a result, no one had authority to contract and enter into a representation agreement with Attorney Kent on behalf of Defendant Nexgen Memantine. Instead, Defendant Ajjarapu personally initiated an investigation using Attorney Kent without authority from Defendant Nexgen Memantine and used the 2018 and 2019 Shareholder Meetings to have the shareholders somehow ratify the investigation as if they were the board of directors. But shareholders (including Defendant Ajjarapu) are not directors or officers of a corporation and do not have any power or authority to bind the corporation itself.

In the 2019 Shareholder Meeting, that Defendant Ajjarapu again presided over, purportedly by proxy from Defendant Gundlapalli, Attorney Kent recommended that shareholders, including Plaintiff Investors, collectively vote to pursue litigation against Defendant Mahendiran. *See* relevant portions of the 2019 Shareholder Meeting transcript, attached hereto as **Exhibit C**, at 8:13-8:24. In addition, Defendant Ajjarapu said the following to Plaintiff Investors:

> Another thing I want to add to the shareholders is I am funding the legal case here *as a shareholder*, so we've got to find a resolution here. Because if we're going to court with the legal, *all the shareholders have to come to an understanding and pay for the legal expenses because so far I have funded as a shareholder* and a substantial stake in the company, even though I'm only 12

percent, but I'm trying to get this resolved. *I'm pursuing on behalf of all the shareholders*. I just want to get it on the record.

*Id*. at 11:24-12:8 (emphasis added).

Based on the above facts, it is clear a joint representation amongst the shareholders, including Plaintiff Investors, was created. Thus, Attorney Kent created a direct fiduciary relationship with all shareholders. If Attorney Kent were to fail in his investigation to obtain accurate findings (which he did), Plaintiff Investors stood in a position to be directly harmed (which they were) as it has cost them several years and significant funds to investigate the misappropriation of funds themselves (which this lawsuit seeks to accomplish in place of Attorney Kent's investigation).

When Defendant Ajjarapu began communicating with Attorney Kent and Trenam Law in September 2017, he was doing so in a personal capacity as a shareholder. Consequently, the votes to investigate taken in the 2018 and 2019 Shareholder Meetings were not taken by or on behalf of Defendant Nexgen Memantine. Rather, these meetings were merely between shareholders of Defendant Nexgen Memantine, who agreed in their personal capacities to engage Attorney Kent to investigate Defendant Mahendiran and recommend possible legal claims. This is especially evident upon Defendant Ajjarapu's request that all shareholders split the litigation costs if claims were brought against Defendant Mahendiran.

Because there was a joint representation between the shareholders of Defendant Nexgen Memantine, including Defendant Ajjarapu and Plaintiff Investors, and because Attorney Kent was not properly retained by Defendant Nexgen Memantine, the requested material does not qualify under attorney-client privilege. Plaintiff Investors were repeatedly promised transparency and access to all aspects of Attorney Kent's investigation and are now being denied access to them despite being represented by Attorney Kent during the investigation.

Accordingly, Plaintiff Investors are entitled to production of the communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine because Plaintiff Investors are clients of Attorney Kent. Consequently, Defendant Nexgen Memantine should be compelled to fully produce these communications.

## II.   Even if Defendant Nexgen Memantine retained Attorney Kent (and not the shareholders) and can properly assert attorney-client privilege, Plaintiff Investors have good cause to pierce the claimed privilege.

When a corporation invokes the attorney-client privilege between itself and its attorney, the privilege can be set aside upon a showing of good cause by the party against which the privilege is asserted. *Garner v. Wolfinbarger,* 430 F.2d 1093, 1095 (5th Cir. 1970); *In re Braniff, Inc.*, 153 B.R. 941, 944 (Bankr. M.D. Fla. 1993) (adopting *Garner*); *See also Moore v. Lender Processing Servs.*, No. 3:12-cv-205-J-

99TJC-MCR, 2012 WL 10829341 *3 (M.D. Fla. Nov. 5, 2012) (endorsing the rationale in *Garner*).

In *Garner*, the court analyzed whether a corporation could invoke privilege against disclosure of communications between itself and its attorney when shareholders of the corporation sue the corporation and its officers for injuring shareholders' interests. The court pierced the attorney-client privilege asserted, reasoning the corporation had to disclose communications because "management judgment must stand on its merits, not behind an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is . . . exercised." *Id.* at 1101, 1103-04.

In *Garner*, the Fifth Circuit listed nine factors to consider in determining whether shareholders have "good cause" to pierce the attorney-client privilege: (1) the number of shareholders and percentage of ownership in the company; (2) the nature of the shareholders' claim; (3) the necessity of the information and whether the information is available elsewhere; (4) whether the wrongful corporate action alleged is criminal or of doubtful legality; (5) the relation of the communications to past or prospective actions; (6) whether the communication is of advice concerning the litigation itself; (7) how clearly the communications are identified; and (8) the risk that the information contains confidential information, such as trade secrets. *Id.* at 1104.

The four most relevant factors to this case—good faith, nature of the claims, relation to the litigation, and availability of the information—clearly weigh in favor of Plaintiff Investors.[6] Plaintiff Investors are making a good faith attempt to discover relevant corporate records that cannot be found anywhere other than from Defendant Nexgen Memantine. Plaintiff Investors are not trying to obtain communications regarding this ongoing litigation, but rather are looking to obtain communications involving Defendant Nexgen Memantine and Attorney Kent. The information contained in those communications is highly relevant to Plaintiff Investors' claims of securities fraud, racketeering, and misrepresentation.

Regarding the "nature of the claims" factor, Plaintiff Investors' claims include securities fraud, racketeering, and misrepresentation, which are all evidenced by the actions of Defendants Ajjarapu and Nexgen Memantine, including the conduct and communications involving Attorney Kent. In addition, the source and use of Defendant Nexgen Memantine's funds is a crucial element

---

[6] Plaintiff Investors contend that all eight factors weigh in their favor. Briefly regarding the four factors not fully discussed, (1) the five Plaintiff Investors collectively own 8% of Defendant Nexgen Memantine, and factoring in the deadlock and inability of Nexgen Lifesciences to vote, controlled approximately 40% of the voting stock during the 2018 and 2019 Shareholder Meetings; (2) this Motion has highlighted just a small sample of the criminal, or at the least legally doubtful, conduct of Defendants Nexgen Memantine and Ajjarapu; (3) the communications all relate to past actions, as Attorney Kent's representation ended upon the 2019 Shareholder Meeting and Attorney Kent does not currently represent any party in this litigation; and (4) the information requested has effectively no risk of revealing trade secrets, particularly as Defendant Nexgen Memantine was a mere shell company and never actually developed or attempted to develop its claimed memantine drug.

in Plaintiff Investors' securities fraud claims. Information regarding the transfer of Plaintiff Investors' funds from Nexgen Memantine to Defendant Mahendiran is essential to proving that claim

The requested communications will assist Plaintiff Investors in discovering: what, if any, corporate formalities were undertaken that authorized Defendant Ajjarapu to retain Attorney Kent on behalf of Defendant Nexgen Memantine (which is Defendant Nexgen Memantine's justification for its assertion of the privilege); why Defendant Ajjarapu funneled Plaintiff Investors' funds through intermediate entities and ultimately to Defendant Mahendiran; why Defendant Ajjarapu then initiated a sham investigation against Defendant Mahendiran regarding the "stolen" funds when Defendant Ajjarapu initiated the transfers himself; and additional information regarding why Plaintiff Investors' funds were funneled out of Defendant Nexgen Memantine within months of the Plaintiff Investors' investments.

Plaintiff Investors are entitled to the communications and documents given to Attorney Kent from Defendant Ajjarapu to understand how the investigation was framed, what assumptions were made, what facts were discovered, what conclusions were drawn, what efforts were genuinely made to discover wrongdoing, or if in fact the entire investigation was a sham to throw off Plaintiff Investors.

This information is not available elsewhere, as the communications were between Defendant Ajjarapu and Attorney Kent, and frequently included Defendant Ajjarapu's personal counsel. Attorney Kent never published any written reports of his findings and conclusions, so the only source of information is confined to the communications between Defendant Ajjarapu, Defendant Nexgen Memantine, and Attorney Kent.

As all nine Garner factors weigh in Plaintiff Investors' favor, this Court should find that Plaintiff Investors have "good cause" for piercing any attorney-client privilege asserted by Defendant Nexgen Memantine on communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine. Accordingly, this Court should require disclosure of the contents of those communications to Plaintiff Investors pursuant to their discovery request.

**III.   As an independent ground entitling Plaintiff Investors to production of the relevant communications and documents, all defendants are barred from asserting attorney-client privilege under the crime-fraud exception.**

Under the crime-fraud exception, communications made by a client to an attorney before or during the commission of a crime are not privileged. When determining whether the crime-fraud exception applies, federal courts apply a two-part test:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of

17

counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1416 (11th Cir. 1994).

To invoke the crime-fraud exception to attorney-client privilege, one must establish the client was engaged in or planning a fraudulent scheme when it sought advice of counsel. *In Re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996); *See also In re Cutuli*, No. 11–bk–35256, 2013 WL 5236711, (Bankr.S.D.Fla. Sept. 16, 2013). However, the attorney is not required to have participated in the client's criminal activity. *Id.* at 382. Assuming Defendant Nexgen Memantine could properly assert attorney-client privilege, it is precluded from doing so as the crime-fraud exception applies.

1. <u>Plaintiff Investors can make a prima facie case showing that Defendant Nexgen Memantine was engaged in criminal or fraudulent activity when it sought the advice of Attorney Dean Kent.</u>

Plaintiff Investors meet the first part of the test for the crime-fraud exception established in *Cox*. It is clear Defendant Ajjarapu was engaging in fraudulent conduct, purportedly on behalf of Defendant Nexgen Memantine, when he sought the advice of Attorney Kent, despite having no authority to do so. Defendant Nexgen Memantine did not go through any of the required corporate formalities upon incorporating. Plaintiff Investors believe the corporate entity

18

was set up as a way for Defendant Ajjarapu to launder funds to Defendant Mahendiran to satisfy pre-existing personal obligations to Defendant Mahendiran. As a result, Defendant Nexgen Memantine had no bylaws, no board of directors, and did not go through any formal process for appointing qualified directors.[7]

Defendant Ajjarapu admitted that he personally transferred the funds from Nexgen Memantine to Defendant Mahendiran. A copy of the relevant admissions made by Defendant Ajjarapu are attached hereto as **Exhibit E**. After taking Plaintiff Investors' money and wiring it to Defendant Mahendiran, Defendant Ajjarapu hired Attorney Kent to "investigate" the missing funds on behalf of Defendant Nexgen Memantine—knowing he himself was the sole cause of the "missing" funds—in an attempt to disguise the transactions and make it appear as though Defendant Mahendiran had stolen the funds.

This is a clear example of fraudulent activity and is directly related to allegations in the pleadings of fraudulent misuse of corporate funds in Plaintiff Investors' claims of securities fraud, racketeering, and misrepresentation. Defendant Ajjarapu used Defendant Nexgen Memantine to funnel money away

---

[7] Annual reports produced by Defendant Nexgen Memantine indicate that Defendants Mahendiran and Gundlapalli were somehow made directors. However, it is unclear how they were appointed as all documents relevant to this purported election of directors are being withheld by opposing counsel. *See also* n. 3, supra. In addition, Defendant Mahendiran has asserted in discovery responses that he was never elected as a director or officer. A copy of relevant discovery responses is attached hereto as **Exhibit D**.

from Plaintiff Investors, through other entities controlled by Defendant Ajjarapu, into Defendant Mahendiran's personal bank account. Defendant Ajjarapu then wrongfully used Memantine to conduct an "investigation" to rinse his unclean hands. Defendant Nexgen Memantine was clearly involved in fraudulent or criminal activity when Attorney Kent was engaged to conduct that same investigation.

2. Plaintiff Investors can show Attorney Kent's assistance was obtained in furtherance of fraudulent activity or closely related to the 10(b)(5) violations that are the subject matter of this lawsuit.

Defendant Nexgen Memantine, through the conduct of Defendant Ajjarapu, used Attorney Kent to further the fraudulent activity by misleading Plaintiff Investors. Upon retaining Attorney Kent, Defendant Ajjarapu began sharing documents and information with Attorney Kent in an effort to frame Defendant Mahendiran. One year later, in some kind of attempt to expose Defendant Mahendiran, Defendant Ajjarapu presided over the 2018 and 2019 Shareholder Meetings (without the requisite authority) and convinced Plaintiff Investors to initiate a joint shareholder investigation against Defendant Mahendiran under the guise that Defendant Mahendiran stole the funds from Nexgen Memantine and defrauded the company.

From there, Defendant Ajjarapu continued communicating and sharing information with Attorney Kent, purportedly on behalf of Nexgen Memantine,

without including the Plaintiff Investors, all while knowing the entire time that he himself wired the funds out of Nexgen Memantine. Defendant Ajjarapu's misrepresentations are clearly highlighted during the 2019 Shareholder Meeting, when the following exchange occurred:

> **Dr. Arora**: Now, one of the questions that I have, Suren, so the money -- the money was in the account he was transferring? Did I understand that correctly?
> **Mr. Ken**t: I think so, yeah. That's what it seems to me, yeah.
> …
> **Mr. Saslow**: Somebody who had signing authority on the account authorized those --
> **Dr. Arora:** Do you know who that authority was?
> …
> **Mr. Ajjarapu:** We are investigating that…. The [Nexgen Memantine] account is fraudulent and they're not willing to cooperate to give the information…

*See* Ex. C, 14:2-14:7, 14:21-14:23, and 15:9-15:15:12.

Despite saying he did not know who had authority to initiate the transfers, Defendant Ajjarapu has now admitted to being the "fraudulent" actor he previously referred to. *See* Ex. E. This discrepancy demonstrates Defendant Nexgen Memantine, through the conduct of Defendant Ajjarapu, constantly misled Plaintiff Investors throughout the investigation and utilized Attorney Kent to perpetuate this scheme, whether Attorney Kent was aware of it or not.

Lastly, Defendant Ajjarapu's admissions that he made the transfers of funds to Defendant Mahendiran contradict the conclusions of Attorney Kent. Attorney Kent concluded the funds "went all directly to Gajan individually" and agreed

that Defendant Mahendiran was "syphoning off money out" of Defendant Nexgen Memantine. *See* Ex. C, 9:5-9:7, 9:11-9:14. Attorney Kent also said he was unable to obtain any underlying information "in connection with the purposes or who authorized or signed any of the transfers." *Id.* at 16:16-16:21. Given the vast contacts over a years' time between Defendant Ajjarapu and Attorney Kent prior to and after the investigation (now being withheld under claim of attorney-client privilege), it is incredible Attorney Kent never discovered Defendant Ajjarapu initiated the wire transfers himself - *not* Defendant Mahendiran.

The conclusions stated on the record by Attorney Kent, which directly contradict Defendant Ajjarapu's admissions, indicate Attorney Kent either assisted in the furtherance of Defendant Nexgen Memantine's fraudulent conduct or fell victim to Defendant Ajjarapu's fraudulent conduct. Plaintiff Investors have serious doubts that after one year of investigating and communicating with Defendant Ajjarapu and his personal attorney (McIntyre), Attorney Kent would conclude Defendant Mahendiran had stolen the funds, unless of course there was fraudulent conduct on the part of Defendant Ajjarapu and Defendant Nexgen Memantine to disguise these truths from Attorney Kent - which there most likely was.

Regardless of how Attorney Kent failed to uncover any accurate information about the transfers, the facts show Defendant Ajjarapu fraudulently

laundered Plaintiff Investors' money through Defendant Nexgen Memantine to Defendant Mahendiran by wiring it through intermediate entities to disguise the source of the funds. Defendant Ajjarapu's actions, purportedly taken on behalf of Defendant Nexgen Memantine, clearly fall within the crime-fraud exception and therefore permit Plaintiff Investors to access communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine. As a result, this Court should find Plaintiff Investors are entitled to those communications under the crime-fraud exception.

## CONCLUSION

Plaintiff Investors are entitled to communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine. There is no valid attorney-client privilege between Defendant Nexgen Memantine and Attorney Kent. Defendant Nexgen Memantine failed to elect an individual to contract on behalf of itself. Therefore, Defendant Ajjarapu's attempt to ratify an investigation he had already personally initiated created a joint representation with Plaintiff Investors. Thus, Defendant Nexgen Memantine cannot raise attorney-client privilege against Plaintiff Investors.

Even if Defendant Nexgen Memantine properly retained Attorney Kent on its behalf and could assert attorney-client privilege, Plaintiff Investors have shown

good cause to pierce the claimed privilege and allow discovery of communications between Defendant Nexgen Memantine and Attorney Kent.

As a separate ground to compel discovery, the crime-fraud exception applies to bar any claim of attorney-client privilege. Defendant Ajjarapu, purportedly acting on behalf of Defendant Nexgen Memantine, embezzled Plaintiff Investors' funds to Defendant Mahendiran, then attempted to disguise the transfers by claiming the funds were stolen and pointing the finger at Defendant Mahendiran. As part of this scheme, Defendant Ajjarapu utilized Attorney Kent to conduct a sham investigation of the transfers. Based on these facts, this Court should find the communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine are not privileged due to the crime-fraud exception.

**WHEREFORE** Plaintiffs respectfully request that this Court enter an Order compelling Defendant Nexgen Memantine to produce the communications between Attorney Kent, Trenam, and Defendant Ajjarapu and/or Defendant Nexgen Memantine as indicated in Defendant Nexgen Memantine's produced privilege log.

## <u>Local Rule 3.01(g) Certification</u>

The movant certifies the movant has conferred with the opposing party, but the parties were not able to agree on the resolution of the dispute herein. A

substantive discussion occurred on November 3, 2021, between the movant and the counsel of record for Defendant Nexgen Memantine to discuss this dispute, but the parties were unable to resolve the matter.

Dated: <u>November 16, 2021.</u>

Respectfully submitted,

<u>/s/ Joseph F. Southron</u>
Joseph F. Southron, Esq.
Florida Bar Number: 122109
**FOUR RIVERS LAW FIRM**
400 N. Ashley Drive, Suite 1720
Tampa, Florida 33602
Telephone: (813) 773-5105
Fax: (813) 773-5103
E-Mail: joe@fourriverslaw.com
Secondary E-Mail:
eservice@fourriverslaw.com
Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed on November 16, 2021, with the Court via CM/ECF system, which will send notification of such filing to all parties and counsel of record.

<u>/s/ Joseph F. Southron</u>
Joseph F. Southron
Florida Bar No. 122109