Page 1

NOTICE OF SPECIAL MEETING OF SHAREHOLDERS OF
NEXGEN MEMANTINE, INC.

TELEPHONIC
PROCEEDINGS:

1. **REPORT THE RESULTS OF LITIGATION COUNSEL'S INVESTIGATION OF THE WESTMINSTER TRANSACTION.** ==To report litigation counsel's finding regarding potential claims against Gajan Mahendiran arising from his transactions with the company relating to Westminster Pharmaceuticals==

2. **DISCUSS FURTHER ACTION.** Discuss the results of litigation counsel's findings and potential further actions

3. **OTHER BUSINESS.** To transact such other business as may properly come before the special meeting or any adjournments or postponements thereof

TAKEN: Pursuant to notice given to all shareholders and board members of Nexgen Memantine, Inc., by Suren Ajjarapu and Annapurna Gundlapalli

DATE: August 13, 2019

TIME: 11:10 a.m. to 12:05 p.m.

REPORTED BY: Melanie Keefe, FPR
Notary Public
State of Florida at Large

PLACE: 8913 Regents Park Drive
Suite 390
Tampa, Florida  33647

REGENCY REPORTING SERVICE, INC. (813)224-0224

---

Page 2

APPEARANCES:   DAVID M. SASLOW, ESQUIRE
McIntyre Thanasides Bringgold Elliott
Grimaldi Guito & Matthews, P.A.
500 East Kennedy Boulevard
Suite 200
Tampa, Florida  33602

            Attorney for Suren Ajjarapu

DEAN A. KENT, ESQUIRE
Trenam Law
101 East Kennedy Boulevard
Suite 2700
Tampa, Florida  33602

            Attorney for Nexgen Memantine, Inc.

ALSO PRESENT:   Suren Ajjarapu
                Balvant Arora
                Harsh Datta
                Tiffany Hice (Via Telephone)
                Jitendra Jain (Via Telephone)

REGENCY REPORTING SERVICE, INC. (813)224-0224

---

Page 3

| INDEX | PAGE NUMBER |
|---|---|
| Proceedings | 4 |
| Reporter's Certificate | 59 |

REGENCY REPORTING SERVICE, INC. (813)224-0224

---

Page 4

P R O C E E D I N G S

THE COURT: Last time we had a shareholders' meeting and decided to retain Trenam Kemker to investigate potential claims against Mr. Mahendiran. So at the conclusion of the meeting, Dean undertook an investigation. And the purpose of this meeting is to -- for Dean to discuss the results of his report -- of his investigation -- I'm sorry -- and decide what next steps to take.

MR. KENT: I'm going to take over. Okay. Dean Kent, I guess special litigation counsel for Nexgen Memantine, LLC. I was retained way back. I was at the last meeting. I have done a preliminary investigation. I think I've e-mailed and requested documents from any shareholders or in-person meetings, and so I've reviewed information. I haven't really obtained anything from Mr. Mahendiran or his counsel.

In fact, recently this week -- I don't know if you were copied with this, Dave, or anyone else, but he has now engaged local counsel, not just Mr. Sabharwal up in DC, but he's engaged the Gunster law firm as local counsel and essentially taken the position that he's never -- or is not a shareholder and doesn't owe any, you know, fiduciary duties to the company, was not an officer or director, and essentially is not going to

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 5

1 participate in today's meeting.
2     But then I can circle back with some discussions
3 that I actually had with his attorney yesterday in a
4 conference call, but that was a letter dated August 6th
5 that I got certified mail yesterday. But essentially,
6 I think, you know, a lot of communications were going
7 back and forth essentially with Mr. Mahendiran's
8 counsel.
9     We identified, I think, $1.85 million in
10 transfers that were identified in the documents as
11 TRXADE Invest between April 2016 and December of 2016.
12 I asked for follow-up detail and information on that,
13 which was never given. I asked Mr. Mahendiran
14 essentially what they were for, if he could identify
15 any documents relating to such transfers, and what, if
16 anything, Nexgen Memantine, LLC, received as
17 compensation or consideration for the transfers and
18 nothing was provided and nothing is in the books and
19 records and nothing is reflected.
20     So it looks as though it's essentially a
21 one-sided transaction. It's unfortunate that
22 Mr. Mahendiran's counsel isn't here to kind of
23 counterpoint things, but essentially right now it's a
24 very one-sided situation, and that's why we didn't put
25 forth some kind of written findings of fact and
REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 6

1 conclusions of law and summarizing all the documents,
2 because it just looks like there's a giant outflow of
3 money. There's nothing coming back to the entity.
4     So to the extent the entity has been harmed, it
5 has claims against Mr. Mahendiran essentially either
6 for recoupment of those funds, return of the funds, or
7 for either a constructive trust to try to retain -- and
8 again, constructive trust is difficult because you have
9 to be able to specifically identify those funds to
10 attach, but to essentially track those proceeds and
11 whatever assets they went to to try to pull them back
12 into the entity and distribute them appropriately.
13     The idea being, you know, that that was a company
14 asset. Money is a company asset, so every dollar that
15 comes out of the company would be a distribution which
16 should be shared equally amongst the shareholders
17 unless there was some meeting in advance, some approval
18 in advance, or some business reason for those
19 transfers, which we have not received.
20     So that would be my recommendation, or
21 consideration now is to maybe take things to the next
22 step to explore whether Mr. Mahendiran is going to
23 fight this to the extent he's going to force the
24 company to pursue a legal action against him for --
25 under those type of legal theories for a breach of
REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 7

1 fiduciary duty or constructive trust or unjust
2 enrichment or for conversion of its assets. Those are
3 the types of claims that we're talking about right now
4 that I think would be appropriate and make him
5 establish or take a position, because essentially right
6 now he's just saying, "I was not involved." He's not
7 denying he got the money. He's just throwing up his
8 hands and walking away.
9     As part of that -- and that was some of the
10 discussions that I had with his counsel yesterday, his
11 local counsel, Mr. Mather, at Gunster. He realizes
12 that that's the path he's going to take because they
13 haven't been cooperative. They've given us information
14 that we've requested and the documentation that we've
15 requested regarding these transfers and he indicated
16 that he would be willing, if -- to sit down and try to
17 have a forensic accountant go through these transfers
18 on behalf -- on Mr. Mahendiran's side and try to
19 mediate this dispute to try to head it off before it
20 gets to a lawsuit.
21     And again, I told him that that was something I
22 would bring up to the shareholders and have them
23 discuss because I told him that -- you know, all I'm
24 getting right now is "I dare you to sue me," and so my
25 recommendation would be to sue to force some action,
REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 8

1 "and your lack of cooperation is indicating that
2 anything short of litigation is not going to be met
3 with any sort of cooperation."
4     But he expressed an interest in obviously keeping
5 this out of the public record due to the fact that,
6 yeah, once we file a lawsuit, we would file it likely
7 in Florida or federal court, it becomes a news item.
8 There's press releases. So the documentation and
9 information that is filed would be -- even though you
10 can try to protect it, it would be discoverable and
11 information that's always going to be out there and you
12 can't even expunge or delete completely.
13     So that's kind of where we are at. I mean, my
14 recommendation would be, if the shareholders approve of
15 it, is to go back to his counsel and let him know --
16 that's essentially -- what I told him is I was going to
17 circle up and make my presentation to the shareholders.
18 If the shareholders were of the mind and voted
19 appropriately to take the next step, to let him know
20 that we are -- we have authorized legal action against
21 you, whether that's a lawsuit or something short of a
22 lawsuit, and then to -- for him to come back and say
23 does he want to mediate or does he just want to force
24 us to sue. That's kind of where we're at right now.
25     DR. DATTA: I have a question.
REGENCY REPORTING SERVICE, INC. (813)224-0224

Memantine 000025

## Page 9

1  MR. KENT: Sure.
2  DR. DATTA: So the money that was transferred
3  from the Nexgen Memantine account, where did that money
4  go, to which company? Did we figure that one out?
5  MR. KENT: I think it was all directly to Gajan
6  individually. It looked as though it was to him
7  directly.
8  DR. DATTA: Okay. So -- but he's saying that he
9  was not involved in this company?
10  MR. KENT: Yes.
11  DR. DATTA: And yet he's syphoning off money out
12  of some company which he claims he has nothing to do
13  with. So why is he doing that? Is he stealing money?
14  MR. KENT: That's what we think. I mean, I don't
15  know if it's stealing because I don't know to the
16  extent there's other answers or positions that he may
17  take, but you're right. It's not as though there's a
18  normal transaction where you get a hundred thousand
19  dollars, I get a note, here is a million dollars. I
20  get a share of an asset that appreciates in value or
21  something for it.
22  Right now it looks like it's all one-sided.
23  Money was being taken out. Nothing is given back.
24  He's refused to give us any information as to what was
25  given back. And for there to be some sort of, like I

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 10

1  said, a binding -- even an oral agreement, there needs
2  to be a consideration. There needs to be something in
3  return for that money other than him -- it would be
4  just taking the money away.
5  DR. DATTA: So Gajan's claim is that he has not
6  been involved in Nexgen Memantine in any capacity or in
7  some capacity he was involved?
8  MR. KENT: I think -- they weren't abundantly
9  clear on that in the message, but I think it's got to
10  be -- it would be insanity for him to claim he has no
11  knowledge of this whatsoever, was never involved in any
12  way, form, or shape.
13  But I think what he's probably saying is he no
14  longer has an interest, that he is out; as an officer,
15  director, shareholder has no duties to the company,
16  which are borne from the fact that you are an officer,
17  director, shareholder of a company.
18  DR. ARORA: But from which date he claims that he
19  is not a part of Nexgen Memantine?
20  MR. KENT: He never tells us, and that's why I
21  said -- and I asked him. And again, part of the
22  problem is when I bring up those exact questions, they
23  just don't respond. "Oh, I'll go back to my guy and
24  I'll talk to him," or we get nothing.
25  MR. AJJARAPU: That's weird because he signed the

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 11

1  shareholder agreement.
2  DR. ARORA: Yeah, exactly. I mean, we have
3  the --
4  DR. DATTA: Right. The point I was trying to
5  make is that he is saying that "I am not involved" or
6  was not involved, then he's just stealing money from
7  someone else's house.
8  MR. KENT: Right. You can't have it both ways.
9  DR. DATTA: Right. So -- but if he was
10  transferring monies --
11  MS. HICE: I'm sorry.
12  MR. SASLOW: Can you not hear, Tiffany?
13  MR. HICE: I was going to say as soon as we
14  actually take legal action against him, we can file for
15  discovery and get all e-mails and phone calls -- like,
16  number of phone calls, all of that to counter the claim
17  that he is not involved.
18  MR. KENT: Right. And I think it doesn't look
19  well. It doesn't make any sense to say, "I have no
20  involvement with the company." I would love it if
21  companies were sending me $1.2 million over the course
22  of six months. It hasn't happened. I haven't been
23  that lucky yet.
24  MR. AJJARAPU: Another thing I want to add to the
25  shareholders is I am funding the legal case here as a

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 12

1  shareholder, so we've got to find a resolution here.
2  Because if we're going to court with the legal, all the
3  shareholders have to come to an understanding and pay
4  for the legal expenses because so far I have funded as
5  a shareholder and a substantial stake in the company,
6  even though I'm only 12 percent, but I'm trying to get
7  this resolved. I'm pursuing on behalf of all the
8  shareholders. I just want to get it on the record.
9  MR. KENT: No, that's true. That's a fair point.
10  Something to consider is the fact, yeah, I mean, filing
11  a legal claim against him with the attorneys he has
12  involved. Again, these are large firms and they're no
13  rookies. They know what they're doing. They've got a
14  deep bench, but so does our firm, and we're familiar
15  with these types of issues.
16  I am hopeful. I'm not completely optimistic
17  about a chance for a resolution, but it did sound --
18  and I would just say in our conversations that I had
19  with his attorney yesterday, it wasn't the type of
20  conversation that I've had before where it was, "Pound
21  sand. I'm not going to give you anything. Go away."
22  It was more of a "Hey, we need to talk about this."
23  And I think there might be an opportunity to
24  avoid those expenses if we do some sort of very quick
25  -- and he wanted a formal mediator/mediation-type

REGENCY REPORTING SERVICE, INC. (813)224-0224

Memantine 000026

13

1  situation as kind of a precursor to filing a formal
2  lawsuit, which I think in this case might make some
3  sense.
4      MR. AJJARAPU:  Okay.
5      DR. DATTA:  Okay.  Who else is over the phone?
6      MR. KENT:  I think Dr. Jain was going to pop in
7  and out and someone else.
8      MR. SASLOW:  It's just Dr. Jain.
9      MS. HICE:  I want to say on behalf of Dr. Jain,
10 he had expressed that he had reached out to you for
11 legal counsel and asked if you'd represent the
12 shareholders as well and he didn't get a response back.
13     MR. KENT:  Oh, no.  I think I did.  And I think
14 -- I told him -- it was an e-mail, I believe.
15     DR. DATTA:  Yes.
16     MR. KENT:  Essentially, we're representing the
17 company.  We don't have to represent the shareholders.
18     DR. DATTA:  Okay.
19     MR. KENT:  Essentially, it's all the same claim,
20 which is good.  I mean, it would be different if the
21 company refused to investigate and then the
22 shareholders had to do a derivative suit, but we're
23 looking at kind of a direct action here where there's
24 shareholder approval to directly pursue and investigate
25 these claims and the distributions.
REGENCY REPORTING SERVICE, INC. (813)224-0224

14

1      DR. DATTA:  Okay.
2      DR. ARORA:  Now, one of the questions that I
3  have, Suren, so the money -- the money was in the
4  account and he was transferring?  Did I understand that
5  correctly?
6      MR. KENT:  I think so, yeah.  That's what it
7  seems to me, yeah.
8      DR. ARORA:  Was there any oversight or was there
9  any other --
10     MR. SASLOW:  You can't tell that from the
11 documents.  The document does not say -- the document
12 does not say Gajan sent it to Gajan.
13     MR. KENT:  TRXADE Invest.
14     MR. SASLOW:  The bank records say -- well, that
15 was the reference line, TRXADE Investment.  The sender
16 is the company.  There's no indication of who at the
17 company sent it in the documents.  There's no direct
18 evidence that he sent it to them himself.
19     DR. ARORA:  Okay.  But somebody from the company,
20 the one who was opening that company --
21     MR. SASLOW:  Somebody who had signing authority
22 on that account authorized those --
23     DR. ARORA:  Do you know who that authority was?
24     MR. SASLOW:  No, I don't have any --
25     DR. ARORA:  Suren?
REGENCY REPORTING SERVICE, INC. (813)224-0224

15

1      MR. AJJARAPU:  We are investigating that.
2      DR. DATTA:  So that could be found out from the
3  bank?
4      MR. KENT:  Right.  The bank has no dog in the
5  fight.  They'll give that up.
6      MR. SASLOW:  Well, they gave up all the records
7  they have.  I mean, do you think there's more?  Do you
8  think there's something else?
9      MR. AJJARAPU:  The account is fraudulent because
10 the shareholders -- the account is fraudulent and
11 they're not willing to cooperate to give the
12 information, so we've got to approach --
13     MR. KENT:  They're not going to do anything
14 without a formal subpoena and a formal --
15     MR. SASLOW:  They will cooperate.  They gave the
16 records to Suren.  I showed her the --
17     MR. AJJARAPU:  The bank statements, but --
18     MR. KENT:  I don't think they'll give you the
19 underlying authorizations for transfers generally.
20     MR. SASLOW:  You think they will still have that?
21     MR. KENT:  Yeah.  Absolutely.  I mean, which bank
22 was this?
23     MR. AJJARAPU:  SunTrust.
24     MR. KENT:  Oh, absolutely.  Yeah, so SunTrust is
25 now BB&T.  Absolutely.  Or Truist Bank, I think it's
REGENCY REPORTING SERVICE, INC. (813)224-0224

16

1  going to be.
2      MR. AJJARAPU:  Truist Bank?
3      MR. KENT:  Yes.  That's the new bank --
4      DR. DATTA:  Anybody else on the phone other than
5  Dr. Jain?
6      MR. AJJARAPU:  I don't see any other
7  shareholders.  I don't see anybody else.
8      MR. KENT:  I think that might be it.  She said
9  someone might be coming --
10     MS. HICE:  Did we --
11     MR. AJJARAPU:  Dr. Jain.
12     MS. HICE:  In your investigation, I'm sure
13 representing the shareholders and the company, the
14 company bank account where this money was transferred
15 out, did we not already get those bank records?
16     MR. KENT:  The only thing that we could obtain
17 is, yeah, just kind of a bank statement which shows the
18 transfers, but they didn't provide us with kind of,
19 like I said, the underlying authorizations or
20 communications in connection with the purposes or who
21 authorized or signed any of the transfers.
22     So they kind of gave us the, you know, very blank
23 "You can look at the accounts and see monies going out"
24 and it's got the information line saying "TRXADE
25 Invest," but you don't know who authorized or directed
REGENCY REPORTING SERVICE, INC. (813)224-0224

Memantine 000027

### Page 17

1 the transaction.
2     MS. HICE:  Well, they can print out the checks.
3 I know they can only go back -- sometimes they can only
4 go back --
5     MR. SASLOW:  These were wires.
6     MR. KENT:  They were all wire transfers.
7     MS. HICE:  All right.
8     DR. ARORA:  Okay.  And this money was from Nexgen
9 Memantine to TRXADE?
10     MR. KENT:  Yes -- or to Gajan individually.
11     MR. AJJARAPU:  Gajan individually.  And
12 afterwards, where it went --
13     MR. KENT:  We don't know if that -- yeah, I think
14 the target of the funds was generally Mr. Mahendiran
15 individually.  It wasn't even an entity.  It was --
16     DR. DATTA:  Personal account?
17     MR. AJJARAPU:  Investment account.
18     MR. SASLOW:  Those are the only --
19     MR. KENT:  Wire transfers to Mr. Mahendiran.
20     DR. DATTA:  All of that?
21     MR. KENT:  Yes.
22     DR. DATTA:  How much was that total?
23     MR. KENT:  1.185.
24     DR. DATTA:  1.185, okay.  Was that all the money
25 Nexgen Memantine had in its account total?
REGENCY REPORTING SERVICE, INC. (813)224-0224

### Page 18

1     MR. AJJARAPU:  It was like 1.5 million or more
2 than that, so we don't know the exact -- exactly how
3 much monies were in there.
4     MR. KENT:  Yeah, when I looked in the account, it
5 didn't go negative, but it was swept pretty close.
6     DR. DATTA:  Because we gave close to half a
7 million at least.
8     MR. AJJARAPU:  True.
9     DR. DATTA:  So we were given information that the
10 company has a lot more in its accounts.
11     MR. AJJARAPU:  So all the detail has to be found
12 out.  We're asking for when it started and all where it
13 went and stuff.
14     DR. DATTA:  Because if it's 1.5 out 33 percent
15 is, you know, coming from us only alone.  Is it kind of
16 a Ponzi scheme or something?
17     MR. KENT:  So you were -- I didn't know this, but
18 it was represented to you that there was a lot more
19 money in the accounts?
20     DR. DATTA:  Yes.
21     MR. KENT:  Who represented that to you?
22     MR. SASLOW:  I remember that --
23     MR. KENT:  I think, like I said, I know there was
24 more in there.  I haven't verified that.  I was just
25 kind of looking at what -- how the amounts were
REGENCY REPORTING SERVICE, INC. (813)224-0224

### Page 19

1 transferred.  I wasn't looking at the kind of running
2 account, but like I said, I know it didn't go negative.
3 There was still --
4     MR. SASLOW:  And I don't -- what I remember, it
5 wasn't a balance here and slowly went down to zero.
6 There were fluctuations.  There were balances here,
7 deductions.  Cash would come in.  I mean, it was --
8     MS. HICE:  But you guys -- for the amounts to be
9 close to zero for the size of the company and the
10 amount of money, that would be a strong case for a
11 fiduciary breach by the officer in charge.
12     MR. KENT:  No doubt.
13     DR. DATTA:  So what's --
14     MS. HICE:  And even if he's claiming he's not an
15 officer, should we prove that he was an officer, that
16 he was involved, even an investor strongly involved
17 is --
18     MR. SASLOW:  He's a signer on the account.
19     MS. HICE:  If you can pierce the corporate veil
20 and make him personally liable --
21     MR. SASLOW:  He's a signer on the account.
22     MR. KENT:  Yeah, I think there's a lot of legal
23 theories.  There's no doubt about the fact that even if
24 he's not deemed -- I mean, if he avoided putting
25 himself down through circumventing it or putting a
REGENCY REPORTING SERVICE, INC. (813)224-0224

### Page 20

1 phantom company in there even, I think he's still going
2 to have some sort of fiduciary duties to the company
3 based on a position of trust and confidence and
4 representations that were made.  I don't think that's
5 going to get him off the hook for liability on those
6 types of things.
7     MS. HICE:  For him, I'm not sure he's realized as
8 a doctor where fraud is involved, he can be subject to
9 losing his license.
10     DR. ARORA:  Sure.  Exactly, yeah.  Tiffany, you
11 are right, because if it is going to be a fraud, then
12 that is going to be a very big issue.
13     MS. HICE:  Yeah.  He could lose his license.  So
14 if we were to do mediation and kind of stress this is a
15 very big deal, all the shareholders just want their
16 money back -- he has substantial means.  He is a
17 doctor.  He has substantial means.  I don't care if he
18 spent all the money.  Everybody that invested is due
19 back their money and what they were promised.
20     DR. DATTA:  Yes.
21     DR. ARORA:  Yes.
22     MS. HICE:  So he has -- there's a lot of
23 motivation for him to make right the situation that has
24 been made wrong.
25     DR. ARORA:  Yes.
REGENCY REPORTING SERVICE, INC. (813)224-0224

Memantine 000028

## Page 37

recision or fraud or for a claim against the company for the breach of a fiduciary duty, to the extent that exists. I don't think any kind of settlement could extinguish those individual direct injury type of claims to a shareholder.

But I do believe, like I said, the injury to the company as a whole is definitely a claim that would be released. If for instance, we went to a mediation, he says, "I'll give you $800,000." People object. And finally, Suren says, "I'm the majority shareholder. I think that's the best we're going to do. I accept," then you're right. The claims would be resolved as far as a derivative capacity for the individuals to try to bring suit on behalf of the company to recover more than that, but I think they can take action against Suren or individually against whomever for recision based upon their initial investment.

MS. HICE: I think that would be very hard. I have to say I have my juris doctorate degree, but I am -- I didn't take the bar. So I think that would be very hard for the shareholders. It would be a much higher burden for them. And currently all the shareholders have a very good claim to get -- that would reimburse them not only the amount, but the interest that they should've earned and, you know,

## Page 38

punitive damages for this egregious travesty that they have incurred, I mean, on top of their legal -- if they win, they get the legal expenses.

Unfortunately, for Mr. Mahendiran, that would incur the -- he may lose his license because of it. But I mean, he could at this point in time, knowing what he's done and with the company being able to say, "Hey, look, we're shareholders. We have a right to see those accounts," we have already seen that money has gone directly to him, which is not how a corporation is run. Everybody here knows that there's really not -- with a strong claim for fiduciary breach, for conversion, for, you know, all of these things, if he was with great counsel, he would go, "Oh, my God. I think maybe I should make it right." And he should have -- or, you know, between attorney to attorney stressing that you should -- I'm surprised he hasn't offered a settlement already. Without us going to mediation, he could already offer a settlement.

So I think that we give him just verbally another 30 days, "Hey, you know, you're going to have 30 days to offer a settlement, if you want," between counsel to counsel of which, you know, we can then determine, we can come back and have a meeting. But if we don't have any offer for all of the shareholders to vote on, then

## Page 39

I think that, you know, we should go to suing him. I think we should formally sue him.

MR. SASLOW: Okay. So we -- I thought we decided clearly earlier that we were going to do the mediation, do it within 30 days, and now you're saying you don't want to do that. Is that what you're saying, Tiffany? I suspect it's because --

MS. HICE: I think for the shareholders, it's a great risk that they're going to take because they're not a majority --

MR. SASLOW: Okay. So listen, so Dr. Jain can vote against moving forward with mediation, and that's his prerogative. So if he doesn't want to move forward with it, he can abstain and not vote to move forward with it. That's fine.

DR. ARORA: No, no. But I mean, I was actually -- when this discussion started, before that I was coming to the same point. If we are not going to get to know -- and if there is only one person, Suren will decide the compensation amount or rather --

MR. AJJARAPU: Dr. Arora, I'm sorry to interrupt. If I don't want to keep you in the loop, why would I engage the firm Trenam Kemker as an independent firm and keep you guys informed? We're going to keep you informed --

## Page 40

MS. HICE: Because you have to.

MR. AJJARAPU: But at the same time, we're keeping you informed.

MS. HICE: Right.

MR. AJJARAPU: That's the reason. But at the same time as a majority shareholder, I will take the position at the time because I cannot --

MS. HICE: Well, as a majority shareholder, you have to inform the parties.

MR. AJJARAPU: Yeah, we've been keeping you informed on that.

MR. SASLOW: And we have been, Tiffany. We haven't not communicated anything.

DR. DATTA: Tiffany, so you made --

MS. HICE: Right. But I'm saying -- I'm just saying that I think it would be nice if every shareholder got to vote whether or not --

MR. SASLOW: They do get to vote. You do get to vote. You totally get to vote. No one is saying you can't vote.

DR. DATTA: Voting in this case doesn't look like it has any value.

MS. HICE: I'm just saying everybody is happy with the amount --

MR. SASLOW: We're not going to mediate by